**Steven T. Wax, OSB #85012**
**Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, Oregon  97204**
**Tel:   503-326-2123**
**Fax:   503-326-5524**
**steve_wax@fd.org**
**Attorney for Petitioner**

**Patrick J. Ehlers, OSB #04118**
**Assistant Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, Oregon  97204**
**Tel:   503-326-2123**
**Fax:   503-326-5524**
**patrick_ehlers@fd.org**
**Attorney for Petitioner**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ADEL HASSAN HAMAD,** | **CV 05-1009 JDB** |
| **Petitioner,** | |
| **v.** | ***EMERGENCY MOTION AND SUPPORTING MEMORANDUM TO COMPEL EXPEDITED PROCESSING OF SECURITY CLEARANCES TO FACILITATE ATTORNEY-CLIENT ACCESS AND MOTION FOR TELEPHONIC HEARING TO ASSIST IN PROMPT RESOLUTION OF ACCESS ISSUE*** |
| **GEORGE W. BUSH, DONALD RUMSFELD, JAY HOOD, and BRICE GYURISKO,** | |
| **Respondents.** | |

Petitioner Adel Hassan Hamad, through his attorneys of record, Federal Public Defender Steven T. Wax and Assistant Federal Public Defender Patrick J. Ehlers, hereby move the Court for an order requiring Respondent to expedite the processing of security clearances to facilitate attorney-client access.

I.    **Introduction**

The issue presented here is a narrow one:  Should the government be compelled to expedite the processing of security clearance applications so that counsel are not required to wait three months from the time of appointment before being permitted to make initial contact with Mr. Hamad?

This is a logistical issue relating to client visitation.  As such, the instant motions are presented to Magistrate Judge Alan Kay pursuant to Judge Gladys Kessler's order of November 2, 2005, which requires:

> [A]ll disputes pertaining to logistical issues, such as communications with or visits to clients and counsel, shall be referred to Magistrate Judge Kay to facilitate discussion and resolution by the parties as promptly as possible.

*Hamad v. Bush*, No. CV-05-1009 (D. D.C. Nov. 2, 2005).

Based on the arguments set forth in this memorandum, undersigned counsel urge this Court to resolve the issue presented here in favor of Petitioner and require Respondent to expedite the processing of security clearances such that clearances are issued no more than fourteen days following the submission of counsel's applications for clearance.  To the extent that prompt resolution of this matter would be facilitated through discussion by the parties and the Court, undersigned counsel additionally move this Court to hold a telephonic hearing on this motion as soon as possible.

II.    **Respondent Has Been on Notice for More than a Year That Increased Processing of Security Clearances Would Be a Vital Issue in the Representation of Guantanamo Detainees**

Since June 28, 2004, when the Supreme Court of the United States announced the decision in *Rasul v. Bush*, 542 U.S. 446 (2004), Respondent has been on notice that detainees would be entitled to access to the courts of the United States.  Additionally, on

October 20, 2004, in *Al Odah v. United States*, 346 F. Supp.2d 1 (D. D.C. 2004), Judge

Colleen Kollar-Kotelly held that the detainees who have petitioned for habeas relief, like

Mr. Hamad:

> [A]re entitled to be represented by counsel pursuant to the federal habeas
> statute, 28 U.S.C. § 2241, the Criminal Justice Act, 18 U.S.C. § 3006A, and
> the All Writs Act, 28 U.S.C. § 1651.  In light of this finding, the Court
> determined that the Government is not entitled to unilaterally impose
> procedures that abrogate the attorney-client relationship and its concomitant
> attorney-client privilege covering communications between them.

*Al Odah*, 346 F. Supp.2d at 5.  The entitlement to counsel discussed in *Al Odah* was

considered in conjunction with the understanding that counsel for habeas petitioners like

Mr. Hamad would be required to have a security clearance before being permitted to

engage in client visitation.  *Id*. at 14.

An influx of new counsel for the numerous *pro se* petitioners was likewise obvious

to Respondent and was, in fact, anticipated by Respondent.  Indeed, one of the bases for

Respondents' June 3, 2005, *Motion to Stay and for Coordination*, in this case was the

ongoing efforts on the part of the Department of Defense to discuss with "attorney

organization[s] . . . recruiting volunteer counsel for *pro se* petitioners who may desire

representation."  *Motion to Stay and for Coordination* at 6 n.9*., Hamad et al. v. Bush et al.,*

CV-05-1009 (D. D.C. Jun. 3, 2005).  By an order signed on October 5, 2005, and entered

October 14, 2005, Chief Judge Thomas F. Hogan appointed various Federal Public

Defender offices to represent *pro se* petitioners who desired habeas relief from the

conditions of their confinement.

Respondent was, therefore, aware that new counsel would need security clearances

to visit clients at Guantanamo.  Equally clear was the fact that delay in providing such

clearances would only work to impede access to the courts, to which the Supreme Court has held that detainee-petitioners, like Mr. Hamad, are entitled.  Given the likelihood that the new counsel for all of the 50 *pro se* petitioners mentioned in the court's order of October 5 will have the same problem, a new and expedited procedure for gaining access to clients is in order.

**III.    Respondent's Intended Procedure for the Processing of Security Clearances Will Cause Unreasonable Delay, Abrogating the Attorney-Client Relationship**

On November 8, 2005, twenty-five days after the appointment of the Federal Defender offices, Respondents gave notice that they would permit the processing of only four security clearance applications for defense team members assigned to represent individual *pro se* petitioners.[1]  With more than a month having passed since appointment of counsel, on November 8, 2005, Respondents informed counsel for Petitioner that the government anticipate, at least, an additional two-month delay in the granting of security clearances due to a lag in the processing of clearance applications.

If permitted to operate as planned, Respondents will effectively preclude Mr. Hamad from having the assistance of counsel, by three months or more.  Whatever the delay involved in processing the security clearances, the actual delay in getting to visit Mr. Hamad will be even greater given the logistics involved in setting up Guantanamo visits.  Such delay is the type of unilateral imposition of  procedures abrogating the

---

[1]  While counsel have been advised by the Department of Justice that only four security clearances will be permitted for the defense teams assigned to the representation of each detainee, counsel are in the process of negotiating additional clearances for additional defense team members, which are necessary considering the unique and complex nature of this litigation.

attorney-client relationship held intolerable by the Court in *Al Odah*, 346 F. Supp.2d at 10-14.

IV.    **Legal and Ethical Duties Require Counsel to Act Promptly in Client Matters**

It is unreasonable to expect that detainees should be required to wait several months before receiving their initial meeting with their attorneys, or even to find out that their attorneys exist. As examined below, it is well-settled that inmate access to courts, including access to counsel, must be adequate, effective, and meaningful and that the government may not impose unilateral and unreasonable barriers to that access. Further, the standards of professional conduct reenforce counsel's obligation to contact clients.

A.    **Established Federal Law Prohibits Government Interference With the Right to Counsel.**

The Supreme Court has unequivocally held: "Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez*, 416 U.S.396, 419 (1974), *overruled in part on other grounds, Thornburg v. Abbott*, 490 U.S. 401(1989); *see also Ex Parte Hull*, 312 U.S. 546, 549 (1941) (the "state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus"). In what may be the seminal case on the subject, the Court held in *Bounds v. Smith*, 430 U.S. 817 (1977) that the states must "shoulder affirmative obligations to assure all prisoners meaningful access to the courts" and may not "effectively foreclose access." *Bounds*, 430 U.S. at 822, 824.

Precluding an individual from being heard without the assistance of counsel works to deprive that individual of due process:

> If in any case, civil of criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense.

*Powell v. Alabama*, 287 U.S. 45, 69 (1932). Likewise, an unreasonable delaying in the processing of security clearance applications prevents Mr. Hamad from the assistance of counsel and deprives him of Due Process.

These cases found, and were based upon, a constitutional right of access to the courts, whereas the Supreme Court's holding in *Rasul* was that the Guantanamo detainees have a statutory right of access under 28 U.S.C. § 2241. *Rasul*, 124 S. Ct. at 2692-98. Under either a statutory or Constitutional analysis, the government cannot interfere with a right once the right is established. In *Al Odah*, the government argued that the Guantanamo detainees do not have right to communicate privately with attorneys because their right to counsel is statutory, not constitutional, and, therefore, that the Guantanamo detainees were not on a par with criminal defendants or criminal prisoners. The *Al Odah* Court held that once the right of access to courts was established, regardless of its source, the right cannot be abridged. As the Court specifically stated:

> [T]he case law indicates that where a client has been afforded the right to meaningful access to the courts, this right cannot be abridged, and that the ability to communicate in private with counsel is a crucial part of that meaningful access. [citations omitted] In the instant case, Petitioners have been afforded access to the courts, which must be necessarily be meaningful, and this meaningful access includes the opportunity to consul with counsel in private.

*Al Odah*, 346 F. Supp.2d at 11 n.12. *Cf. United States v. Bergeson* (rejecting government's assertion of distinction between retained and assigned counsel in right to meaningful relationship with counsel).

**B.    Under Applicable Professional Rules and Standards, Counsel Must be in Immediate Contact With Clients as a Part of Adequate Representation.    The Requirement of Meaningful Access to Courts Also Requires That Access Between Counsel And Clients Not Be subject To Unreasonable Delays.**

Professional standards anticipate that an attorney will "act with reasonable diligence and promptness in representing a client."  ABA Model Rule 1.3.  The drafters of this Rule noted:

> A client's interests often can be adversely affected by the passage of time or the change of conditions.  . . .  Even when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness.

ABA Model Rule 1.4(a) also requires an attorney to keep a client "reasonably informed about the status of a matter," and Code Rule 4.5 of the American Trial Lawyers Association requires that an attorney "shall keep a client currently apprised of all significant developments in the matter entrusted to the lawyer by the client."  ABA Model Rule 3.2 additionally anticipates that an attorney will "make reasonable efforts to expedite litigation consistent with the interests of the client," while at the same time Model Rule 1.4(a)(2) requires that an attorney "reasonably consult with the client about the means by which the client's objectives are to be accomplished."   The Commentary to ABA Rule 1.4 also provides:

> Reasonable communication between the lawyer and the client is necessary for the client effectively to participate in the representation . . . paragraph (a)(3) requires the lawyer to keep the client reasonably informed about the status of the matter, such as significant developments affecting the timing or the substance of the representation.

Comment., ABA Model Rule 1.4.  These rules impose a requirement on the lawyer which is hardly arguable - once an attorney undertakes to represent a client, the attorney is

obliged to act promptly, to communicate with the client about the status of the matter, to expedite the subject of the representation in reasonable fashion, and to consult with the client about significant decisions that affect the client's interests.   None of these requirements can be met given the timetable and procedures established by the Respondents in this case.

There is no case law that allows delays of months at a time before counsel can meet with a client. The caselaw anticipates that far shorter delays are allowed for the right of access to be meaningful.  *Cf., Campbell v. Miller*, 787 F.2d 217, 226-227 (7th Cir. 1986) (24-hour notice requirement for counsel to visit client does not deprive client of meaningful access when attorneys could visit four days per week, especially when exceptions were sometimes made); *Johnson v. Brelje*, 701 F.2d 1201, 1207-1208 (7th Cir. 1983) (limit of two telephones calls per week for inmates, including both social and legal calls, denied meaningful access to attorneys); *Benjamin v. Fraser*, 264 F.3d 175, 187 (2d Cir. 2001) (delays which sometimes caused attorneys to have to wait several hours after arriving at local holding facilities deprived defendants of meaningful access to counsel); *Nunez v. Bolden*, 537 F. Supp. 578, 582 (S.D. TX. 1982) (given remoteness of facility, prohibiting attorney visits after 3:30 p.m. was unduly restrictive).

Mr. Hamad drafted his *pro se* petition eight months ago.  The petition was filed in this Court five months ago, on May 18, 2005.  His case has since been stayed on motion of the Respondents without any reasonable opportunity for Mr. Hamad to oppose that stay, or even to have court processes explained to him by assigned counsel.  He has been appointed attorneys who are charged with acting in Mr. Hamad's interests, but who are unable to make any contact with him in any meaningful or prompt fashion, which precludes

counsel from being able to learn even the most basic details about his health, condition,

or status.  To worsen the situation, not only are counsel being denied access to their client,

the government refuses to provide answers to even the most basic questions about the

Petitioner.  *See, infra.* discussion regarding refusal of Respondents' to disclose to counsel

about Petitioner without prior issuance of a security clearance.

**V.    Untimely Processing of Security Clearance Applications Has Substantially Impaired Efforts by Counsel to Act Promptly in Undertaking the Representation of Petitioner**

Since being appointed to the representation of Mr. Hamad on October 14, 2005,

counsel have worked to become familiar with the litigation on behalf of the Guantanamo

detainees by participating in training sessions and conference calls sponsored by the

Center for Constitutional Rights.  In the three weeks since appointment, undersigned

counsel have searched in vain for any information regarding Petitioner.  To date,

undersigned counsel know nothing more than Petitioner's name and are not even aware

at this point of Petitioner's country of origin.[2]

Realizing there was virtually no information about Mr. Hamad available, and in light

of the well publicized abuses of Guantanamo detainees and the deteriorating conditions

at Guantanamo, counsel sent an urgent letter on November 7, 2005, by telefacsimile and

e-mail, to Mr. Terry Henry, counsel for the Respondents, requesting the following

information about Mr. Hamad:

1.    His current medical condition;

2.    Whether he is currently engaged in hunger strike activities;

---

[2]  The Order appointing the Federal Public Defender to represent Mr. Hamad, signed on October 5, 2005, by the Honorable Thomas F. Hogan, Chief Judge, and entered on October 14, 2005, indicates "unknown" with regard to Mr. Hamad's nationality.

**EMERGENCY MOTION TO COMPEL EXPEDITED PROCESSING OF SECURITY CLEARANCES AND MOTION FOR TELEPHONIC HEARING**

3.      Whether, while detained at Guantanamo, he has made any suicide attempts, the dates of such attempts, and any injuries stemming therefrom;

4.      Whether he has sustained any injuries while detained, and, if so, what injuries did he sustain and what medical treatment was administered to him;

5.      His current mental health status?

6.      Whether he has received any mental health care, and, if so, when did he receive such care and what was the outcome of his receiving such care;

7.      Is he currently being interrogated;

8.      Has he been advised of the appointment of counsel in this case;

9.      What language does he speak;

10.     Has he formally been declared an enemy combatant by a Combatant Status Review Tribunal, and, if so, when was that determination made, and has it been affirmed by the Administrative Review Board;

11.     Has anyone, including family members of Mr. Hamad, been in contact with the government, or come to the government's attention, seeking information about his whereabouts or condition?  If so, please provide all contact information in the possession of the government at this time.

*See* Attachment A (Letter from Steven T. Wax to Terry Henry).  On November 8, 2005,

counsel sent another letter to Mr. Henry requesting the unclassified portions of the

Combatant Status Review Tribunals, if any, related to Mr. Hamad.  *See* Attachment B.

(Letter from Steven T. Wax to Terry Henry).  Having no information to review regarding

Mr. Hamad's case, counsel were left without even the most basic tools with which to

undertake the representation.  Citing concerns regarding the deteriorating conditions at

Guantanamo and the length of time Mr. Hamad has languished in custody, uncharged and

without representation, it was urged that Mr. Henry, on behalf of the Department of Justice, move as expeditiously as possible to provide the information requested.

On November 14, 2005, Mr. Andrew I. Warden responded on the requests for information sent to Mr. Henry. *See* Attachment C. (Letter from Andrew I. Warden to Steven T. Wax). The response provided no information about Mr. Hamad and referred counsel to the procedure for direct contact with Mr. Hamad as outlined in the protective orders that have been filed in all Guantanamo litigation.

The refusal to disclose information leaves counsel with no way to assess Mr. Hamad's condition and to provide him with the professional counsel and advice to which he is entitled without direct contact. Further, in-person communication is the only manner by which counsel can initiate any meaningful communication that will move the representation forward.

Given that some interrogators have posed as lawyers in their efforts to extract information from detainees, counsel cannot reasonably expect that merely sending a letter to Petitioner would be an effective and reliable means of gaining trust and building rapport with Mr. Hamad. Counsel would have no way to ensure that the letter got to Mr. Hamad or that Mr. Hamad has not been sent similar letters from interrogators seeking information from him. *See* Attachment D (Affidavit of Clive Stafford Smith).

**VI.    The Assessment of Trust Required for the Issuance of a Security Clearance is Facilitated by the Positions Held by Counsel as Federal Public Defenders and the Cooperation Counsel Have Been Willing to Provide**

Steven T. Wax has been the Federal Public Defender for the District of Oregon for more than two decades and has been engaged in the practice of law for longer than that. Mr. Wax is admitted to the bars of Oregon and New York. In the course of his practice,

Mr. Wax has submitted to numerous background checks and has been permitted admission to numerous high security facilities, including the Intensive Management Unit at the Oregon State Penitentiary, housing Oregon's death row. When he was appointed Federal Public Defender for the District of Oregon, he was subjected to a full field FBI background investigation.

Patrick J. Ehlers has been an Assistant Federal Public Defender for over seven years in the District of Oregon and the Western District of Oklahoma. Mr. Ehlers has been engaged in the practice of law for over eleven years. Mr. Ehlers is admitted to the bars of Oregon and Oklahoma. In the course of his practice, Mr. Ehlers has submitted to numerous background checks and has been permitted admission to numerous high security facilities, including the Intensive Management Unit at the Oregon State Penitentiary, housing Oregon's death row, as well as H-Unit at the Oklahoma State Penitentiary, housing Oklahoma's death row.

Both Mr. Wax and Mr. Ehlers have filed federal and state tax returns for every year for which they have been employed. Mr. Wax and Mr. Ehlers have never received any form of disciplinary sanction from any of the bars to which they are admitted.

In acknowledgment of the national security issues surrounding the litigation at issue, both attorneys have signed and filed a *Memorandum of Understanding* agreeing to abide by the protective orders that have been issued regarding the representation of Guantanamo detainees. Counsel have likewise filed a motion to enter into the instant case all previously issued protective orders relevant to the Guantanamo habeas litigation.

Finally, in an effort to expedite the processing of the security clearances that are a pre-requisite for initial and future meetings with Mr. Hamad, counsel have expeditiously

provided information regarding themselves and their backgrounds so that Respondents can more quickly issue security clearances.

On November 17, 2005, Mr. Wax sent fully completed applications for security clearances to Ms. Jennifer Campbell as direct by Respondent.  These applications included fingerprint cards, completed and signed security clearance questionnaires (SF-86), and signed releases for tax return, and credit report information.  Additionally, in a cover letter sent with the applications, Mr. Wax volunteered that counsel would submit to immediate personal interviews with any local designate of Respondent charged with conducting background checks related to the security clearance application process.  *See* Attachment E.

## VII.    **The Right Of Meaningful Access Requires The Respondents To Expend Reasonable Resources To Provide That Access.**

The situation established by all of the above is that (1) months have passed since Mr. Hamad filed his letter/petition; (2) during that time, the Respondents should have anticipated, and in fact did anticipate, the influx of new counsel and the need for additional processing of security clearances; (3) weeks continue to pass when Mr. Hamad is unable to access his counsel, and when counsel is unable to find out even basic details about Mr. Hamad's condition or his case, or undertake even the beginnings of the representation; (4) the Respondents, according to available information, anticipate further delays of several months for security clearances to be processed; and (5) Mr. Hamad's counsel have expressed every interest and desire to assist in expediting that process.  Counsel now asks the court to order the Respondents to expedite the process of providing clearances.

Inherent in the government's obligation to provide meaningful access to courts is the government's obligation to expend reasonable resources to provide that access. That is the very point of *Bounds'* pronouncement that the government must "shoulder affirmative obligations to assure all prisoners meaningful access to the courts." *Bounds*, 430 U.S. at 822.

Cases are illustrative of the resources that states and/or custodians of prisoners are required to expend. In *Bounds* the Court stated:

> This is not to say that economic factors may not be considered, however, in choosing the methods to provide meaningful access. But the cost of protecting a constitutional right cannot justify its total denial. Thus, neither the unavailability of jailhouse lawyers nor the necessity for affirmative state action is dispositive of [the claims of lack of access].

*Bounds*, 430 U.S. at 325. Here the resources to be expended by the Respondents are not unreasonable. Mr. Hamad asks the court to direct that sufficient resources be expended to expedite the security clearance process for his attorneys so that they may begin the process of representing him.

## CONCLUSION

Assessing the trustworthiness of undersigned counsel is not a task that should take two months. This is especially true in light of the willingness counsel have evidenced to cooperate with the security clearance application process.

For the reasons stated above, counsel for Petitioner respectfully urge this Court to order Respondent to expedite the application process. Specifically, counsel suggest a required processing period of no longer than two weeks from the time counsel submit completed security clearance applications to the time a decision is made regarding issuance of an interim security clearance.

Should the Court require further discussion of the parties to work through the logistical issues raised by the instant motion before issuing a ruling, counsel then move this Court to set a telephonic hearing regarding the subject of this motion as soon as is reasonably possible.

Respectfully submitted November 18, 2005.

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Patrick J. Ehlers
Patrick J. Ehlers
Assistant Federal Public Defender

# ATTACHMENT A

# FEDERAL PUBLIC DEFENDER
## DISTRICT OF OREGON

**STEVEN T. WAX**
  Federal Public Defender
**STEPHEN R. SADY**
  Chief Deputy Defender
Steven Jacobson
Bryan E. Lessley*
Nancy Bergeson
Christopher J. Schatz
Ellen C. Pitcher
Craig Weinerman*
Mark Bennett Weintraub*
Gerald M. Needham
Christine Stebbins Dahl
Thomas J. Hester
Ruben L. Iñiguez

**101 SW Main Street, Suite 1700**
**Portland OR 97204**
**503-326-2123 / Fax 503-326-5524**

Branch Offices:

151 W. 7th, Suite 510
Eugene, OR 97401
541-465-6937
Fax 541-465-6975

15 Newtown Street
Medford, OR 97501
541-776-3630
Fax 541-776-3624

Barbara L. Creel
Anthony D. Bornstein
Donnal S. Mixon+
Lisa Hay
Tonia L. Moro+
Susan Russell
Patrick Ehlers
Francesca Freccero
C. Renée Manes
Amy Baggio
Matthew M. Rubenstein
Caroline Davidson

* Eugene Office
+ Medford Office

**Via FedEx**

November 7, 2005

Terry M. Henry
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W. Room 7144
Washington, D.C. 20530

     Re:   *Adel Hassan Hamad v. George W. Bush, et al.*
          Case No. 05-1009 JDB

Dear Mr. Henry:

    We are writing to you as the attorneys of record for Mr. Hamad in the above-referenced litigation. We have been appointed by Order of the Court, as entered by Chief Judge Thomas F. Hogan on October 14, 2005. Our Notice of Appearance was filed on November 2, 2005. We have also executed the Memorandum Of Understanding Regarding Access To Classified National Security Information, and that document has been forwarded to the Court Security Officer for review and filing.

    Recent reports in the media and from other sources strongly suggest that conditions in the detention facilities located at the U.S. Navel Base in Guantanamo Bay, Cuba, have severely deteriorated such that the welfare and current medical well-being of many of the detainees is presently at risk. In light of this information, it is our professional and legal responsibility, as counsel for Mr. Hamad, to take action to assess his medical condition and provide him with such assistance as he may need in the litigation in which he is currently engaged. In order for us to perform our function and provide Mr. Hamad with assistance of counsel, we need you to provide us with information that addresses the following inquiries:

    1.    What is Mr. Hamad's current medical condition?

    2.    Is Mr. Hamad currently engaged in hunger strike activities?

    3.    While detained at GTMO, has Mr. Hamad made any suicide attempts or (as characterized by the government) manipulative acts of self-mutilation, and, if so, on what date(s) did the suicide attempt(s) and/or

November 7, 2005
Page 2

referenced acts occur, and what injury(ies) did Mr. Chaman sustain as a result thereof?

4.    Has Mr. Hamad sustained any injuries while detained, and, if so, what injury(ies) did he sustain and what medical treatment was administered to him?

5.    What is Mr. Hamad's current mental health status?

6.    Has Mr. Hamad received any mental health care, and, if so, when did he receive such care and what was the outcome of his receiving such care?

7.    Is Mr. Hamad currently being interrogated?

8.    Has Mr. Hamad been advised of my appointment as his attorney in the above-referenced litigation?

9.    What language does Mr. Hamad speak?

10.   Has Mr. Hamad formally been declared an enemy combatant by a Combatant Status Review Tribunal, and, if so, when was that determination made, and has it been affirmed by the Administrative Review Board?

11.   Has anyone, including family members of Mr. Hamad, been in contact with the government, or come to the government's attention, seeking information about his whereabouts or condition? If so, please provide all contact information in the possession of the government at this time.

Based on available information pertaining to the crisis situation at GTMO, we believe it is essential to our performance as counsel that we receive information about Mr. Hamad from you in response to the inquiries set forth above no later than Monday, November 14, 2005. If you would like to discuss Mr. Hamad's situation and our request for information with us personally, please call us at your first convenient opportunity.

Sincerely,

Steven T. Wax
Federal Public Defender

Patrick J. Ehlers
Assistant Federal Public Defender

STW:sls

# ATTACHMENT B

STEVEN T. WAX
    Federal Public Defender
STEPHEN R. SADY
    Chief Deputy Defender
Steven Jacobson
Bryan E. Lessley*
Nancy Bergeson
Christopher J. Schatz
Ellen C. Pitcher
Craig Weinerman*
Mark Bennett Weintraub*
Gerald M. Needham
Christine Stebbins Dahl
Thomas J. Hester
Ruben L. Iñiguez

# FEDERAL PUBLIC DEFENDER
## DISTRICT OF OREGON

**101 SW Main Street, Suite 1700**
**Portland OR 97204**
**503-326-2123 / Fax 503-326-5524**

Barbara L. Creel
Anthony D. Bornstein
Donnal S. Mixon+
Lisa Hay
Tonia L. Moro+
Susan Russell
Patrick Ehlers
Francesca Freccero
C. Renée Manes
Amy Baggio
Matthew M. Rubenstein
Caroline Davidson

* Eugene Office
+ Medford Office

Branch Offices:
151 W. 7th, Suite 510         15 Newtown Street
Eugene, OR 97401             Medford, OR 97501
541-465-6937                  541-776-3630
Fax 541-465-6975             Fax 541-776-3624

November 8, 2005

Terry Henry
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W. Room 7144
Washington, D.C. 20530

> Re:    *Adel Hassan Hamad v. George W. Bush, et al.*
>         Case No. 05-1009 JDB
>
>        *Ali Hussain Mohammad Muety Shaaban v. George W. Bush*
>         Case No. CV 05-00892 CKK

Dear Mr. Henry:

As reflected in our previous correspondence, the Federal Defender for the District of Oregon has been assigned to represent three Guantánamo detainees, Messrs. Shaaban and Hamad, whose cases are referenced above, and Mr. Chaman under case no. 05-CV-00887. As the head of the office, I have reviewed the material that was available on the district court's Pacer system in all three cases. In addition, I have reviewed material that is publicly available in a number of the other habeas corpus petitions that are currently in progress.

I have noted a significant difference in the material that has been made available to counsel for the petitioners, both in the cases that this office is handling and in other cases. The records reflect that the government has provided the Court and counsel with returns in a fair number of the habeas corpus cases, but not all. The records further reflect that the government has made available to the Court and counsel the unclassified portions of the Combatant Status Review Tribunals.

For this office to adequately represent our clients, the review tribunal records, even those portions that have been declassified, are essential. I therefore request that you provide to the attorneys in this office all the information that is declassified, or can be declassified promptly, in the *Shabaan* and *Hamad* cases.

November 8, 2005
Page 2

Given the fact that such records have been released in numerous cases, we are hopeful that you will agree that they can be released without in any manner compromising the government's interests. While the release of those records in some of the cases may have been prompted by a court order, we are hopeful that the obvious need for this material will lead you to provide this material without the need for intervention by the Court. As we have reviewed the record of pleadings filed in other cases, we find appropriate statements from the government regarding efforts that were being undertaken earlier on to locate pro bono counsel. It should be beyond dispute that, having recognized the importance of counsel in these cases, the government similarly recognizes that counsel must have the basic tools that are needed in order to undertake representation.

Given the length of time that our clients have been in Guantánamo, and the reports that we continue to read about the difficulties that some of those clients are facing, we believe it is incumbent upon us as counsel to move as expeditiously as possible to represent our clients. We hope you will agree that provision of the material requested herein is appropriate and that you will honor this request at your earliest convenience.

I look forward to your reply.

Sincerely,

Steven T. Wax
Federal Public Defender

STW/sls
cc:    Stephen R. Sady
       Patrick Ehlers
       Christine Dahl
O:\GTMO\Clients\Adel Hassan Hamad\corres\henry.02

# ATTACHMENT C



**U.S. Department of Justice**
Civil Division
Federal Programs Branch
20 Massachusetts Ave., NW
Washington, D.C. 20530

---

Andrew Warden
Trial Attorney

Tel:   (202) 616-5084
Fax:   (202) 616-8470
Email: andrew.warden@usdoj.gov

November 14, 2005

<u>VIA E-Mail</u> – (Steve_Wax@fd.org)

Steven T. Wax
Federal Public Defender
Federal Public Defender, District of Oregon
101 SW Main Street, Suite 1700
Portland, OR 97204

   Re: <u>Chaman v. Bush</u>, Civ. A. No. 05-887 (RWR)
     <u>Shaaban v. Bush</u>, Civ. A. No. 05-892 (CKK)
     <u>Hamad v. Bush</u>, Civ. A. No. 05-1009 (JDB)

Dear Mr. Wax:

   I am writing in response to the three letters we received from your office dated November 7, 2005, which request information and informal discovery about petitioners in the above-referenced cases.

   We cannot agree to your requests for information regarding petitioners' medical condition or their alleged participation in a hunger strike. As we have explained in public filings, however, personnel at Guantanamo provide quality medical care, including mental health care, to all detainees. The detention center hospital is an 18-bed facility with a medical staff of seventy consisting of highly trained doctors, nurses, technicians, and administrative personnel. <u>See</u> Declaration of Dr. John S. Edmondson ¶ 3, originally submitted in <u>O.K. v. Bush</u>, 04-CV-01136-JDB, April 11, 2005 (attached). Detainees receive a comprehensive physical exam on their arrival and can request medical assistance at any time by telling a guard or medical personnel who make rounds to the cellblocks every other day. <u>Id.</u> ¶ 5. From January 2004 to November 2004, the hospital staff conducted over 17,000 outpatient visits and has treated the detainees for a wide variety of medical conditions including hepatitis, diabetes, and tuberculosis. <u>Id.</u> ¶¶ 5, 7. The staff has also provided prosthetic limbs to some detainees and performed surgical procedures such as removing an appendix and coronary artery stent placement. <u>Id.</u> ¶ 9. In addition, a 21-member Behavioral Health Service (BHS) Staff supports the hospital. The BHS staff includes a Board Certified Psychiatrist and a Ph.D. Psychologist. The remainder of the staff includes psychiatric nurses and psychiatric technicians. The BHS staff provides long-term supportive care and short-term behavioral modification therapy as well as psychotropic medication therapy for acute management of self-injurious behaviors and intense mood swings

associated with dangerousness to others. They also manage major mental disorders and maladaptive behaviors associated with personality disorders.

Further, medial personnel are actively involved in monitoring the health status of any detainee who is fasting or participating in a hunger strike. Security personnel monitor each detainee's daily intake of meals and water. If it is determined that a detainee has missed all meals over three days or has declined food and water for more than two days, medical personnel conduct a medical evaluation of the detainee and then monitor him on a regular basis. If there is reason to believe that the fast or hunger strike could endanger the detainee's health or life, he is admitted to the detention hospital for continued monitoring and counseling regarding the risks associated with not eating. Involuntary medical treatment, such as IV hydration, is administered if the detainee reaches a point where continued fasting would seriously threaten the detainee's life or health. See attached Declarations of Gen. Jay Hood (originally filed in, inter alia, El Banna v. Bush, 04-CV-1144-RWR; Sept. 9, 2005) and Dr. John Edmondson (originally filed in, inter alia, Al Joudi v. Bush, 04-CV-301-GK; Oct. 19, 2005).

Regarding your inquiry concerning interrogations, we are not in a position to provide you with information regarding the content or timing of future interrogations of any Guantanamo Bay detainee. Counsel and officials connected with the habeas cases do not control or attempt to influence the military's ongoing intelligence gathering and law enforcement missions with respect to Guantanamo Bay detainees.

With respect to your remaining inquiries about petitioners and their families, we need additional time to confer with our clients regarding the languages petitioners speak. We are not opposed to providing you with this information and we will attempt to get the information to you soon. The issue of your appointment as counsel and information regarding petitioners' families may be addressed by you with petitioners directly. As you may know, the protective order governing the Guantanamo habeas litigation provides procedures for counsel and detainees to engage in privileged mail communications. You should have received an e-mail regarding the steps that must be taken before privileged communications pursuant the protective order can begin. If you did not receive this e-mail, please let me know, and I'll send you another copy.

Sincerely,

Andrew I. Warden

Attachments (Hood Declaration & Edmondson Declarations)

# ATTACHMENT D

LONDON, ENGLAND

## DECLARATION OF CLIVE A. STAFFORD SMITH

COMES NOW, CLIVE A. STAFFORD SMITH, being sworn, and hereby states as follows:

1. I am a member of the bars of Georgia, Louisiana and Mississippi, as well as of the United States Supreme Court and various lower federal courts.

2. I make this declaration concerning the plight of the prisoners in Guantanamo Bay, and the problems that they face in obtaining meaningful access to courts.

3. Everything I write in this affidavit is unclassified or not subject to the classification procedure.

4. Respondents in these cases have recently filed to dismiss the habeas cases brought by various prisoners by next friends. *Respondents' Motion for Order to show Cause why Case should not be Dismissed for Lack of Proper 'Next Friend' Standing or, in the Alternative, to stay proceedings pending related Appeals and for Continued Coordination* (hereafter *'Respondent's Motion'*).

5. The next friends who are challenged are identified as Omar Deghayes, Jamal Kiyemba, Shaker Aamer, Bisher al Rawi, Usama abu Kabir, former detainee Moazzam Begg, all of whom are my clients. The only one who is not is the "one unnamed detainee." *Respondents' Motion, at 4.*

6. The list of cases are as follows:

| Number | Petitioner | Next Friend Petitioner |
|---|---|---|
| 05-CV-1458(ESH) | Ahmed Doe | Omar Deghayes |
| 05-CV-1497(RCL) | Adil bin Muhammed al Wirghi | Moazzam Begg |
| 05-CV-1504(RMC) | Nabil | Jamal Kiyemba |
| 05-CV-1505(RMC) | Abbar Sufian al Hawary | Shaker Aamer |
| 05-CV-1506(RMC) | Shafiq | Jamal Kiyemba |
| 05-CV-1601(GK) | Hamid al Razak | Bisher al Rawi |
| 05-CV-1635(PLF) | Mohammed Akhtiar | 'Unnamed Detainee' |
| 05-CV-1704(JR) | Sadar Doe | Usama Abu Kabir |

7. Respondents' position is difficult to accept for a number of reasons.

### Guantanamo Bay: The Background

1

8.      I first became involved in the representation (or attempted representation) of the prisoners in Guantanamo Bay in early 2002, because I believed strongly that this nation fails in its most profound promise when it holds prisoners beyond the rule of law.

9.      The prisoners are cut off from the world to an extraordinary degree. The isolation of the prisoners has been a cause of huge concern for families of missing persons across the world, as not everyone there is able to send or receive mail. Some family members do not know today – more than three years later – that their loved ones are in Guantanamo Bay. Indeed, one of my clients, who was apparently just fourteen at the time that he was seized in Pakistan, has never received any letter from his family in Saudi Arabia and still does not know whether his family know that he is alive.

10.     The fact that family members do not know who is truly in Guantanamo Bay is entirely the fault of Respondents. Like most of the problems faced by all parties to this process, this could be solved by the simple expedient of publishing the names and 'Internment Serial Numbers' (ISN's) of all prisoners. This, Respondents have steadfastly refused to do.

### The Extremely Difficult Challenge of Providing Prisoners with a Channel for their Legal Rights

11.     After initially bringing litigation on behalf of two British nationals and one Australian, the small group of lawyers involved in this litigation were joined by the twelve Kuwaitis, whose families got together to hire Shearman & Sterling. From the beginning, the U.S. military frustrated every effort to let the prisoners know their rights. For example, we asked the U.S. military to consent to merely informing the clients that they were represented in court, but Respondents refused even this meager measure. I learned from one of my British clients upon his release that they did not learn that they were represented for many months.

12.     Our small group of lawyers was just that – very small. Our resources were very limited. For example, I was working full time as director of a capital trial office, with a full docket of capital cases.

### Because the Military Would Not Even Reveal the Names of Those Being Held in Guantanamo, Trying to Identify the Prisoners Who Wanted Legal Assistance Was a Monumental Task

13.     The U.S. Military has thrown roadblocks in the way all along. To begin with, the government would not allow any lawyers to represent anyone. Thus, we had to begin by filing suit in the *Rasul* case, on February 19, 2002. It took almost two and a half years before the Supreme Court recognized the legal rights of the prisoners on June 28, 2004.

14.     The first problem in bringing any kind of systematic challenge to the lack of access to courts in Guantanamo Bay was that the U.S. military kept the identities of the

prisoners secret, so we had to work out who was there. To this day, the military has never made known the names of the prisoners on Guantanamo Bay.

15.     In coordination with various other people, I have conducted a project over more than three years merely to identify the names of the prisoners in Guantanamo. This was like completing a very complicated jigsaw. There have been over 750 prisoners from roughly 50 countries, who speak many languages. The only way that their names would come to light was if the home country published a list of their prisoners (provided presumably to the home government by the U.S.), or if the names would leak into the press from the families of the prisoners.

16.     Only a small minority of the prisoners (fewer than one percent, all now released) were nationals of European countries. More than 99% were from other countries scattered around the world.

17.     Most of these names came out in Arabic media, which made the work of identifying them that much harder. Often the name was misspelled in the Arabic newspaper to begin with, and then transliterated into English in a number of different ways. Thus, the task of sorting out the names of the prisoners was very difficult. Also, many foreign media outlets are not available on the internet.

18.     Even today, more than three years after we began, it has been impossible to get an accurate number even of the nationalities of the prisoners, let alone their names. As of August 31, 2005, the following table provides our best estimate of the numbers of prisoners who were from each country:

| Country | Approx. Number of Prisoners |
|---|---|
| Afghanistan | 88 |
| Algeria | 29 |
| Australia | 2 |
| Azerbaijan | 1 |
| Bahrain | 6 |
| Bangladesh | 2 |
| Belgium | 3 |
| Bosnia | 8 |
| Britain | 9 |
| Canada | 2 |
| Chad | 2 |
| Chechnya | 2 |
| Denmark | 1 |

| | |
|---|---|
| Egypt | 16 |
| Ethiopia | 1 |
| France | 12 |
| Georgia | 2 |
| Germany | 1 |
| Iran | 2 |
| Iraq | 2 |
| Jordan | 10 |
| Kazakhstan | - |
| Kenya | 1 |
| Kuwait | 12 |
| Libya | 19 |
| Maldives | 1 |
| Mauritania | 3 |
| Morocco | 34 |
| Pakistan | 65 |
| Palestine | 5 |
| Qatar | 2 |
| Russia | 9 |
| Saudi Arabia | 170 |
| Somalia | 1 |
| Spain | 1 |
| Sudan | 15 |
| Sweden | 1 |
| Syria | 10 |
| Tajikistan | 4 |
| Tunisia | 17 |
| Turkestan | 26 |
| Turkey | 17 |
| Uganda | 1 |
| Uzbekistan | 7 |
| Yemen | 147 |

19.    I would not pretend that these estimates are accurate. For example, I believe the total number of Yemenis is lower than 147, and the Saudi figure is lower than 170. The higher number is a result of various factors. First, when the media in the prisoners' home country published a list of Guantanamo prisoners, this would often include the names of other missing persons who had not actually been confirmed as being held in Guantanamo. Second, because the prisoners may use different names or nicknames, they might be duplicated. Third, there has been confusion over the prisoners' true nationality, particularly in Saudi Arabia where there are many foreign nationals who have lived there all their lives but do not technically hold Saudi nationality.

20.    At the same time, the list probably underestimates the numbers of other prisoners who have been held there. For example, I believe there should be at least 22 more Afghanis, given that the U.S. has recently announced that it plans to repatriate 110 Afghanis.

21.    There is a simple solution to our dilemma, if only Respondents would provide us with a complete list of detainees. This would allow us to build an accurate list of those who need legal services. However, Respondents have refused to take this basic step. It is very difficult to see how, three years into the Guantanamo Bay experiment, there can be any valid security concern in ensuring that we are all operating off an accurate list. Indeed, I could even help sort out the confusion if I was allowed to review a classified list.

22.    Under each nationality on our aggregate list we have the names of the prisoners. Again, I cannot guarantee the list to be accurate in any way. However, even though it is only our best estimate, the list does reflect the enormity of the task we have faced.

23.    As of June 2004, when the Supreme Court ruled, we had identified fewer than one third of the prisoners being held in Guantanamo Bay, and the names that we had for some of these prisoners were very questionable. Having the names was only the first step. Very rarely did the media identify any way to contact the family or friends of a prisoner, and tracking them down in a country such as Yemen was never going to be easy if we were operating from the United States.

### Rules Imposed by Respondents
### That Made Identification Much Harder

24.    Respondents suggest that demanding a more rigorous relationship between the prisoner and the next friend "would diminish the identification issues that have plagued the parties in the Guantanamo detainee litigation thus far." *Respondents' Motion, at 14.* This is simply not the cause of our problems. If Respondents would just identify the names which they believe to be the correct names of the prisoners, life would be much simpler. If they gave us a list, we could easily review it with our clients in Guantanamo Bay and identify the names of petitioners according to information known to Respondents.

25.    Indeed, I strongly suspect that we could help Respondents make their own list more accurate. While we have never been allowed to see the list of those Respondents believe to be in Guantanamo Bay, we do know that, after three years, Respondents have not even been able to identify the ages of many of the prisoners, let alone their proper names. For example, I have been told repeatedly in Guantanamo that my client M.C. is much older than he really is. This is because he secured identification that stated his age as older, because he could not otherwise travel without his parents. Respondents have made public statements about the ages of prisoners that seem highly inaccurate.

5

26.    We could also help clear up a great deal of confusion over nicknames. Arabic and Muslim culture encourages the use of nicknames – for example, the father of Imran may be called Abu Imran. One of my clients is known by at least six names, each of which is an innocuous nickname, rather than some kind of alias. Many prisoners prefer to be known by their nicknames in Guantanamo Bay. They feel that they have been humiliated, and they do not want some of the details of their humiliation to be known to their families, as this would cause the family member great distress. This applies particularly to the sexual humiliation that they have suffered. However we, as the lawyers, are in a position to clear up which are the real names and which are nicknames, if only Respondents would let us review a list.

27.    Respondents say that they have yet to identify two dozen petitioners, *Respondents' Motion, at 14*, and that there have been two counsel who went all the way to Guantanamo only to learn that Respondents had incorrectly identified their petitioners. *Respondents' Motion, at 14.* They seek to imply that this is somehow the fault of the lawyers involved.

28.    The fault, here, does not lie with Petitioners' counsel but with Respondents' rules. The only consistent method of identification was the ISN. However, the process of identifying people has been made radically more difficult by the fact, despite constant requests for a change in policy, Respondents deemed the ISN to be classified FOUO ('For Official Use Only') until July 7, 2005.[1]    This meant that we could not ask our clients for the ISN and then put it in a central list of all the prisoners to crosscheck it. Each time I would get an authorization from a prisoner, I had to edit the ISN out before I could remove the authorization from the secure facility and provide it to counsel for filing a petition. When that petition was then filed, without the ISN, it was correspondingly more difficult to make the proper identification.

29.    Again, here, Respondents' insistence on secrecy makes no sense at all. The ISN is either a number (e.g., 000123) or a series of letters (e.g., JJJABC). The letters reflect the numbers (A=1, B=2, etc.). The series of letters appears on every piece of correspondence that the prisoner sends to his family, to the family will know the prisoner's ISN the moment they receive mail. Indeed, they are required to put the ISN on their replies.

30.    Thus, making the ISN classified made no sense, but made our task of identifying each prisoner to Respondents' satisfaction much more difficult. If Respondents are complaining, they must accept that they created this problem themselves.

---

[1] See *E-mail of Andrew Warden* (July 7, 2005) ("After further consultation on the subject, the Department of Defense has determined for the purposes of this habeas litigation only that the pairing of a detainee's name and the 3, 4, or 5-digit ISN for the detainee is no longer classified or subject to treatment as protected information under the applicable protective orders.").

## The U.S. Military Has Not Given Accurate Information
## About Prisoners Even to the Governments of Our Closest Allies

31.    The inaccuracy of Respondents' own data would seem to also be the cause of the misinformation that Respondents have given to other governments about the prisoners in Guantanamo bay. For example, based on what the U.S. has told them, the British government maintains to this day that there are only five British residents in Guantanamo Bay – Shaker Aamer, Jamil al Banna, Bisher al Rawi, Omar Deghayes and Jamal Kiyemba. I represent them all, and relied for a long time on the British government's assertion that these were the sum total.

32.    That reliance was misplaced. There are many other British residents among the prisoners, including Binyam Mohammed, Ahmed Errachidi, Abdulnour Sameur, Ahmed Ben Bacha, and apparently others whom I have not yet confirmed.

33.    The tragic case of Binyam Mohammed illustrates how hard it has been to secure authorizations from family members, based on the misinformation spread abroad by Respondents. Mr. Mohammed was a resident of the U.K., who had applied for political asylum from Ethiopia. His siblings all received asylum from the U.S., and are now U.S. nationals.

34.    When Binyam went missing from the world, his older brother and sister worked tirelessly to try to find him. They wanted to locate him and, had they known he was in prison, they would definitely have wanted to get him legal counsel. However, an FBI Agent actively lied to them, telling them that Binyam was not in U.S. custody and that the U.S. did not know where he was. The Agent, who left his card, was James R. Sobchack, Special Agent, Washington Metropolitan Field office, Washington, DC 20535 (phone 202-278-4352).

35.    This was false, as Binyam had been rendered from Pakistan to Morocco in a U.S. plane, where he underwent 18 months of horrendous abuse. Meanwhile, his brother traveled to England to try to find him. His sister distributed his picture as far afield as Pakistan, to no avail. He was 'missing' for more than two years, and they did not even learn he was in Guantanamo Bay until 2005, several months after he arrived there.

36.    Binyam himself, when he finally reached Guantanamo Bay about a year ago, tried all kinds of ways to get counsel. He asked other prisoners who had friends to ask them to contact lawyers. He got my address from another prisoner, and wrote to me – but it took months for the letter to get through. In the meantime, he also asked one of my clients to act as his next friend, and this is how I came to take up his case.

37.    Binyam is an educated person, who speaks English fluently, and who has even lived in the United States. Despite this, he found it impossible to achieve any

meaningful access to the courts before a petition was filed for him by the next friend process.

38.    His family were much better placed than 99 percent of the families of prisoners, as they lived in the U.S., so they could have found him counsel. Indeed, they would have secured him legal assistance but could not because they did not know where he was. The fact that it proved so difficult to identify, locate and help an educated prisoner from England with family in the U.S. merely illustrates the immensity of the task when it comes to other countries.

## Identifying the Family Members Was Even More Difficult

39.    If it was difficult to identify prisoners' names, it was even more difficult to identify and contact the families. While the media might identify the names of some prisoners, very rarely did the media identify family members. Part of the reason for this was the reticence among family members to be identified publicly.

40.    The problems for families contacting us were profound. First, they had to know that help was available, and there was no way that we were able to broadcast to families all over the world that they could contact us. Second, they had to have a means to contact us, and the internet is not readily available to many people in a country such as Yemen. Third, they would have to be able to contact us in English to have any chance of making contact.

41.    Indeed, I did not begin to receive an appreciable number of contacts from family members until recently, after I had done some media with Al Jazeera to try to raise the profile of the issues. Even so, I have received fewer than ten direct contacts from family members in the past year, without traveling abroad to try to find them.

42.    Even in the limited number of cases where family members have been able to establish contact inn this way, it has been difficult to maintain consistent e-mail contact, due to problems with the e-mail in places like Yemen. For example, I received the following on July 31, 2005, at 11:12:27 PM GMT+01:00:

Hi

Thank you Mr clivess for your send.

I am not spling english good sorry. ok i have may brother in coba goantnamo his name is tariek ali abdullah ahmad his from yamen. and i have may cazen his name mohamed abdullah mohamed al hemere. pls hilp hime and send me pls thank you very mash.

Mr. Yaseer Ali Abdullah Ahmad

It has not been possible to get a signed statement from Mr. Ahmad – indeed, I have not received a response to my full up e-mail. While this makes less difference here (it is clear that Mr. Ahmad has given authorization) the inability to get back in touch with other family correspondents had made it very difficult to get meaningful authorizations via e-mail or fax.

### Given That We Had to Go to Great Lengths to Facilitate Securing Counsel for the Prisoners or Their Families, Respondents' Allegation That We Have Been 'Soliciting' Clients Is Hard to Accept

43.    Respondents accuse volunteer counsel for the prisoners of "improperly abusing the next friend device in order merely to solicit the Guantanamo detainee population for clients. . . ." *Respondents' Motion, at 14 n.11.*

44.    To be accused of 'soliciting' clients – presumably with overtones of ethical impropriety – is rather difficult to accept. Those of us who have been primarily responsible for securing authorizations from prisoners mainly work with two charities – my own, and the *Center for Constitutional Rights*. Virtually all of the other lawyers involved are working *pro bono* at great expense to themselves.

45.    Speaking for myself, and I believe for the other lawyers involved in this effort, the effort made on behalf of the prisoners in Guantanamo Bay has been solely directed at ensuring that they have legal assistance available, and has been extremely expensive. No representative of any prisoner has paid me for the assistance rendered.

46.    It must be borne in mind that the only reason we have to seek out any next friend for the prisoners is that Respondents have held them effectively incommunicado in Guantanamo Bay.

### Initially, the Only Way to Make Legal Assistance Available Was to Travel to Foreign Countries to Secure Authorizations to Represent Prisoners

47.    Respondents suggest that using 'friends' of the prisoners at Guantanamo is unnecessary because there are other ways to achieve the same ends. *Respondents' Motion, at 13* (citing 5 such examples).

48.    The implication is apparently that getting authorizations from family members is a simple alternative. This is not the case. Over the years, I have been responsible for filing various next friend petitions in capital cases in the United States, and on each occasion the next friend has been available within the United States, generally within the state where the petition has been filed. In contrast, with the prisoners in Guantanamo Bay, the family members were spread over 50 countries.

49.    I found early on in the process that the only realistic way to secure authorization from family members was to travel to each country to secure it.

9

50.     Given the lack of resources in our group, and a reasonable reticence on the part of some to travel to countries that were potentially hostile to a United States citizen, for many months I was the *only* volunteer counsel to travel around the Middle East seeking out the prisoners' family members and friends, and asking whether they wanted legal assistance. All of this had to be self-funded since Respondents opposed the appointment and funding of counsel.

51.     My first foreign trip (other than to Britain) was to Paris shortly before Christmas 2003. I was then living in New Orleans, and made this trip during my vacation. Through this, and other efforts, we were able to make contact with some of the French prisoners' families. They had French lawyers, making the task easier. I had to pay for this trip with no realistic hope of reimbursement from any U.S. government source.

52.     The European nationals constituted a small number of the prisoners, roughly twenty-two out of several hundred prisoners. Once we moved beyond Europe, the problem got much more difficult. There was the sheer size of the problem – there were reportedly about 350 prisoners from Afghanistan, Saudi Arabia, and Yemen combined, and many from various other countries outside Europe.

53.     There was also a significant issue of cost. Some countries only had one or two prisoners, and it would be prohibitively costly to go there to try to locate their families.

54.     I therefore first chose to visit Yemen, because it had a large number of prisoners. My first trip was to Sana'a, the capital of Yemen, in April 2004. Yemen is geographically quite large, and it is very poor. I visited the capital, but the prisoners' families were spread over the entire country. I had been warned prior to leaving that it could be dangerous to leave the capital and travel around the country. I would have been willing to risk it, but I had no way of knowing where the families and friends of the prisoners might be located.

55.     Thus, I had to figure out a way to get the 'next friends' to come to Sana'a. To do this, I had to hold a press conference upon my arrival so that the local media would make it known that families could come to my hotel. Given the obstacles, I thought the trip a great success when 'next friends' for 31 prisoners came to the hotel where I was staying, or provided authorizations to a local human rights group. However, this expensive trip only netted authorizations for fewer than one third of the prisoners.

56.     As of June 28, 2004, when the Supreme Court ruled in *Rasul*, my records reflect that we had authorizations for 45 'new' prisoners beyond those involved in the *Rasul* litigation: two of the remaining British nationals and two British refugees, three French, one Turkish resident of Germany, one Canadian, one Australian, one Syrian, three Algerians (who I had contacted through the Canadian wife of one of the Algerian prisoners), and 31 Yemenis.

10

57.    In July 2004, I then went to Bahrain. Again, I had to find funding for this
trip since there was no chance that the U.S. government would assist in this effort. With
the help of local Human Rights advocates, and the father of one of the Kuwaiti prisoners,
in the week I was there we secured 33 authorizations. These come from Bahrain (6),
Jordan (3), Libya (2), Qatar (1), Saudi Arabia (19), Syria (1) and Yemen (1).

58.    Again, this was an enormous amount of work. Again, we had to get
information into the local media that I had come to Bahrain who could provide help to the
prisoners, so that the friends and families would come to meet with me. I had to meet
with various Bahraini government officials to ensure that the work would not be curtailed
by the government.

59.    So desperate were people to help the prisoners in Guantanamo that
nineteen Saudis crossed the border into Bahrain, and two other people who wanted to
help prisoners flew in from Qatar and the United Arab Emirates when they heard on al
Jazeera of the efforts we were making.

60.    In late August, my wife and I moved from Louisiana to London, which did
not allow for much travel for a while.

61.    I next went to Jordan in October 2004. I had some concerns about going
there because of its reputation as a repressive society. This was to prove prescient.
When I arrived in Jordan, as usual I spoke with the media in order to get the word out to
families and friends of the prisoners that I was there to offer help, since this was the only
realistic way of making contact with the prisoners' families and friends. I mentioned that
there was a dispute concerning the number of Jordanians in Guantanamo Bay, because
my information indicated that there might be as many as 30. Some of these might be
Palestinians, many of whom live in Jordan rather than the West Bank.

62.    When this appeared in the Jordanian media, I had an Arabic translator who
was kindly helping me without charging me anything, and we had given out her contact
details in the media. She received more than one hostile call from someone purporting to
be with Jordanian Secret Service. The person who called her gave an apparently false
name (Abu Mataz) and a telephone number. "Abu Mataz" started demanding what she
was doing with me, and made various scandalous and false accusations against her and
me. He demanded that we appear at the Secret Police headquarters at 6pm that evening.
Before going, I asked an associate to seek consular assistance if I have not returned in
two hours.

63.    The translator came with me. When we told the taxi driver that we wanted
to go to the secret police HQ, he was very nervous and refused to take us to the gate. We
had to walk the last part of the way, towards a well-defended building that housed the
Secret Police. We were led into the white building, along a lengthy white corridor, with
sporadic closed doors. It was nighttime, and totally silent. I will admit to being rather
intimidated at this point.

11

64.     We were taken into a room with two men. I introduced myself, and asked their names. One of them, apparently the most senior, said rather melodramatically,. "We do not use names in this building."

65.     I wrote a description of him during the meeting. He was about 45-50, short, balding, reddish hair, and wore a very large and expensive looking watch. He did not speak much English, apparently, though he appeared to understand a fair amount. I later described him to a local lawyer, who immediately identified him as Colonel Ali Borjak, who is Director of the Terrorism Department of the Jordanian Intelligence Service. I was told that he is notorious – rightly or wrongly – for having tortured Al Zarkawi when the latter was held in Jordanian custody.

66.     Col. Borjak demanded to know why I had said in the newspaper that there were 30 Jordanians in Guantanamo. We had a discussion about this, and he seemed not to believe that I would have come that distance to offer free legal assistance to these prisoners.

67.     Hoping that bravado would help us out of an unpleasant situation, I told him that the Jordanian government was morally obligated to help me find the families and friends of the prisoners so that I could help them. Col. Borjak said that they did not know where most of the families are, and demanded that I share what I knew with him. This seemed improbable, given that he worked for the intelligence service. I was doubly nervous about his interest because the worst thing that could happen would be having the Jordanian Secret Police show up on the families' doorstep and intimidate them not to work with me.

68.     We were kept at the Secret Police HQ for the best part of an hour. This intervention emphasized the problems we face trying to help prisoners who come from a repressive state like this. On that trip, for all this trouble and expense, I was eventually able to secure authorizations for only two additional prisoners, although I was also able to meet the three families in person who had made contact with me in Bahrain.

### Foreign Government Interference with Access to Prisoners' Families

69.     When it comes to interference by foreign governments with our efforts to offer help to the families and friends of prisoners, Jordan is by no means the worst offender.

70.     There are obvious examples of countries where one simply cannot imagine traveling there to meet with family members, either because I would not get a visa to go, or because the families would be placed in jeopardy if I went. These would include Algeria, Chechnya, Egypt, Iran, Iraq, Kazakhstan, Libya, Saudi Arabia, Syria, Tajikistan, Turkestan, and Uzbekistan.

71.     Saudi Arabia has been a good example of a country that has not only forbidden me from traveling there, but has also actively impeded our access to prisoners'

families. It was on a trip to Yemen in 2004 that I met with six lawyers from Saudi Arabia, headed by Ahmad Maszar. They were designated by the Saudi authorities as the 'legal committee' assigned to 'help' the Saudi prisoners in Guantanamo Bay. In fact they have consistently obstructed us from assisting the prisoners.

72.    I impressed upon Mr. Mazhar that it was very important to let the friends and families of the prisoners know that we could provide free legal assistance to them. I asked Mr. Mazhar if he could arrange a visa for me to come to Saudi Arabia to meet with family members. I said that I would come there at no cost to them, and find lawyers in the U.S. who would represent the prisoners at no cost. I said that alternatively the Saudi government could follow the lead of the Kuwaitis, and retain a firm they trusted in the U.S. The Saudi government had hired a firm (McKenna) to file an amicus brief in the U.S. Supreme Court, and I hoped that they might be willing to retain McKenna or another firm this time as well.

73.    Mr. Mazhar promised to consult back in Saudi and get back in touch with me. I continually tried to contact him when I returned to the U.S., with no success. He consistently failed to reply to my messages.

74.    On my Bahrain trip four months later, I prevailed upon Mr. Mazhar to come across the border so that I could continue in my efforts to persuade him, as the representative of the Saudi government, to cooperate in our efforts, at least by letting me come to Saudi and meet with people in the government and those who might be concerned about the prisoners. Again, Mr. Mazhar said that I would not be able to come to Saudi Arabia.

75.    I learned that the families and friends of Saudi prisoners were being reassured that they did not need to do anything on behalf of the prisoners because Mr. Mazhar's committee was taking care of it. This actively prevented the Saudi prisoners from getting meaningful representation, although the Saudi 'committee' was doing nothing to assist the prisoners secure legal assistance.

76.    In between my other responsibilities, these were the only trips that I was able to make up to October. I did go again to Jordan in November 2004, and Yemen in June 2005, but all of this travel cost a great deal of money, as well as time. The cost of these trips was over $5,000. By November, I had been able to secure authorizations for only 66 prisoners from family members, roughly one tenth of those in Guantanamo Bay at the time. At this rate, ensuring that all the prisoners had meaningful access to counsel was going to be prohibitively expensive, and unacceptably slow. There had to be another, more efficient way to get the prisoners the legal assistance that they so badly wanted.

77.    However difficult it is to locate the family members, it should be emphasized that virtually every family wants to secure free legal assistance for their loved ones, thereby sharing a community of interest with the prisoner next friends we subsequently used. To this day I have never located a friend or family member of a

13

prisoner in Guantanamo Bay who did not want legal assistance for the prisoner, although some people have been intimidated, thinking that they would incur the wrath of their home governments if they were seen to be working with a foreign lawyer. Many were incredulous that American lawyers would agree to provide this assistance without payment, and had to be convinced that we were for real.

## Ultimately, It Became Possible to Cut Out the Need for International Travel and Secure Authorizations from Guantanamo Bay

78.     In November 2004, I was first able to visit two clients in Guantanamo Bay. This was a great relief, because it opened up a new avenue for helping the prisoners get counsel.

79.     My clients told me that other prisoners desperately wanted counsel and asked me how they could help. My initial idea was to write out a form that my clients could take back to their cells and use as the format for other prisoners. If other prisoners wanted me to help them, they could write out the form and send it to me. However, this proved ineffective. One client I had at the time was not well educated, and found it hard to understand how to go about it.

80.     We also had to contend with the unacceptable legal mail system from Guantanamo Bay. I have my clients keep logs of the letters that they send me, and the ones they receive from me. The letters that my clients send to me either do not get through at all, or take an unacceptably long time arriving. Via this method, I only received four signed requests for counsel, and those did not come through the mail to me until *May 29, 2005,* five months after they had been sent.

## The Next Friend Petitioners Relied on the Representations or Promises Made by the U.S.

81.     Thus, by early 2005, there were still very few prisoners for whom there was authorization to file a petition, although I talked to my clients and learned that many were desperate to secure help. We had to search for a more reasonable way to deliver this assistance.

82.     One of my clients showed me the English-language version of the Enemy Combatant Notice (ECN) that he had been given by the U.S. military. This gave us the idea of the way in which those of my clients could act as next friends for the other prisoners, thereby helping the other prisoners get the legal assistance they so desperately wanted.

83.     To set this in context, the Center for Constitutional Rights (CCR) had been working to persuade the Military to agree to circulate a meaningful notice to the prisoners that would inform them that they could have lawyers, and that the lawyers would cost nothing.

84.     The Military would not agree to this, and instead circulated their own ECN. This reads in pertinent part:

> You may ask a civilian judge to look at the lawfulness of your detention through a process called a *petition for a writ of habeas corpus*. You **may ask a friend** or family member or a lawyer to file such a petition with the court. If you do not have a lawyer or a family member **or a friend** who could file this petition for you, you may file your own petition.

*Exhibit A* to *Declaration of Frank Sweigard* (filed with *Respondent's Motion*) (italics in original; bold emphasis supplied).[2]

85.     It should be noted that Respondents did not begin to provide this notice to the prisoners until December 2004, roughly six months after the Supreme Court identified the prisoners' right to file for habeas corpus. *Declaration of Frank Sweigard, at ¶3*. Why this was delayed so long is not explained.

86.     However, virtually every prisoner should, at this stage, have been provided with the information in *Exhibit A* in one form or another – either orally or in writing, either in English or Arabic, or some other language. I have discussed this document with some of my clients, and they have understood this to mean that they could file a request for legal assistance for their 'friends' in Guantanamo Bay.

87.     It is difficult to see how the Respondents can expect to craft and circulate this notice, and then argue that 'friends' in Guantanamo Bay cannot file a next friend petition. Indeed, under the ECN, the prisoner is not told that his first alternative is to file a petition himself: The default alternative is to have a friend file a petition, and only if there is no available friend is the prisoner told that he 'may' file a petition on his own. Therefore, from the prisoners' perspective, this is not an issue of whether another prisoner may act as 'next friend' – but simply whether the U.S. Military is going to be held to its promise.

88.     The prisoners certainly have no way of having a lawyer act as next friend and most prisoners would rather have a fellow prisoner as 'next friend' than a family member. For example, one of my British resident clients, Jamal Kiyemba, has stated in an unclassified document that "[t]he prisoners want to know why they have to have a family member contacted on this. It's personal. They think this is just a way of dragging their families into this process, putting them at risk. This is particularly true when the

---

[2] The identical language appears in the other 'Notifications'. *See Exhibits B & C* to *Declaration of Frank Sweigard*. For identical language in another similar form provided to the prisoners, *see also* Exhibit E, attached to *Declaration of First Lieutenant Wade M. Brown* (filed with *Respondent's Motion*).

family is in a repressive society back home. What is the point of having a family member involved?"

89.    Based on this, various of my clients have wanted to act as next friends for other prisoners with whom they have become friendly while in the prison. I have asked them to be sure that the prisoners for whom they act desire legal assistance. (I refer to these prisoners as 'prisoner next friends.')

## The Special Problems of Camp Echo

90.    It is unrealistic – and, given that Respondents are holding our clients incommunicado, unreasonable -- for Respondents to pretend that the prisoners can easily secure the legal assistance they desired.

91.    It is not easy for any prisoner to secure help, but it is next to impossible for some who are held in certain areas. Camp Echo has been one example, and prisoners there continue to have problems, although it is used now mainly for client legal visits.

92.    On one of my visits to Guantanamo, at 3:35pm on May 3, 2005, I was at Camp Echo talking to Lt. Col. Lowery when a man who was in the exercise cage shouted to me to ask whether I was a lawyer. Col. Lowery allowed me to speak to him, and he said that he "desperately want[ed] a lawyer". He said he had been in Camp Echo for months and had not been able to get counsel. I had this information unclassified so that I could execute my own statement as the basis for filing a petition for a writ of habeas corpus on his behalf.

93.    Not only is it difficult for prisoners to get help in Camp Echo, but Respondents make it very difficult for them even to have a friend in the prison to file on their behalf. As Jamal Kiyemba notes, "many prisoners are held under circumstances under which they cannot talk to any 'friend.' For example, in Camp Echo, there is no talking to any other prisoner, or you are punished. . . ."

## The Special Problems of Camp V and Level 2, 3 & 4 Prisoners

94.    Camp V has now taken over from Camp Echo as the solitary confinement camp, and the prisoners are not meant to have any contact there. The prisoners in Camp V, and those who have been held in restrictive custody of other kinds, face other problems.

95.    Camp V prisoners are held in solitary confinement and have nobody who can help them to write documents to counsel. More important, those in Camp V, and those in restrictive levels, are not allowed pen and paper. Respondents suggest that "Detainees are supplied pens, paper and envelopes regularly. . . ." *Respondents' Motion, at 7 n.4.* For these prisoners, this is just not true, according to the reports of my clients.

16

96.    According to the unclassified information that I have secured from my clients, "particularly with levels 3 & 4 [prisoners], the lack of pen and paper make it very difficult for prisoners to work with counsel." This has been confirmed by my own experience. When I met with my prisoners on one visit, the Sergeant at Camp Echo said that the prisoners could not have a pen except when I was present with them. Clearly, it is impossible for prisoners to represent themselves without a pen.

### Other Military Interference with the Right to Counsel

97.    One issue raised by Respondents is whether my clients have a community of interest with the other prisoners such as to justify their acting as 'next friends.' It is very hard to see how any rational person would not want assistance in vindicating his rights. To the limited extent that some prisoners are mistrustful of American lawyers who volunteer to help them, this is almost exclusively attributable to the manipulative strategies adopted by Respondents and their personnel.

98.    It should always be remembered that the Military could easily have solved all of these problems. All the Military had to do was allow an independent person to speak to each prisoner and ask him whether he would like counsel, and we would have secured counsel for everyone who wanted it. Instead, the process of getting the prisoners the help they want has been incredibly convoluted.

99.    Far from making counsel available, Respondents have tried to prevent the prisoners from trusting counsel. Some of the prisoners have been manipulated by the Military into thinking that the lawyers are yet another part of the Guantanamo deception. There has been extremely troubling interference with the right to counsel, with the Military discouraging prisoners from attending legal meetings. For example, when I have been to Guantanamo Bay, I meet with prisoners at Camp Echo, which used to be a punitive camp, and continues to be an isolation camp. When there, the prisoners are held in solitary confinement, are not allowed a shower every day, cannot have collective prayer, and are only allowed out briefly once or twice a week. I am required to provide the Military with a schedule for my visits, so the Military are on notice when people need to be there. Yet the military has sometimes made a practice of taking the prisoners over there long before they are needed.

100.    As one of my clients, Jamal Kiyemba, has explained in unclassified materials:

> "Camp Echo is the most lonely place on earth. Last time I had a legal visit, I was all alone for ten days. They brought me over there, they would not let me take my Koran, and they put me in an isolation cell with nothing. There is no way to talk to any other prisoner, you're not meant to talk to the guards. There is a camera and microphones in the cell to make sure this is obeyed. The camera seems to shrink the cell, and make you paranoid. * * * There is no communal

17

prayer. Showers and recreation were greatly limited – I got to go into the outside cell once for half an hour in six days, and got one shower. In [Camp] Delta I get outside [e]very day, and have a shower every day. If I complain [about Camp Echo], I am told that it is the lawyer's fault. If I did not have to come for a legal visit, I would not be treated like this."

101.    I have kept a log of when my clients were brought over to Camp Echo for visits, and when they left after my visit. When I was in Guantanamo in May, two of my clients were brought over to Camp Echo five days before my scheduled meeting, one eight days early and one *eleven* days early. I learned on my subsequent trip that one of my clients was held in solitary confinement in Camp Echo for *eleven* days after I met with him. There is no imaginable security reason for this; however, it was a huge imposition on my clients' right to meet with their attorneys.

102.    There have also been other consistent and troubling steps taken by the Military to frustrate the right to counsel. On a basic level, the prisoners have a hard time believing that the lawyers are for real because (due to Respondents' opposition to counsel visiting) it took almost three years for them to begin to come to the prison. How, the prisoners ask, can this be a legitimate legal system if the lawyers did not come all that time? It strikes the prisoners as more likely that the lawyers are simply the next devious step in the interrogation system.

103.    This impression is radically enhanced by the Military's deceitful practices. My unclassified notes reflect that several prisoners have told me that investigators have impersonated lawyers in an effort to get prisoners to talk. More recently, a juvenile prisoner explained to me how the interrogator had boasted about her experience in the U.S. Supreme Court and what she was going to do for the young man. Naturally, when they learn that these 'lawyers' are actually interrogators, this makes the prisoners loathe to believe that we are really lawyers on their side.

104.    The interrogators consistently tell prisoners that the lawyer's advice is wrong, that having a lawyer is harmful, and that if the prisoner has a lawyer that makes it less likely that the prisoner will get out.

105.    Not one of my clients believes that attorney-client discussions are confidential, and there have been suggestions that the Military does monitor supposedly privileged hearings. Certainly, the Military has tried to interrogate the prisoners about what they discussed with their lawyers. With more than one of my clients, after I left, the interrogators sought to question them about their privileged discussions with me.

106.    As one prisoner said:

"We all know that everything we say in these rooms is being monitored by them, and every time we say that we

18

> particularly hated being treated in a particular way, we
> know that this will later be used against us. There are
> constant examples of this. Last time my lawyer was here, I
> told him that I did not like being spoken to by my ISN
> number all the time, because it was so dehumanizing. * * *
> When I got back to my cell, they suddenly started doing
> this a whole lot more. And other things I just don't want to
> mention."

Regardless of whether the Military does violate the order of the court, the prisoners all believe they do – a belief based on the consistent deceit and manipulation that the Military has practiced.

107.    The requirement that everything said to counsel has to be subjected to review before counsel can speak publicly about it is also a basis for creating mistrust with the prisoners. As Jamal Kiyemba said to me, "[w]hat am I meant to think of my Attorney-Client Privilege when everything that is in the privilege is being 'reviewed'?"

## Inadequate Descriptions of Legal Rights

108.    Respondents suggest, via the declaration of Frank Sweigart, that they have "notified each detainee at Guantanamo Bay of his right to file a petition for habeas corpus, and has provided each detainee with the address of the United States District Court in the event that he desires to submit his own petition to the Court." *Respondents' Motion, at 7.*

109.    It would be inappropriate to rely on the Enemy Combatant Notification as sufficient to ensure that the prisoners will get the legal assistance that they need. To my knowledge, not one prisoner has thus far secured counsel through a 'petition' filed as a result of the ECN notice.

110.    The prisoners are not even consistently allowed a copy of the ECN to study. For example, according to reports of my clients that have been unclassified, Omar Deghayes was not allowed to have a copy of the form, while Jamal Kiyemba was allowed it briefly, and Shaker Aamer was able to keep his copy.

111.    The ECN states that the Assisting Military Officer (AMO) will help the prisoner to understand his right to file for habeas corpus. ("Please talk to your Assisting Military Officer if you have any questions about this notification. Your Assisting Military Officer will meet with you later."). However, in my experience this is simply not done – certainly not on any systematic level.

112.    None of my clients have ever heard of an AMO. They have heard of a Personal Representative (PR). Yet, setting aside the ethical propriety of the Military encouraging non-lawyers to provide legal advice to prisoners, the PR's have provided inadequate 'advice' in the cases with which I am familiar.

113.    Omar Deghayes received only one visit from a PR (with respect to the CSRT), and he received no meaningful assistance. Mr. Deghayes thought the PR was an interrogator (he was even told he had a "Reservation," the euphemism for interrogation), the PR would not give Omar his name, would not have his handcuffs taken off, only met with him for about ten minutes total, and did not tell him until well into the meeting that he was the PR. *See First Supplement to Petition for Writ of Habeas Corpus (Deghayes et all. v. Bush), at 4-5 (filed April 1, 2005).* Such advice as Mr. Deghayes sought was not given. The PR did not, or would not, tell him whether there as any point attending the CSRT (i.e., whether anyone was being found not to be an Enemy Combatant), what kind of tribunal it would be, or how he might secure witnesses. *Id. at 5.* Neither could Mr. Deghayes get an answer as to how he could file a statement or secure witnesses when (as a Level 3 or 4 prisoner) he could not have a pen and paper.

114.    In another instance, Shaker Aamer had one meeting with a PR, and that was prior to his CSRT. His PR told him:

> "I'm not a lawyer. I'm more of a middle man. I'm not here to help you. I cannot give you any advice. I'm just here to take what you want to send to the [CSR] tribunal."

115.    According to Jamal Kiyemba when, prior to my being able to visit him, he asked for help understanding the habeas process, he found that "the advice is incomprehensible. The officers [PR/AMO] who are meant to explain the habeas corpus process to us do not know."

116.    Since meeting with my clients, I have instructed them to request to meet with the PR/AMO on a regular basis as they have to present a meaningful case to their ARB. I provided my clients with a list of suggested questions that they might ask about the ARB, as well as the habeas process. To my knowledge, to date, no PR/AMO has responded to the request of *any* of my clients for a meeting, let alone to provide this information.

### Problems Stemming from the Different Cultures and Languages of the Prisoners

117.    There are many problematic issues of translation in Guantanamo Bay. The ECN explanation is apparently one such issue. Some prisoners who are bi-lingual and have seen the ECN in both English and Arabic. They say that the ECN is hard to understand even in English, but even harder in Arabic.

118.    The prisoners are told that they "may ask a civilian judge to look at the lawfulness of your detention through a process called a *petition for a writ of habeas corpus.*" (emphasis in original). Recently, a very sophisticated graduate of Oxford University asked me what a "writ of habeas corpus" actually was, and what it meant to file a petition. If an educated person steeped in the culture of a country with the Anglo-

American habeas system does not understand the process, it is far from evident that someone without the benefit of an Oxford education or a person from a country with a wholly different legal system will do so.

119.   To tell a prisoner that a civilian judge will "look at the lawfulness of your detention" hardly informs the prisoner what he needs to know. Indeed, my various clients insisted to me that they wanted to act as next friends to other prisoners, because they felt that a prisoner from a Middle East country who did not speak English would face great problems seeking legal assistance on his own.

## Problems Counsel Would Face in Getting More Information
## About a Prisoner Without Being Able to Meet with that Prisoner

120.   To the extent that Respondents insist that more information be supplied by the next friends about the prisoners who they would like to assist, this would cause a tremendous delay in securing legal assistance for the prisoners.

121.   The timing of Respondents' motion is perplexing to me. Hitherto, Respondents' counsel have contacted me on more than one occasion to seek my assistance to flesh out information about prisoners, when they were having difficulty identifying the prisoner in a particular petition. For example, in one e-mail, counsel for Respondents asked me as follows:

Clive,

When you speak to Messrs. Deghayes and Kiyemba this week, please ask them to provide more information about the detainees on whose behalf they purportedly acts as next friends. ISN numbers would be best. At this point, based on the information in the petitions, we have not been able to identify the following petitioner names with actual detainees at GTMO:

Mohammed al Nadour (Inram v. Bush) (Deghayes)
Mohammed Fahreo (Inram v. Bush) (Deghayes)
Mohamad Morotany (Sliti v. Bush) (Deghayes)
Mohmoud Al Soury (Sliti v. Bush) (Deghayes)
Ahmed Doe (Ahmed Doe v. Bush) (Deghayes)

Abdusabuy Doe (Kiyemba v. Bush)
Abdusamad Doe (Kiyemba v. Bush)
Abdunasir Doe (Kiyemba v. Bush)
Hammad Doe (Kiyemba v. Bush)
Hudhaifa Doe (Kiyemba v. Bush)
Jalaal Doe (Kiyemba v. Bush)
Khalid Doe (Kiyemba v. Bush)
Saabir Doe (Kiyemba v. Bush)
Saadiq Doe (Kiyemba v. Bush)

21

Thanks,

Andrew

> Andrew I. Warden
> Trial Attorney
> U.S. Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Ave., NW, Room 6120
> Washington, DC 20530
> Tel: 202.616.5084

122.    While I was under no obligation to do this, I tried to cooperate with Respondents. Indeed, since Respondents seemed to be having the most trouble with the Turkestanis, I wrote up a memo to Mr. Warden identifying the prisoners and providing cell locations and other information, to help Respondents identify prisoners who, after all, have been in Respondents' custody for more than three years. I did the best I could on this, even though Respondents refused to reciprocate by providing me with a table of prisoners that could radically assist me in this task.

123.    It is perplexing that the only person on the list provided by Mr. Warden who is subject to this motion is Ahmad Doe. I should note that I do not have unclassified all of my notes yet, and have not been able to determine whether I got additional information about Mr. Doe that could help on this point. But for reasons best known to themselves, Respondents did not ask me to get additional information with respect to the other six petitions challenged in their motion.

124.    Respondents knew that I was in Guantanamo between August 4th and 14th, yet they filed their motion after I had returned, and I will not be going back down there until mid-October (assuming that they permit a visit then). It would be November at the earliest that I could therefore get additional information about these clients, delaying their legal rights even more.

125.    Since I cannot go sooner, I consent to counsel for the other prisoners speaking with my clients, where relevant, on a visit to Guantanamo Bay to secure this information before I am able to visit again.

### Checks Already in Place if Prisoners
### Decide They Do Not Want Lawyers

126.    There should be no concern that the prisoner is going to be provided with counsel when he does not want it. There is already a system in place should the prisoner decide he does not want a lawyer. The U.S. military requires that, by the second time that counsel visits, counsel secures an "Acknowledgement of Representation" form, signed by the prisoner.

127. This form is already a considerable burden on the right to counsel, since many of the prisoners are very worried about signing anything.

## Background of Declarant

128. For informational purposes, I will provide a limited resume of my experience in this area.

129. I received my *Juris Doctor*, Columbia Law School, in 1984, and I was recognized as a Harlan Fiske Stone Merit Scholar all three years I was there. My previous degree was from the University of North Carolina at Chapel Hill, where I was a John Motley Morehead Scholar from 1978-81. I had completed my British education at Radley College, near Oxford where I received A levels in Physics, Chemistry, Mathematics, and Further Mathematics.

130. Before turning to the Guantanamo Bay cases effectively full time, I was Director of the *Louisiana Crisis Assistance Center*, for almost eleven years from July 1993 to March 2004. The *LCAC* is a not-for-profit law foundation devoted to providing legal services to indigent persons facing the death penalty in the South. I had previously spent nine years as a staff attorney with the Southern Center for Human Rights in Atlanta, Georgia.

*131.* Over the years, I have been counsel in many very serious criminal cases (mostly capital cases) at all levels of the process, from trial to the United States Supreme Court. I have tried more than two dozen capital cases to a jury, and been involved in many more cases that did not proceed to trial. I have been involved as counsel in dozens of capital appeals, and more capital cases in post-conviction and habeas review. I have been responsible for securing certiorari review in the United States Supreme Court in various cases, including *Johnson v. Mississippi*, 108 S. Ct. 1981 (1988) (unanimous reversal of death sentence for improper consideration of invalid prior conviction); *Shell v. Mississippi*, 111 S. Ct. 313 (1990) (unanimous *per curiam* reversal of death sentence for invalid consideration of aggravating circumstance); *Minnick v. Mississippi*, 112 L. Ed. 2d 489 (1990) (reversal of conviction for violation of the Fifth Amendment right to counsel); *Lonchar v. Thomas*, 116 S. Ct. 1293 (1996) (certiorari granted moments before petitioner's scheduled execution, resulting in unanimous decision in favor of the death sentenced inmate). In each case I asked another counsel to argue the case, so that I could focus on the capital trials that I was then responsible for.

132. I was one of the counsel involved in the initial litigation of the case that eventually became *Rasul v. Bush* (June 28, 2004) (availability of judicial review for prisoners in Guantanamo Bay).

133. Because of the importance of effective counsel in a meaningful judicial system, I have taken an very active role in systematic litigation on behalf of the right to counsel. This has included a class action on the right to counsel in capital post-

23

conviction in Mississippi, and a large amount of litigation on the need for adequate funding and caseload limits in Louisiana.

134.    I have taught many legal education programs on a variety of scientific subjects in Arizona, California, the District of Columbia, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Mississippi, New Mexico, New York, North Carolina, Ohio, Tennessee, Texas, and Virginia.

135.    I have twice been invited to testify before the United States Congress, Sub-Committee on the Judiciary, regarding racial discrimination in capital cases.

136.    I was a member and staff counsel to the *Commission on Human Rights Abuses in Mississippi* (Jackson, MS, 1993).

137.    In 2000, I was honored by Her Majesty Queen Elizabeth II with the *Order of the British Empire* (OBE) for services to humanity. For work for indigent persons who could not afford counsel, I received an Honorary LLM Degree, from the University of Wolverhampton, England in 2001, and a *Lifetime Achievement Award*, from *The Lawyer Magazine* (UK April 2003), and *The Law Society* (U.K. Oct. 2003).

138.    I have been author or co-author of various manuals on the effective representation of indigent persons facing serious criminal or capital charges in Louisiana (1987, 1994 eds.), Mississippi (four editions, most recently in 1991) and Georgia (two editions).

139.    I have co-authored various law review articles, the most relevant perhaps being Paduano & Stafford Smith, *The Unconscionability of Sub-Minimum Wages Paid Appointed Counsel in Capital Cases*, 43 Rutgers L. Rev. 281 (1991).

140.    I was a Soros Senior Fellow, courtesy of the Open Society Institute, for 2004-05, and have now been awarded a Rowntree Visionary grant for the next five years to do this charitable work. I had been working on the Guantanamo Bay issues part time even before this, but I resigned as director of the LCAC in August 2004 to devote all of my time to trying to help the prisoners in Guantanamo Bay, because I believe passionately that if we are going to preserve our standing as proponents of human rights, as Americans we must show that we mean what we say, and adhere to the rule of law in the most difficult cases, as well as the easiest. My main role in that position has been to work to ensure that prisoners in Guantanamo Bay were able to get counsel, and effective representation. I have assumed this role solely because the work so obviously needed to be done. I must stress at every turn, however, that my resources are wholly inadequate for the purpose.

141.    I am now based in the United Kingdom. I have dual U.S. and U.K. nationality.

## Conclusion

THE FOREGOING is executed under the penalties of perjury, constitutes a true and accurate account of what I know, and does not exhaust the sum of my knowledge.

Done this 12th day of September, 2005, in London, England.

CLIVE A. STAFFORD SMITH

# ATTACHMENT E

# FEDERAL PUBLIC DEFENDER
## DISTRICT OF OREGON

STEVEN T. WAX
   Federal Public Defender
STEPHEN R. SADY
   Chief Deputy Defender
Steven Jacobson
Bryan E. Lessley*
Nancy Bergeson
Christopher J. Schatz
Ellen C. Pitcher
Craig Weinerman*
Mark Bennett Weintraub*
Gerald M. Needham
Christine Stebbins Dahl
Thomas J. Hester
Ruben L. Iñiguez

101 SW Main Street, Suite 1700
Portland OR 97204
503-326-2123 / Fax 503-326-5524

Branch Offices:

151 W. 7th, Suite 510
Eugene, OR 97401
541-465-6937
Fax 541-465-6975

15 Newtown Street
Medford, OR 97501
541-776-3630
Fax 541-776-3624

Barbara L. Creel
Anthony D. Bornstein
Donnal S. Mixon+
Lisa Hay
Tonia L. Moro+
Susan Russell
Patrick Ehlers
Francesca Freccero
C. Renée Manes
Amy Baggio
Matthew M. Rubenstein
Caroline Davidson

* Eugene Office
+ Medford Office

November 17, 2005

Jennifer Campbell
United States Department of Justice
20 Massachusetts Avenue, NW
Room 5300
CRLSG/LSS
Washington, DC 20530-0001

Dear Ms. Campbell:

Enclosed are security questionnaires for the representation by this office of three Guantánamo detainees. Following is a list of the individuals whose packets are enclosed with the case on which each person is working.

*Hamad v. Bush, et al.*, CV 05-1009 JDB
Steven T. Wax
Patrick Ehlers
William Teesdale
Lisa Powell

*Ali Hussian Mohammad Muety Shaaban v. Bush, et al.*, CV 05-892 CKK
Stephen R. Sady
Christine Stebbins Dahl
Maia Godet
Martín Caballero

*Chaman v. Bush, et al.*, CV 05-887 RWR
Christopher J. Schatz
Bryan Lessley
Janan Stoll
Bruce Daily

November 17, 2005
Page 2


    Please feel free to contact me at the above number should you have any questions.


                Sincerely,

                Steven T. Wax
                Federal Public Defender


STW/sls
Enclosures
O:\GTMO\Clients\Gen Corresp\jennifer campbell.01