Steven T. Wax, OSB #85012
Federal Public Defender
Patrick J. Ehlers, OSB #04118
Assistant Federal Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon  97204
Tel:   503-326-2123
Fax:  503-326-5524
patrick_ehlers@fd.org
Attorneys for Petitioner

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ADEL HASSAN HAMAD,<br><br>                                  Petitioner,<br><br>v.<br><br>GEORGE W. BUSH, DONALD RUMSFELD, JAY HOOD, and BRICE GYURISKO,<br><br>                                  Respondents. | CV 05-1009 JDB<br><br>MEMORANDUM IN SUPPORT OF MOTION REQUIRING COMPLIANCE WITH RULE 23 AND PRELIMINARY INJUNCTION FOR 30-DAY NOTICE OF INTENT TO TRANSFER |

**Introduction**

　　　Adel Hassan Hamad may face irreparable harm if the government unilaterally

transfers him from Guantánamo.  The petitioner, held in United States custody for well over

Page 1    MEMORANDUM IN SUPPORT OF MOTION REQUIRING COMPLIANCE WITH RULE
         23 AND PRELIMINARY INJUNCTION FOR 30-DAY NOTICE OF INTENT TO
         TRANSFER

three years, virtually incommunicado and without access to counsel, respectfully moves for an order requiring the government to seek prior authorization from the Court and 30-day advance notice to counsel for petitioner of any intended removal of the petitioner from Guantánamo Bay Naval Base in Cuba. The petitioner makes this request pursuant to Rule 23 of the Federal Rules of Appellate Procedure, Rule 65 of the Federal Rules of Civil Procedure, and the All Writs Act, 28 U.S.C. § 1651.

In seeking compliance with Rule 23(a)'s directive for advance authorization by the Court for transfer or forced repatriation, the petitioner seeks to preserve the jurisdiction of the federal court for the opportunity to contest the legality of his detention, status as an enemy combatant, and indeed, the lawfulness of the transfer itself. In the alternative, the petitioner asks that the government provide 30-day notice to counsel for petitioner of any intent to transfer him. An order from the Court is particularly necessary in this case to maintain the status quo because the government has not filed a return or provided any information about the petitioner; nor has counsel had contact with the petitioner or an opportunity to assess his particular circumstance. On this record, the Court should maintain the status quo and prohibit the United States from transferring the petitioner without affording counsel, at a minimum, an opportunity to confer with his client.

**STATEMENT OF FACTS**

Mr. Hamad is being detained as an "enemy combatant" at the Guantánamo Bay Naval Base in Cuba. In the habeas petition he has filed, he denies being an "enemy combatant" and contends he is being detained in violation of the Constitution, treaties and laws of the United States. Upon information and belief, the United States has

secretly removed detainees to other countries for interrogation or detention without complying with extradition or other legal process. This practice – known as "rendition," "irregular rendition," or "extraordinary rendition" – is understood to be used to facilitate interrogation by subjecting detainees to torture. As reflected in government documents, many of the countries from which the Guantánamo detainees originate have policies of detaining without charge or trial those it considers members of banned fundamentalist organizations. To repatriate the petitioner to such a country before his status as an "enemy combatant" is determined may have dire consequences.[1]

### 1. The United States Has A Policy of Rendition

The United States has publically announced that it has a policy of rendition. Secretary of State Condoleezza Rice recently defended the practice, asserting that it is a "vital tool" in the war against terrorism. Glenn Kessler, *Rice Defends Tactics Used Against Suspects,* Wash. Post, Dec. 6, 2005; at A01. According to an article in the *New Yorker*, the "rendition" process was originally "a program aimed at a small, discrete set of suspects – people against whom there were outstanding foreign arrest warrants," but after September 11 came to include a "wide and ill-defined population that the Administration terms 'illegal enemy combatants.'" Jane Mayer, *Outsourcing Torture*, NEW YORKER, Feb. 14, 2005, at http://www.newyorker.com/fact/content/?050214fa_fact 6, ¶ 7. According to the WASHINGTON POST,

Since Sept. 11, the U.S. government has secretly transported dozens of

---

[1] At this time, counsel for Mr. Hamad have had no contact with him and no knowledge of his country of origin or political standing within such country.

> people suspected of links to terrorists to countries other than the United States, bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence sources. The suspects have been taken to countries . . . whose intelligence services have close ties to the CIA and where they can be subjected to interrogation tactics – including torture and threats to families – that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogation, the sources said.

Rajiv Chanrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, WASH. POST, Mar. 11, [2002], at A1; *see also* Dana Priest & Barton Gellman, *U.S. Decries Abuse But Defends Interrogations,* WASH. POST, Dec. 26, 2002, at A1. Some of the countries to which detainees may be brought are known to practice torture. *See, e.g.*, Megan K. Stack & Bob Drogin, *Detainee Says U.S. Handed Him Over For Torture,* L.A. TIMES, Jan. 13, [2005], at A1 ("News accounts, congressional testimony and independent investigations suggests that [the CIA] has covertly delivered at least 18 terrorism suspects since 1998 to Egypt, Syria, Jordan and other Middle Eastern nations where, according to State Department reports, torture has been widely used on prisoners.").

The practice of "extraordinary rendition" became headline news when a Canadian citizen was rendered to Syria by the United States. In September 2002, Maher Arar was in Tunisia, vacationing with his family. On September 26, 2002, while in transit in New York's JFK airport, he was detained by United States officials and interrogated about alleged links to al-Qaeda. Twelve days later, he was chained, shackled, and flown to Jordan aboard a private plane and from there transferred to a Syrian prison. In Syria, he was held in a tiny "grave-like" cell for ten months and ten

days before he was moved to a better cell in a different prison. He was beaten, tortured and forced to make a false confession.

> [Syrian] interrogators, after a day of threats, "just began beating on me." They whipped his hands repeatedly with two-inch-thick electrical cables, and kept him in a windowless underground cell that he likened to a grave. "Not even animals could withstand it," he said. Although he initially tried to assert his innocence, he eventually confessed to anything his tormentors wanted him to say. "You just give up," he said. "You become like an animal."

Mayer, *Outsourcing Torture* at ¶ 2-4. The pain was so unbearable, he said, that "you forget the milk that you have been fed from the breast of your mother." *Id.* The Canadian government is investigating the rendition of Mr. Arar to Syria, and thus far has concluded that the United States delivered Arar to Syrian authorities where he was tortured. *Commission of Inquiry Into the Actions of Canadian Officials in Relation to Maher Arar,* Oct. 14, 2005.

Syria is not the only country to accept "rendered" detainees for further interrogation. Mamdouh Habib was rendered to Egypt prior to his transfer to Guantánamo. During the six months in Egyptian custody, Mr. Habib was allegedly tortured without mercy:

> He said that he was beaten frequently with blunt instruments, including an object that he likened to an electric "cattle prod." And he was told that if he didn't confess to belonging to Al Qaeda he would be anally raped by specially trained dogs. . . Habib said that he was shackled and forced to standing in three torture chambers: one room was filled with water up to his chin, requiring him to stand on tiptoe for hours; another chamber, filled with water up to his knees, had a ceiling so low that he was forced into a prolonged, painful stoop; in the third, he stood in water up to his ankles, and within sight of an electric switch and a generator, which his jailers said would be used to electrocute him if he didn't confess.

Page 5    MEMORANDUM IN SUPPORT OF MOTION REQUIRING COMPLIANCE WITH RULE 23 AND PRELIMINARY INJUNCTION FOR 30-DAY NOTICE OF INTENT TO TRANSFER

Mayer, *Outsourcing Torture* at 54. The government admits that it transfers detainees to the control of other governments "for investigation and possible prosecution and continued detention when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies. Such governments can include the government of a detainees home country, or a country other than the detainee's home country that may have law enforcement or prosecution interest in the detainee." *Abdah c. Bush*, No. 04-1254 (D.D.C. Mar. 8, 2005)(docket #16)(declaration of Deputy Assistance Secretary of State Matthew Waxman) at para. 3. In fact, the government has accelerated the rate of "custodial transfers" in the last year, with the goal of transferring 400 detainees. *Leaving Guantánamo, The Law Of International Detainee Transfers,* Robert Chesney, Wake Forest School of Law at 8 (citing announcements from the official Department of Defense website).

During the week of December 5-10, 2005, Secretary Rice admitted that Khalid al Masri, a German citizen, was wrongfully abducted, detained, and interrogated by Americans in a secret prison in Afghanistan. Joel Brinkley, *Questions About Secret Prisons Follow Rice In Europe*, N.Y. Times, Dec. 6, 2005. Although the government denies that it transfers detainees to countries where they are likely to be abused, there are reports of a Defense Department memorandum indicating "that American officials were frustrated in trying to obtain information from [a detainee], . . . and suggested sending [the detainee] to an unspecified foreign country that employed torture in order to increase chances of extracting information from him." Ken Silverstein, *Pentagon*

*Memo on Torture-Motivated Transfer Cited;* L.A. Times, Dec. 8, 2005. The government is in active negotiations with numerous countries – including Afghanistan, Saudi Arabia, Yemen, Egypt, and Morocco notorious for torturing those in their custody – for the transfer of custody of the Guantánamo detainees.  Josh White and Robin Wright, *Afghanistan Agrees to Accept Detainees; U.S. Negotiating Guantánamo Transfers*, Wash. Post, Aug. 5, 2005, at A1.  The likelihood of rendition or forced transfer to the custody of a country that routinely uses torture in interrogation is not speculative, but an increasingly real possibility.

    2.    *Transfer to a "Black Site"*

Petitioner also has reason to fear that he will be transferred to one of the secret prisons the United States operates round the world.  The *Washington Post* reports that the United States established the secret prisons so that it could interrogate without even the "restrictions" enforced on interrogation at Guantánamo.

> The hidden global internment network is a central element in the CIA's unconventional war on terrorism. It depends on the cooperation of foreign intelligence services, and on keeping even basic information about the system secret from the public, foreign officials and nearly all members of Congress charged with overseeing the CIA's covert actions.
>    . . .
> Although the CIA will not acknowledge details of its system, intelligence officials defend the agency's approach, arguing that the successful defense of the country requires that the agency be empowered to hold and interrogate suspected terrorists for as long as necessary and without restrictions imposed by the U.S. legal system or even by the military tribunals established for prisoners held at Guantánamo Bay.

Dana Priest, *CIA Holds Terror Suspects in Secret Prisons,* Wash. Post, Nov. 2, 2005, at A01.  According to the *Washington Post*, these secret prisons are known as "Black

Sites," and represent a legal black hole for detainees. *Id.*

Secretary Rice admitted that Khalid al Masri, a German citizen, was wrongfully abducted, detained, and interrogated by the CIA in a secret prison in Afghanistan. Joel Brinkley, *Questions About Secret Prisons Follow Rice In Europe*, N.Y. Times, Dec. 6, 2005. The CIA uses extremely aggressive interrogation techniques in these secret prisons – so aggressive that detainees have died. However, the administration defends its actions:

> After September 11th, the Justice Department fashioned secret legal guidelines that appear to indemnify C.I.A. officials who perform aggressive, even violent interrogations outside the United States. Techniques such as waterboarding– the near-drowning of a suspect— have been implicitly authorized by an Administration that feels that such methods may be necessary to win the war on terrorism. (In 2001, Vice-President Dick Cheney, in an interview on Meet the Press, said that the government might have to go to the dark side in handling terrorist suspects, adding, Its going to be vital for us to use any means at our disposal.")

Jane Mayer, *A Deadly Interrogation: Can the CIA Legally Kill A Prisoner?,* New Yorker, Nov. 14, 2005). Recently, CIA sources, speaking anonymously, described the official "enhanced interrogation techniques" used on detainees held in isolation at secret US run prisons:

> 1. The Attention Grab: The interrogator forcefully grabs the shirt front of the prisoner and shakes him.
>
> 2. Attention Slap: An open-handed slap aimed at causing pain and triggering fear.
>
> 3. The Belly Slap: A hard open-handed slap to the stomach. The aim is to cause pain, but not internal injury. Doctors consulted advised against using a punch, which could cause lasting internal damage.
> 4. Long Time Standing: This technique is described as among the most effective.

> Prisoners are forced to stand, handcuffed and with their feet shackled to an eye bolt in the floor for more than 40 hours. Exhaustion and sleep deprivation are effective in yielding confessions.
>
> 5. The Cold Cell: The prisoner is left to stand naked in a cell kept near 50 degrees. Throughout the time in the cell the prisoner is doused with cold water.
>
> 6. Water Boarding: The prisoner is bound to an inclined board, feet raised and head slightly below the feet. Cellophane is wrapped over the prisoner's face and water is poured over him. Unavoidably, the gag reflex kicks in and a terrifying fear of drowning leads to almost instant pleas to bring the treatment to a halt.

Brian Ross and Richard Esposito, *CIA's Harsh Interrogation Techniques Described,* ABC News, Nov. 18, 2005 (available at http://abcnews.go.com/WNT/Investigation/story?id=1322866).  These techniques have led to at least one detainee death.  Jane Mayer, *A Deadly Interrogation*, The New Yorker, Nov. 14, 2005 ("Manadel al-Jamadi, died during an interrogation. His head had been covered with a plastic bag, and he was shackled in a crucifixion-like pose that inhibited his ability to breathe; according to forensic pathologists who have examined the case, he asphyxiated.")(available at www.newyorker.com/fact/content/articles/051114fa_fact).

      The McCain Amendment, which would outlaw the use of torture, cruel, abusive and degrading treatment of detainees held in United States custody, coupled with the renewed investigation into the abuses at Guantánamo makes the possibility of transfer to a "Black Site" likelier.  Active lobbing of Congress by the President and Vice President to defeat the McCain Amendment suggests that it is in the United State's

Page 9    MEMORANDUM IN SUPPORT OF MOTION REQUIRING COMPLIANCE WITH RULE 23 AND PRELIMINARY INJUNCTION FOR 30-DAY NOTICE OF INTENT TO TRANSFER

interest to transfer the detainees to "Black Sites." [2]

## ARGUMENT

The petitioner requests that this Court order the government to comply with Rule 23(a) of the Federal Rules of Appellate Procedure requiring prior approval by the court before a detainee may be transferred. While ordinarily transfer of a prisoner will not defeat the court's jurisdiction, *United States v. Giddings*, 740 F.2d 770, 772 (9th Cir. 1984), here, a transfer to the custody of a foreign government could deprive the petitioner of the opportunity to contest the legality of that very transfer, and would deprive the Court of jurisdiction. Without an order ensuring, at the very least, proper notice before petitioner is transferred, the continued jurisdiction of the Court could be undermined by the government's sudden unilateral action. The Court has the inherent authority under the All Writs Act, 28 U.S.C. § 1651(a), "to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Envtl. Def. Fund v. EPA*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973). Petitioner's request meets the most fundamental purpose of preliminary injunctive relief, "to preserve the status quo between the parties pending a final determination of the merits of the

---

[2] Recent statements by Secretary of State Rice are in apparent conflict with prior administration statements that the CIA should be except the McCain Amendment's proposed ban on torture and abusive treatment of detainees. Compare David Espo and Liz Sidoti, *Cheney Seeks CIA Exemption To Torture Ban*, Wash. Post, Nov. 5, 2005("Vice President Dick Cheney made an unusual personal appeal to Republican senators this week to allow CIA exemptions to a proposed ban on the torture of terror suspects in U.S. custody, according to participants in a closed-door session."); *with* Glenn Kessler, *Rice Defends Tactics Used Against Suspects,* Wash. Post, Dec. 6, 2005 ("The United States government does not authorize or condone torture of detainees.").

Page 10    MEMORANDUM IN SUPPORT OF MOTION REQUIRING COMPLIANCE WITH RULE 23 AND PRELIMINARY INJUNCTION FOR 30-DAY NOTICE OF INTENT TO TRANSFER

action." 13 Moore's Federal Practice 3d, § 65.20 (2004).

### A. Rule 23(a) Requires Advance Permission by the Court Before the Government May Transfer Petitioner.

Rule 23(a) of the Federal Rules of Appellate Procedure unequivocally requires prior approval by the court before a habeas litigant is transferred beyond the court's jurisdiction:

> Transfer of Custody Pending Review. Pending review of a decision in a habeas corpus proceeding commenced before a court, justice, or judge of the United States for the release of a prisoner, the person having custody of the prisoner must not transfer custody to another unless a transfer is directed in accordance with this rule. When, upon application, a custodian shows the need for a transfer, the court, justice, or judge rendering the decision under review may authorize the transfer and substitute the successor custodian as party.

Fed.R.App.Pro. 23(a). The text of the rule, which is enacted under authority of the Congress, provides no exceptions. *See Dodd v. United States,* 125 S.Ct. 2478, – (2005)("We must presume that [the] legislature says in a statute what it means and means in a statute was it says."(quoting *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253-54 (1992)).

Non-compliance with Rule 23(a) should not be allowed to defeat this Court's jurisdiction to provide relief from those very same unlawful acts. Jurisdiction for relief cannot be barred as "the result of interference by government officials with the presentation of the claim." *Pace v. DiGuglielmo,* 125 S.Ct. 1807, 1818 (2005)(citation omitted). The Rule is absolute – the government must seek advance authorization to transfer the petitioner.

Petitioner is familiar with this Court's opinion in *O.K. v. Bush,* 377 F.Supp.2d 102

Page 11    MEMORANDUM IN SUPPORT OF MOTION REQUIRING COMPLIANCE WITH RULE 23 AND PRELIMINARY INJUNCTION FOR 30-DAY NOTICE OF INTENT TO TRANSFER

(D.D.C. 2005), which applied Rule 23(a) narrowly, finding that the rule concerned only identity of parties. This motion presents issues not reached in that case.

*O.K.* did not have before it the issue of the continued validity of the petitioner's claims challenging his status as an enemy combatant where jurisdiction could be defeated by the transfer from Guantanamo. Where the petitioner's "enemy combatant" status may have life-threatening collateral consequences – regardless of the factual basis of such allegations – resulting in likely detention and further interrogation, the Court should not allow the government to unilaterally defeat jurisdiction through the summary transfer of the petitioner. This Court's prior ruling was premised on the conclusion that there was little evidence to show that O.K, a Canadian, would be transferred into continued custody. *Id.,* at 117. Facts that have come to light since *O.K.* was decided show that the petitioner here faces a very real threat that forced repatriation would result in continued detention and possibly torture. At the very least, the government should be required to establish Mr. Hamad's country of origin and that it, like Canada, has a fair legal system. If not, the rationale of *O.K.* is inapplicable.

In footnote 17, the Court noted in *O.K.* that, while it is the policy of the United States not to repatriate to a country where it is more likely than not that the person will be tortured, there is no law preventing the government from doing so outside of the immigration context. 377 F.Supp.2d at 118 n. 17. We respectfully suggest that the Court was not presented with all relevant authority in *O.K.*. While the military may not be bound by immigration regulations – which is arguable – all agencies of the United States government are bound by the Convention Against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment, a ratified treaty of the United States. U.S. Const., Art. VI cl.2.[3]  Upon further review, we urge the Court to order that the government is not allowed to transfer the petitioner without the prior authorization required by Rule 23(a).

B.  **Requiring the Limited Obligation to Provide 30-day Advance Notice of an Intent to Transfer Is Proper under Federal Rule of Civil Procedure 65.**

The petitioner is entitled to a preliminary injunction for the limited purpose of maintaining the status quo pending adjudication of the merits of his habeas petition by requiring the government to provide 30-day notice of its intent to transfer or repatriate the petitioner.  The petitioner can demonstrate 1) irreparable harm if the application is not granted, 2) a strong public interest in providing the relief petitioner seeks, 3) a likelihood of success on the merits, and 4) no corresponding injury to the government if the restraint is not granted. *Al-Fayed v. CIA*, 254 F.3d 300, 303 (D.C.Cir. 2001).  "These factors interrelate on a sliding scale and must be balanced against each other.  *Serano Labs., Inc. v. Shalala,* 158 F.3d 1313, 1318 (D.C.Cir. 1998).  When the balance of hardships tips decidedly toward the movant, it "will ordinarily be enough that the movant has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberative investigation."

---

[3]*O.K.* focused it's discussion of the Convention Against Torture on whether the treaty conferred a right of action.  However, the obligation of agencies to honor the Convention Against Torture is an entirely separate issue.  Whether a detainee has a cause of action for an unlawful transfer, does not make the transfer any less unlawful. *Cf. Wang v. Ashcroft*, 320 F.3d 130, 141 (2nd Cir. 2003) (convention against torture claims cognizable in § 2241 habeas statute).

Page 13   MEMORANDUM IN SUPPORT OF MOTION REQUIRING COMPLIANCE WITH RULE 23 AND PRELIMINARY INJUNCTION FOR 30-DAY NOTICE OF INTENT TO TRANSFER

*Washington Metro Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841, 844 (D.C.Cir. 1977). An injunction may issue if one factor is particularly strong, even if the arguments in the other areas are weak. *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C.Cir. 1995).

    1.    *Transfer without prior approval or notice would cause irreparable harm.*

The petitioner faces two obvious and substantial threats were he suddenly transferred from Guantánamo. First, he faces the very real possibility of torture and indefinite detention in many of the countries from which the Guantánamo detainees originate. Second, he faces the potential elimination of all opportunity to adjudicate his habeas claims.

        a.    The threat of torture and continued detention upon transfer would cause irreparable harm.

Torture and indefinite detention undeniably cause irreparable harm. As noted above, petitioner faces a substantial likelihood of torture and detention if he were "renditioned" or forcibly repatriated. The government admits that many detainees have been transferred to continued custody. *Country Reports on Human Rights Practices – 2004,* available http:www.state.gov/g/drl/rls/hrrpt/2004 (65 of 211 detainees released to continued custody). The impending enactment of the McCain Amendment restricting the government's actions toward detainees, coupled with Vice President Cheney's public declarations of the need for extreme interrogation techniques, adds impetus for the government to unilaterally transfer detainees from Guantánamo.

Moreover, even if the government did not intend to "rendition" the petitioner,

Page 14    MEMORANDUM IN SUPPORT OF MOTION REQUIRING COMPLIANCE WITH RULE 23 AND PRELIMINARY INJUNCTION FOR 30-DAY NOTICE OF INTENT TO TRANSFER

forced repatriation would have the same effect were petitioner a member or advocate of a banned organization, such as a fundamentalist group. Upon information and belief, release under these circumstances is not the relief that petitioner seeks. Moreover, forced repatriation to torture and indefinite detention would violate immigration laws and the Convention Against Torture. 8 U.S.C. 1231 note ("[I]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture."). Although the government has not announced its intent to transfer Mr. Hamad immediately, the government in similar cases has maintained its right to transfer at any time. In fact, the government recently "released" five Guantánamo detainees to Kuwait. These releases indicates an immediate interest and intent to repatriate the Guantánamo detainees. Transfer should be barred pending resolution of these proceedings or the voluntary and informed consent by Mr. Hamad to the transfer, made with the advice of counsel.

      b.    The extinguishment of an opportunity to adjudicate his claims causes irreparable harm.

Transfer or forced repatriation would deprive the court of jurisdiction to consider the merits of his habeas petition. Rule 23(a) protects the court's jurisdiction in the event of a potential transfer. Although the caselaw holds that transfer to another custodian does not deprive the court of jurisdiction, transfer to another country would "effectively extinguish [petitioner's] habeas claims by fiat." *Abdah v. Bush*, No. 04-CV 1245 Slip op. at 7(D.D.C. 2005). "With or without the allegation of improper forms of interrogation in a

Page 15    MEMORANDUM IN SUPPORT OF MOTION REQUIRING COMPLIANCE WITH RULE 23 AND PRELIMINARY INJUNCTION FOR 30-DAY NOTICE OF INTENT TO TRANSFER

foreign country, . . . a continuation of their detention without redress to assess its legality could constitute irreparable harm to the Petitioners." *Id.* at 8.

If, as the government claims, the United States loses all control of the detainees once they are transferred to another country, the court would lose jurisdiction to consider all of the petitioner's claims. Upon information and belief, Mr. Hamad seeks not only total freedom, but also a determination that he is not an enemy combatant in order to clear his reputation. Depriving Mr. Hamad of the opportunity to litigate his claims would cause irreparable harm.

2.  *There is a strong public interest in maintaining the status quo.*

Mr. Hamad has a protected interest in judicial review of his detention and classification as a enemy combatant. *Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004). Should the government seek to undermine that right by unilaterally transferring the petitioner, he should at the very least be afforded the opportunity to be heard first. At a minimum, the government should be obligated to adhere to the United States' policy prohibiting the transfer of individuals to countries who torture. *Fund for Animals, Inc. v. Espy*, 814 F.Supp. 12, 152 (D.D.C. 1993)(public interest lies "in meticulous compliance with the law by public officials.").

Confidence that the government will comply with the rule of law has been shattered by recent revelations of improper treatment in Abu Ghraib that resulted in trial and conviction of United States military personnel and allegations of similar conduct in Guantánamo and of prisons operated in secret so that the government can use all means necessary – including torture – in interrogation. The "Black Sites," coupled with

the Executive's public efforts to undermine the McCain Amendment prohibiting torture, abuse and degrading treatment of detainees, create the impression that the government can avoid the application of laws by simply placing people beyond the court's reach. Indeed, that was the position articulated by the government for establishing the Guantánamo prison. *See* Respondents' Brief filed in *Rasul v. Bush,* 2004 WL 425739 (2004). No matter how satisfied the Executive Branch is that its actions are lawful, the public good and the Separation of Powers Doctrine require that federal litigants properly before the Court and represented by counsel have a meaningful opportunity to contest their transfer into the hands of those who might abuse them or detain them indefinitely without due process of law.

       3.     *There Are No Countervailing Government Interests.*

In contrast to the actual irreparable harms that Mr. Hamad faces, there can be no injury to the government where, as here, injunctive relief would merely require it to abide by Rule 23 and provide counsel with advance notice. The only practical effect of an injunction is to maintain the status quo to allow a sufficient time for counsel to consult with Mr. Hamad, and should, transfer be determined to pose a danger to Mr. Hamad's safety, seek an opportunity to be heard by the Court through appropriate means.

Injunctive relief does not interfere with the government's diplomatic efforts. The government has held Mr. Hamad in custody for several years. Delaying transfer for 30 days to ensure that the Court reviews any transfer and retains jurisdiction does not constitute even a minimal burden on the government. The balance of harms tilts

Page 17    MEMORANDUM IN SUPPORT OF MOTION REQUIRING COMPLIANCE WITH RULE 23 AND PRELIMINARY INJUNCTION FOR 30-DAY NOTICE OF INTENT TO TRANSFER

overwhelmingly toward Mr. Hamad.

> 4. *The Petitioner Is Likely To Succeed On The Merits, And, At A Minimum, Raises Serious and Substantial Questions As To The Legality Of His Detention That Warrant Maintaining The Status Quo.*

The petitioner is likely to succeed on the merits of his claims. The Supreme Court in *Rasul* noted that the detainees claims "unquestionably describe custody in violation of he Constitutional or laws or treaties of the United States." 542 U.S. at 484 n.15. Last term the Court also held that the indefinite detention of Mariel Cubans, also regarded by the government as having no protections under the Constitution or laws of the United States, was unlawful. *Martinez v. Clark*, 125 S.Ct.716 (2005). The government in *Martinez* claimed that it had unreviewable discretion under its foreign powers authority to indefinitely detain persons who it deemed undesirable because they had committed crimes in the United States but who could not be deported to Cuba. The government in this case cites to a similar unreviewable authority to indefinitely detain. Under the reasoning of *Martinez*, there is a likelihood of success on the merits of Mr. Hamad's claims.

Even if the petitioner could not make that showing, injunctive relief is appropriate because he has demonstrated that his claims raise serious and substantial issues warranting further investigation. *Washington Metro,* 559 F.2d at 844. The courts in this district are divided on the merits of the petitioners claims. *Compare In re Guantánamo Cases,* 355 F.Supp.2d 443 (D.D.C. 2005) (holding that Guantánamo detainees have some constitutional rights) *with Khalid v Bush*, 355 F.Supp.2d 311 (D.D.C. 2005)(holding that Guantánamo detainees have no constitutional rights). Moreover, the

Supreme Court accepted certiorari in *Hamdan v. Bush* to consider some of the questions involved in whether the tribunals that classified Mr. Hamad as an enemy combatant met constitutional and statutory requirements.  "The issues raised in these motions are sensitive and involve complex constitutional questions. . . .  Like the issue in *Hamdi v. Rumsfeld, Padilla v. Rumsfeld,* and *Rasul,* there is a strong probability that they ultimately will be resolved by the Supreme Court." *Al Marri v. Bush*, 2005 WL 774843 (D.D.C. Apr. 4, 2005).

**Conclusion**

For the reasons discussed above, the Court should enter an order under Rule 23(a) directing the government not to subject Mr. Hamad to involuntary rendition or repatriation without first giving him the opportunity to consult with counsel and without express authorization from this Court.  Alternatively, the government should be ordered to notify this Court and counsel 30 days in advance of any effort to transfer or repatriate Mr. Hamad so that any appropriate litigation can commence.  At a minimum, the Court should order that the status quo be maintained, *i.e.,* Mr. Hamad be maintained in Guantánamo, until counsel has had an opportunity to confer with him to determine if repatriation is in his interest.

Respectfully submitted 14th day of December, 2005.

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Patrick Ehlers
Patrick Ehlers
Assistant Federal Defender

Page 19   MEMORANDUM IN SUPPORT OF MOTION REQUIRING COMPLIANCE WITH RULE 23 AND PRELIMINARY INJUNCTION FOR 30-DAY NOTICE OF INTENT TO TRANSFER