### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ADEL HASSAN HAMAD, et al., | |
| Petitioners, | |
| v. | Civil Action No. 05-1009 (JDB) |
| GEORGE W. BUSH, et al., | |
| Respondents. | |

### RESPONDENTS' MEMORANDUM IN OPPOSITION TO PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION REQUIRING ADVANCE AUTHORIZATION AND/OR ADVANCE NOTICE OF TRANSFER OR RELEASE

Respondents hereby respond to petitioner's motion for a preliminary injunction requiring respondents to obtain advance authorization from the Court, or in the alternative requiring respondents to provide the Court and petitioners' counsel with 30 days' advance notice, before any transfer or release of petitioner from Guantanamo (dkt. no. 21). Petitioner's motion should be denied because it fails to establish a factual or legal basis for the relief sought, as this Court previously held in a number of other cases. See Al-Anazi v. Bush, 370 F. Supp. 2d 188 (D.D.C. 2005); O.K. v. Bush, 377 F. Supp. 2d 102 (D.D.C. 2005); Order dated Oct. 25, 2005, in Zaid v. Bush, Civ. A. No. 05-1646 (JDB); Order dated Nov. 17, 2005, in Al-Shabany v. Bush, Civ. A. No. 05-2029 (JDB); Order dated Dec. 9, 2005, in Tohirjanovich v. Bush, Civ. A. No. 05-994 (JDB).

### BACKGROUND

**A.    Detention of Enemy Combatants at Guantanamo**

Following the terrorist attacks of September 11, 2001, pursuant to his powers as Commander in Chief and with congressional authorization, see Authorization for Use of Military

Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States

Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and

others that had supported it.  In the course of those hostilities, the United States has captured or

taken custody of a number of foreign nationals as enemy combatants, some of whom are being

held at the Guantanamo Bay Naval Base ("Guantanamo") in Cuba.

**B.      Repatriation and Transfer of Enemy Combatant Detainees at Guantanamo**

Although the laws of war permit the United States to hold enemy combatants in detention

for the duration of hostilities, the United States has no interest in detaining any individuals longer

than necessary.  See Declaration of Deputy Assistant Secretary of Defense for Detainee Affairs

Matthew C. Waxman dated June 2, 2005 ("Waxman Decl.") ¶ 3; Declaration of then Ambassador

Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ 2.[1]  The Department of Defense

("DoD") conducts at least annual reviews of each Guantanamo detainee to determine whether

continued detention is warranted based on factors such as whether the detainee continues to pose

a threat to the United States and its allies.  Waxman Decl. ¶¶ 3, 7; Prosper Decl. ¶ 2.  Those

annual reviews include those currently being conducted through Administrative Review Boards.

See Waxman Decl. ¶¶ 3, 7.[2]  As part of the Administrative Review Board process, counsel who

---

[1] The June 2, 2005 Waxman Declaration submitted herewith replaces and supersedes two
prior declarations by Deputy Assistant Secretary Waxman submitted in connection with similar
motions in other Guantanamo detainee cases.  See Waxman Decl. ¶ 1.  The Prosper Declaration
submitted herewith was originally submitted in connection with a similar motion in Abdah, Civ.
A. No. 04-1254 (HHK), and Ambassador Prosper left office on or about October 11, 2005, but
the policies and practices set forth in his March 8 declaration remain in effect and are applicable
to the instant case.  Certain numerical information in the declarations is subject to updating.  See
infra note 3.

[2] See generally Memorandum of the Deputy Secretary of Defense dated May 11, 2004,
(continued...)

represent detainees have been invited to make written submissions concerning whether further detention is appropriate; in these submissions, counsel are free to raise, and in fact have raised, any concerns about transfer or repatriation, and have in fact made such submissions.

Following consultation with various agencies, a senior Department of Defense official grants the ultimate approval for the transfer of any Guantanamo detainee to the control of another government.  Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 2-3, 7.  Almost 250 Guantanamo detainees have been so transferred, over a period spanning several years.  Waxman Decl. ¶ 4; Prosper Decl. ¶ 2.[3]

Where continued detention by the United States is not warranted, a detainee may be transferred to the control of another government, typically the government of his country of citizenship, for release.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  The United States also transfers Guantanamo detainees, under appropriate circumstances, to the control of other governments for continued detention, investigation, and/or possible prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  Such

_____

[2](...continued)
re: Administrative Review Procedures for Enemy Combatants in the Control of the Department of Defense at Guantanamo Bay Naval Base, Cuba, available at <<http://www.defenselink.mil/news/May2004/d20040518gtmoreview.pdf>>; Memorandum dated September 14, 2004, re: Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, available at <<http://www.defenselink.mil/news/Sep2004/ d20040914adminreview.pdf>>.

[3]  As an update to certain information provided in the attached declarations, at last count, 256 detainees have been transferred by the Defense Department from Guantanamo, of which 180 were transferred for release.  See Department of Defense News Release, "Detainee Transfer Announced," Nov. 5, 2005, available at <<http://www.defenselink.mil/news/detainees.html>>.

governments can include the government of a detainee's country of citizenship, or another country that may have law enforcement, prosecution, or other interest in the detainee. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.

Such transfers to the control of other governments for continued detention, investigation, and/or prosecution occur after a dialogue between the United States and the receiving government, which may have been initiated by either the United States or the receiving government. Waxman Decl. ¶ 5. The purpose of such dialogue is to ascertain or establish what measures the receiving government intends to take, pursuant to its own domestic laws and independent determinations, that will ensure that the detainee will not pose a continuing threat to the United States and its allies. Id. In all cases where a transfer is consummated, the detainee is transferred entirely to the custody and control of the other government; once transferred, the individual is no longer in the custody or control of the United States. Id. Any future detention of that individual is by the foreign government pursuant to its own laws and not on behalf of the United States. Id. In fact, most of the Guantanamo detainees who have been transferred by the Department of Defense to the control of their home countries for continued detention, investigation, and/or prosecution have been released from detention some time after the transfer. Id.

In any transfer, a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations. Prosper Decl. ¶ 4; Waxman Decl. ¶ 6-7. It is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured. Prosper Decl. ¶ 4; Waxman Decl. ¶ 6. If a transfer is deemed appropriate, a process is

undertaken, typically involving the Department of State, in which appropriate assurances

regarding the detainee's treatment are sought from the country to whom the transfer of the

detainee is proposed.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 5.  Once the Department of Defense

approves a transfer and requests the assistance of the Department of State, the Department of

State initiates transfer discussions with the foreign government concerned.  Waxman Decl. ¶ 6;

Prosper Decl. ¶ 6.  Such discussions include an effort to seek assurances that the United States

Government considers necessary and appropriate for the country in question, including

assurances of humane treatment and treatment in accordance with the international obligations of

the foreign government accepting transfer.  Id.  Among other things, the Department of State

considers whether the nation in question is a party to relevant treaties such as the Convention

Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues

more specific assurances if the nation concerned is not a party or other circumstances warrant.

Id.

       The determination whether it is more likely than not an individual would be tortured by a

receiving foreign government, including, where applicable, evaluation of foreign government

assurances, involves senior level officials and takes into account a number of considerations,

including whether the nation concerned is a party to certain treaties; the expressed commitments

of officials of the foreign government accepting transfer; the particular circumstances of the

transfer, the country, and the individual concerned; and any concerns regarding torture that may

arise.  Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7.  Recommendations by the State Department are

developed through a process involving the Bureau of Democracy, Human Rights, and Labor

(which drafts the State Department's annual Country Reports on Human Rights Practices) and

the relevant State Department regional bureau, country desk, or U.S. Embassy.  Prosper Decl.

¶ 7.  When evaluating the adequacy of assurances, State Department officials consider the

identity, position, or other information concerning the official relaying the assurances; political or

legal developments in the foreign country concerned that provide context for the assurances; and

the foreign government's incentives and capacity to fulfill its assurances to the United States.

Prosper Decl. ¶ 8.  In an appropriate case, the State Department may consider various monitoring

mechanisms for verifying that assurances are being honored.  Id.  If a case were to arise in which

the assurances obtained from the receiving government were not sufficient when balanced

against treatment concerns, the United States would not transfer a detainee to the control of that

government unless the concerns were satisfactorily resolved.  Waxman Decl. ¶ 7; Prosper Decl. ¶

8.  Indeed, circumstances have arisen in the past where the Department of Defense decided not to

transfer detainees to their country of origin because of mistreatment concerns.  Waxman Decl. ¶

7; Prosper Decl. ¶ 8.

The United States' ability to seek and obtain assurances from a foreign government

depends on its ability to treat its dealings with the foreign government with discretion.  Prosper

Decl. ¶ 9; Waxman Decl. ¶ 8.  Obviously, diplomatic sensitivities surround the Department of

State's communications with foreign governments concerning allegations relating to torture.

Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  The United States Government typically does not

unilaterally make public any specific assurances or other precautionary measures obtained,

because such disclosure would have a chilling effect on and cause damage to our ability to

conduct foreign relations.  Prosper Decl. ¶ 9.  If the United States Government were required to

disclose its communications with a foreign government relating to particular mistreatment or

torture concerns outside appropriate Executive Branch channels, that government and potentially other governments would likely be reluctant to communicate frankly with the United States concerning such issues in the future.[4]  Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8.  As a result, disclosure could impede our country's ability to obtain vital cooperation from concerned governments with respect to military, law enforcement, and intelligence efforts related to the war on terrorism.  Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

## ARGUMENT

**I.    PRELIMINARY INJUNCTION STANDARD**

It is well-established that a request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'"  See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In particular, the irreparable harm that must be shown to justify a preliminary injunction

---

[4] Another reason such disclosure would be harmful is that the State Department's recommendation concerning transfer relies heavily on facts and analyses provided by Embassies and other State Department offices, and confidentiality is necessary to ensure that the advice and analysis provided by those offices are useful and informative for the decision-maker.  Prosper Decl. ¶ 11.  Disclosure of their assessments could chill important sources of information and interfere with the ability of our foreign relations personnel to interact effectively with foreign state officials.  Id.

"must be both certain and great; it must be actual and not theoretical." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Id. (citations and internal quotation marks omitted; emphasis in original).[5]

## II.    PETITIONER FAILS TO SHOW IRREPARABLE INJURY

### A.    The Mooting of a Habeas Claim that Naturally Flows From Relinquishment of United States Custody Does Not Constitute Irreparable Injury Justifying a Preliminary Injunction

Some Judges of this Court have required advance notice of any transfer through a preliminary injunction or otherwise in order to "protect" or "preserve" the Court's jurisdiction, reasoning that a transfer would or could extinguish the transferred detainee's habeas claims and curtail the Court's review of the legality of his detention.  Respondents respectfully suggest that these decisions rest on faulty logic.  Any right to challenge the legality of one's detention through a habeas proceeding cannot reasonably extend so far as to require that detention be continued,

---

[5] Some Judges of this Court have entered the functional equivalent of preliminary injunctive relief as a component of a stay of proceedings related appeals.  Similarly, petitioner's motion is framed in a way that suggests an order requiring advance notice be entered directly under Federal of Appellate Procedure 23(a), without resort to the preliminary injunction framework.  As this Court previously concluded, however, "if the petitioners cannot meet the prerequisites of a motion for preliminary injunction . . . it is unlikely that they should receive that same relief through the backdoor of a stay." Al-Anazi, 370 F. Supp. 2d at 199 n.11 (citing Laborers' Intern. Union of North Am. v. Nat'l Post Office Mail Handlers, 1988 WL 142384, at *1 (D.D.C. Dec. 23, 1988)).  Thus, in whatever form of order the inherently-injunctive-in-nature relief petitioner seeks might be embodied, petitioner should be required to satisfy the preliminary injunction standard in order to justify that relief.  For this reason, we analyze petitioner's arguments under Federal Rule of Appellate Procedure 23(a) as part of the preliminary injunction framework.  See infra Section III.A.

after the Executive determines that the military rationales for enemy combatant detention no longer warrant such custody, for no reason other than to be able to test the legitimacy of detention the Executive no longer is interested in maintaining.[6]  "The ultimate objective of a habeas petition is release from custody."  Almurbati, 366 F. Supp. 2d at 78.  As Judge Walton found, "once the respondents release the petitioners from United States custody . . . they will have obtained the result requested and at that point there will be no further need for this Court to maintain jurisdiction."  Id. at 80; see also Al-Anazi, 370 F. Supp. 2d at 198 ("Every habeas petition, including this one, is ultimately about obtaining release from detention, and where, as here, the United States will relinquish custody of the detainee to the home government there is nothing more the Court could provide to petitioners." (citation omitted)).

     That release from United States custody will give petitioner all the relief he can seek through habeas is not altered by the fact that, upon being released from the custody of the United States, a former detainee may be taken into custody and detained in the receiving country based on that country's independent interests and determinations.  As respondents' declarations make clear, when the Department of Defense transfers detainees to the control of other governments,

---

[6] Transfers of Guantanamo detainees are not undertaken in order to thwart the jurisdiction of the Court.  Waxman Decl. ¶ 3.  Indeed, such transfers have been occurring since October 2002, long before the June 28, 2004 Rasul Supreme Court decision and the proliferation of detainee habeas petitions that it spawned in this Court.  Waxman Decl. ¶ 4.  As this Court previously noted, 131 transfers (i.e., more than half of the transfers to date) had occurred three months or longer before Rasul was decided, "thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of transfer in order to thwart the jurisdiction of the courts."  Al-Anazi, 370 F. Supp. 2d at 196 n.7 (citing Dep't of Defense, Transfer of Afghani and Pakistani Detainees Complete (Mar. 15, 2004), available at http://www.defenselink.mil/releases/2004/nr20040315-0462.htm); see also supra note 4 (citing documents showing that administrative review process for considering transfers and repatriations predates Rasul and the filing of this and most other detainee habeas petitions).

the detainees are no longer subject to the custody or control of the United States, and any

subsequent confinement in the receiving country is based on the receiving government's

independent decision, based on its domestic laws, that the individual should be detained.

Waxman Decl. ¶ 5.[7]  The Court should therefore reject petitioner's suggestion that the possibility

of future detention in an individual's home or another country based on that country's

independent interests and determinations constitutes irreparable injury warranting an injunction.

> **B.     Speculation that the United States Will Defy its Own
> Policy by Transferring Detainees to Countries in
> Circumstances Where it is Believed They Will be Tortured
> Does Not Warrant a Preliminary Injunction**

Nor can petitioner carry his burden to show irreparable injury that is "certain and great . . .

actual and not theoretical," <u>Wisconsin Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985), by

unhinged speculation that, contrary to the policies and processes attested to in the sworn

declarations of high-level Executive Branch officials, the United States has designs to send

petitioner to a country in circumstances where he will be tortured.  Those declarations, after all,

make clear that it is the policy of the United States not to repatriate or transfer a detainee to a

country when the United States believes, based on a number of factors and considerations, it is

more likely than not that the individual will be tortured there.  Prosper Decl. ¶ 4; Waxman Decl.

¶ 6.  This policy is implemented through a process that contains several levels of precautions and

safeguards.  To conclude that an injunction is nevertheless necessary would require the Court to

assume, without any evidence, that the United States' policy and practice is somehow a sham or

---

[7] Even if the United States transfers a detainee to another country with the understanding
that, from the United States' perspective, he can be released, the receiving country is not, and
could not be, prevented from subsequently taking any law enforcement or investigatory action
against the former detainee that it may deem appropriate under its laws.

pretext.  As this Court has previously determined, there is no valid basis for such an assumption.

Rather, as Judge Walton has found, respondents' sworn declarations "directly refute the

petitioners' allegations of their potential torture, mistreatment and indefinite detention to which

the United States will in some way be complicit."  Almurbati, 366 F. Supp. 2d at 78.  Moreover,

this Court previously found that the assortment of magazine and newspaper stories that

petitioners in previous cases had compiled – which overlaps considerably with the magazine and

newspaper stories that petitioner relies upon here – failed to form a factual predicate justifying an

injunction, noting that, among other problems with relying on such materials, "[p]etitioners [in

that case] concede that none of these incidents involve the transfer of detainees out of

Guantanamo."  Al-Anazi, 370 F. Supp. 2d at 190-91; see also id. at 196.  Thus, petitioner has

failed to show that either the prospect of relinquishment from United States custody or

unfounded speculation about possible torture in a foreign country constitute irreparable harm that

must be remedied by a preliminary injunction.

### III.    PETITIONER CANNOT SHOW A LIKELIHOOD OF SUCCESS IN OBTAINING A COURT ORDER PREVENTING A TRANSFER IN ACCORDANCE WITH THE POLICIES EXPRESSED IN RESPONDENTS' DECLARATIONS

Petitioner fares no better on the second prong of the preliminary injunction analysis,

which requires him to show that he is likely to succeed, following notice, in preventing a transfer

from Guantanamo.

To be clear, whatever the merits of the issues currently before the D.C. Circuit in the

ongoing appeals in Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005), appeals docketed, Nos.

05-5062, 05-5063 (D.C. Cir. Mar. 2, 2005), and In re Guantanamo Detainee Cases, 355 F. Supp.

11

2d 443 (D.D.C. 2005), <u>appeal on petition for interlocutory appeal</u>, No. 05-5064 et al. (D.C. Cir.),

and of petitioner's claim that he is being wrongfully detained, it is not the likelihood of success

on <u>those</u> issues or claims that matters for purposes of the instant motion for preliminary

injunction.  As this Court previously held, and another Judge has agreed, the likelihood of

success analysis must focus on the legal basis for petitioner to obtain an order preventing

<u>termination</u> of detention by the United States in the manner described in the declarations

submitted herewith.  <u>See</u> <u>Al-Anazi</u>, 370 F. Supp. 2d at 194 ("[T]he presence of a sound basis to

challenge the legality of one's <u>detention</u> does not at all imply that there exists a sound basis to

challenge the legality of one's <u>transfer</u>.  Put differently, the 'merits,' if you will, to be assessed for

purposes of the present claim for preliminary injunctive relief, is petitioners' challenge to their

<u>transfer</u> from Guantanamo, not to their <u>detention</u> at Guantanamo (emphasis in original)); <u>Abdah</u>,

2005 WL 711814, at *4 ("<u>if</u> there are no circumstances under which Petitioners could obtain a

court order preventing a contemplated transfer, a preliminary injunction should not be granted"

(emphasis in original)).

　　　Petitioner fails to identify any valid source of legal authority for such an order.

Moreover, even if a valid source of legal authority existed for an order prohibiting a <u>transfer</u>, the

Rule of Non-Inquiry, which bars judicial inquiry into the fairness of a foreign nation's justice

system and the procedures or treatment that an individual may experience in a foreign nation,

weighs heavily against petitioners' likelihood of success in contesting a transfer or repatriation.

##### A.　　Federal Rule of Appellate Procedure 23 Does Not Apply

　　　Petitioner's primary argument appears to be that Rule 23(a) of the Federal Rules of

Appellate Procedure requires prior court approval before a detainee may be released, repatriated,

or transferred.  See Petr's Mem. at 10-13.  However, petitioner never confronts a threshold

problem with this argument: the Federal Rules of Appellate Procedure, by their terms, plainly do

not apply to this case, in which there has not been any decision undergoing appellate review.  See

Fed. R. App. P. 23(a) (applying "[p]ending review of a decision in a habeas corpus proceeding"

and only to "the prisoner" in whose proceeding that decision was made); see also Fed. R. App. P.

1(a)(1) ("These rules govern procedure in the United States courts of appeals."); Order dated May

3, 2005, in Battayav v. Bush, Civ. A. No. 05-714 (RBW) (D.D.C.), at 1 n.1 (rejecting Fed. R.

App. P. 23(a) argument in case that, like this one, did not have a pending appeal); Al-Anazi, 370

F. Supp. 2d at 199 n.11 ("The Court notes that petitioners did not even attempt to argue in their

papers that Federal Rule of Appellate Procedure 23 requires a stay of a transfer decision, because

petitioners' habeas petition is not presently on appeal.").

     In any event, this Court has already thoroughly considered this issue and held that, even

in a case in which there was a decision undergoing appellate review, Federal Rule of Appellate

Procedure 23(a) did not have the effect that petitioner ascribes to it.  O.K. v. Bush, 377 F. Supp.

2d 102, 116-17 (D.D.C. 2005).  As the Court held there, petitioner's novel attempted use of the

rule "would transform a technical and procedural rule that addresses the identity of the parties in

a habeas proceeding into a sweeping prohibition on the transfer and release of military detainees

while a case is on appeal."  Id. at 117 (citing Dep't of Navy v. Egan, 484 U.S. 518, 527 (1988)).

     Petitioner strains to distinguish O.K. on the ground that "O.K. did not have before it the

issue of the continued validity of the petitioner's claims challenging his status as an enemy

combatant where jurisdiction could be defeated by the transfer from Guantanamo."  Petr's Mem.

at 12.  This attempted distinction is specious.  That issue was as much before the Court in O.K.

as it is currently in the instant case.[8]  Petitioner also attempts to distinguish O.K. factually.

However, petitioner's allegations here are of a piece with those made in O.K., Al-Anazi, and the

other cases in which this Court has ruled on this question.  In any event, given the Court's

discussion in O.K. interpreting Fed. R. App. P. 23(a) as a matter of law as not applying to "block

the movement of detainees captured in the course of ongoing military hostilities," O.K., 377 F.

Supp. 2d at 116, it would make little sense to say that the applicability of the Rule should vary

depending on the particulars of the factual allegations in a given case.[9]

### B.     Petitioner's Other Arguments for Likelihood of Success On the Merits Address the Wrong "Merits"

Petitioner's other argument for a likelihood of success on the merits is that he is likely to

succeed on the merits of his challenge to what he terms "indefinite detention."  Petr's Mem. at 18

(citing Martinez v. Clark, 125 S. Ct. 716 (2005)).  Petitioner contends that his claims at least

"raise serious and substantial issues warranting further investigation," and in support of that

proposition, cites the contrasting opinions in In re Guantanamo Detainee Cases, 355 F. Supp. 2d

---

[8] To the extent the Court's opinion in O.K. does not contain a lengthy discussion of that particular issue, that would seem to be because the Court had already discussed it in Al-Anazi v. Bush, 370 F. Supp. 2d 188, 196-97 (2005), a decision that petitioner altogether ignores.  In its opinion in O.K., the Court naturally focused on the new arguments petitioner O.K. made for why his case was different from Al-Anazi.  See O.K., 377 F. Supp. 2d at 115-18.

[9] Finally, petitioner argues that "the Court was not presented with all relevant authority in O.K.," and brings the Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment and Punishment ("CAT") to the Court's attention.  Petr's Mem. at 12-13.  This is a puzzling contention, as the very footnote that petitioner faults for omitting the CAT expressly addresses the CAT and its implementing statute.  See O.K., 377 F. Supp. 2d at 118 n.17. Likewise, while petitioner claims that "[w]hether a detainee has a cause of action for unlawful transfer, does not makes the transfer any less unlawful," Petr's Mem. at 13 n.3, even petitioner would have to concede that "whether a detainee has a cause of action for unlawful transfer" is of key significance to whether the Court has the authority to enjoin a transfer.

443 (D.D.C. 2005), and <u>Khalid v. Bush</u>, 355 F. Supp. 2d 311 (D.D.C. 2005), and the Supreme

Court's recent grant of certiorari to review <u>Hamdan v. Bush</u>, 415 F.3d 33 (D.C. Cir. 2005)

(involving prosecution by military commission).

      Petitioner's analysis concentrates on the wrong target. <u>See</u> <u>Al-Anazi</u>, 370 F. Supp. 2d at

194 ("[T]he presence of a sound basis to challenge the legality of one's <u>detention</u> does not at all

imply that there exists a sound basis to challenge the legality of one's <u>transfer</u>. Put differently,

the 'merits,' if you will, to be assessed for purposes of the present claim for preliminary injunctive

relief, is petitioners' challenge to their <u>transfer</u> from Guantanamo, not to their <u>detention</u> at

Guantanamo (emphasis in original)). Therefore, petitioner's suggestion that his underlying

challenges to his detention enjoy favorable prospects, whatever may be that suggestion's validity,

should be dismissed as irrelevant to the particular likelihood-of-success inquiry that matters for

purposes of the present motion.

      **C.**     **Separation-of-Powers Principles Militate Heavily Against**
                **Petitioner's Likelihood of Success**

      Further, even if some valid claim or other legal basis existed for judicial involvement in

transfer or repatriation decisions with respect to enemy combatants held abroad, or for an

advance authorization or advance notice requirement to support and facilitate such involvement,

the separation of powers would bar such relief. "[I]t is beyond the judicial function for a court to

review foreign policy decisions of the Executive Branch." <u>People's Mojahedin Org. v. Dep't of</u>

<u>State</u>, 182 F.3d 17, 23 (D.C. Cir. 1999) (citing <u>Chicago & Southern Air Lines, Inc. v. Waterman</u>

<u>Steamship Corp.</u>, 333 U.S. 103 (1948)); <u>see also</u> <u>Holmes v. Laird</u>, 459 F.2d 1211, 1215 (D.C.

Cir. 1972) ("In situations such as this, '[t]he controlling considerations are the interacting

interests of the United States and of foreign countries, and in assessing them [the courts] must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations.'") (quoting Romero v. International Terminal Operating Co., 358 U.S. 354, 383 (1959)).[10]  If the Court were to entertain petitioner's claims to a right to contest repatriation or removal from Guantanamo, it would insert itself into the most sensitive of diplomatic matters.  Judicial review of a transfer or repatriation decision could involve scrutiny of United States officials' judgments and assessments on the likelihood of torture in a foreign country, including judgments on the reliability of information and representations or the adequacy of assurances provided, and confidential communications with the foreign government and/or sources therein.  Prosper Decl. ¶¶ 9-12.  Disclosure and/or judicial review of such matters could chill important sources of information and interfere with our ability to interact effectively with foreign governments.  Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8.  In particular, the foreign government in question, as well as other governments, would likely be reluctant to communicate frankly with the United States in the future concerning torture and mistreatment concerns.  Prosper Decl. ¶¶ 10, 12.  This chilling effect would jeopardize the cooperation of other nations in the war on terrorism.  Prosper Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

 Because of these foreign relations implications, as developed most extensively in the

---

[10] In Holmes, U.S. citizen servicemembers sued to prevent the United States government from surrendering them to West German authorities to serve sentences for convictions by West German courts on criminal charges relating to their conduct while stationed in West Germany. Even in this situation involving U.S. citizens, the District Court and D.C. Circuit rejected the plaintiffs' invitation to examine the fairness of their treatment by the West German courts and declined to enjoin the transfer, the latter court holding that "the contemplated surrender of appellants to the Federal Republic of Germany is a matter beyond the purview of this court." 459 F.2d at 1225.

analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a

requesting nation's justice system'" and "'the procedures or treatment which await a surrendered

fugitive in the requesting country.'"  United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir.

1997) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983));

see Al-Anazi, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the

extradition context" "counsel[s] even further against judicial interference").  This principle is

sometimes called the Rule of Non-Inquiry.  For example, in Ahmad v. Wigen, 910 F.2d 1063 (2d

Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial

for an alleged terrorist attack.  While the district court upheld the extradition only after receiving

testimony and extensive documentation concerning Israel's law enforcement system and

treatment of prisoners, the Second Circuit held that such inquiry was wholly improper.  "The

interests of international comity are ill-served," the Second Circuit explained, "by requiring a

foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its

laws and the manner in which they are enforced."  Id. at 1067.[11]  "It is the function of the

Secretary of State to determine whether extradition should be denied on humanitarian grounds."

Id.  Accord Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar

extradition based on allegations that appellant "may be tortured or killed if surrendered to

Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that

properly falls within the exclusive purview of the executive branch" (internal quotation marks

omitted)); Peroff v. Hylton, 563 F.2d 1099, 1102 (4th Cir. 1977); Matter of Extradition of

---

[11] Compare Petr's Mem. at 12 ("At the very least, the government should be required to
establish [that] Mr. Hamad's country of origin . . . has a fair legal system.").

Sandhu, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); Hoxha v. Levi, 371 F. Supp. 2d 651, 659-61 (E.D. Pa. 2005) (holding that allegations that individual would be tortured after extradition to Albania were solely for the Secretary of State to weigh, and not an appropriate subject for judicial inquiry), on appeal, No. 05-3149 (3d Cir.). See generally Jacques Semmelman, Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings, 76 Cornell L. Rev. 1198 (1991).

The force of these principles is not diminished by the fact that petitioner seeks judicial review of any kind of transfer, repatriation or removal from Guantanamo – in fact, "prior approval by the court" (Petr's Mem. at 10), to include evaluation of the fairness of the receiving country's legal system (Petr's Mem. at 12), before petitioner may be transferred or released – rather than merely trying to block an extradition. The considerations that underlie the Rule of Non-Inquiry are not endemic to the specific context of extradition, but instead rest on the constitutional separation of powers.[12] See Matter of Requested Extradition of Smyth, 61 F.3d

---

[12] Some petitioners in Guantanamo detainee habeas cases have argued that the Rule of Non-Inquiry is contingent on the existence of an extradition treaty, citing In re Extradition of Howard, 996 F.2d 1320, 1329 (1st Cir. 1993). However, the applicable language from Howard was characterized as dicta by the First Circuit in a subsequent decision. Kin-Hong, 110 F.3d at 111 n.12. In that later case, while pretermitting the question "[w]hether the doctrine is constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-state doctrine and described the doctrine using language imbued with constitutional significance. See id. at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers. It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.") (citation omitted).

Moreover, to the extent that petitioner may contend that the only possible way to transfer him would be pursuant to an extradition treaty or statute, such a contention would be wholly without merit. See United States v. Alvarez-Machain, 504 U.S. 655 (1992); Ker v. Illinois, 119

(continued...)

711, 714 (9th Cir. 1995) ("Undergirding this principle is the notion that courts are ill-equipped as

institutions and ill-advised as a matter of separation of powers and foreign relations policy to

make inquiries into and pronouncements about the workings of foreign countries' justice

systems."); <u>Sandhu</u>, 886 F. Supp. at 321 ("The rule of non-inquiry arises from recognition that

the executive branch has exclusive jurisdiction over the country's foreign affairs."); <u>cf.</u> <u>Holmes</u>,

459 F.2d at 1219-23 (holding, in a non-extradition context, that considerations similar to those

embodied in the Rule of Non-Inquiry made it improper for the Judiciary to examine allegations

of unfairness in a foreign nation's trial of a U.S. citizen).  Thus, petitioners cannot turn to the

courts to second-guess Executive judgments about matters such as custodial conditions and/or

the adequacy of legal procedures in a foreign country as well as the credibility and adequacy of a

foreign government's assurances.  <u>Cf.</u> <u>People's Mojahedin</u>, 182 F.3d at 23 (expressing reluctance

of courts to interfere in matters "'for which the Judiciary has neither aptitude, facilities nor

responsibility and have long been held to belong in the domain of political power not subject to

judicial intrusion or inquiry'" (quoting <u>Chicago & Southern</u>, 333 U.S. at 111)).

***

Thus, there is no basis in law for an injunction requiring advance authorization or

advance notice of an upcoming transfer or repatriation in order to enable petitioner to seek a

judicial order blocking it.  Neither the Court's habeas corpus jurisdiction nor any other legal

authority supports the notion of ordering custody that the United States wishes to relinquish to

---

[12](...continued)
U.S. 436 (1886); <u>Coumou v. United States</u>, 107 F.3d 290, 295 (5th Cir. 1997) (reversing lower
court's holding, 1995 WL 2292, *11 (E.D. La. Jan. 3, 1995), that "[n]or did the United States, or
its officers or agents, have the discretion to deliver an arrested person to the government of Haiti,
unless the extradition laws of the United States were followed").

nevertheless be artificially and indeterminately prolonged purely to preserve a live case for the Court. And, apart from the absence of affirmative legal authority, separation of powers considerations and foreign relations sensitivities preclude a judicial inquiry in which this Court would substitute its judgment regarding the appropriateness of transfer or repatriation for that of the appropriate Executive Branch officials.

## IV.  AN INJUNCTION REQUIRING ADVANCE NOTICE, OR REQUIRING THE EXECUTIVE TO OBTAIN JUDICIAL AUTHORIZATION BEFORE PROCEEDING WITH A TRANSFER OR REPATRIATION, WOULD TRAMPLE ON THE SEPARATION OF POWERS

Petitioner seeks either an outright requirement that the government obtain advance authorization before carrying out transfer or repatriation decision that the Executive would already have made after consultation and coordination with the foreign government in question, or an advance notice requirement that would serve no purpose other than enabling his counsel to seek a future order prohibiting such a transfer or repatriation. Either type of order foreshadows judicial review and intervention that would be accompanied by the attendant harms discussed in the declarations of Deputy Assistant Secretary Waxman and Ambassador Prosper submitted herewith. See Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Even if such judicial review did not ultimately result in an injunction against transfer, the mere inquiry into the United States' dialogue with foreign nations and into the terms of a transfer and any assurances that may have been obtained would cause grave harm. See supra Section III, at pp. 15-19 (describing interests of international comity that underlie the Rule of Non-Inquiry); Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Moreover, the very prospect of judicial review, as exemplified by an advance authorization or advance notice requirement, causes separation-of-powers harm by undermining

the ability of the Executive Branch to speak with one voice in its dealings with foreign nations.

See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 381 (2000) (expressing disapproval of

acts that "compromise the very capacity of the President to speak for the nation with one voice in

dealing with other governments").  Either type of requirement, after all, would make the results

of diplomatic dialogue between the Executive Branch and a foreign government regarding

repatriations or transfers inherently contingent because the effective acquiescence of another

Branch (i.e., the Judiciary) would be required for a transfer or repatriation to go forward, and

such a requirement would also inject delays into future transfers.  These harms weigh heavily

against entry of a preliminary injunction.

## V.    AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST

The public interest favors allowing the Executive Branch, which is constitutionally vested

with the authority both to conduct military functions, such as detention of enemy combatants for

the duration of hostilities, and to engage in foreign relations, to act without undue intrusion

within its constitutional sphere of responsibility.  Petitioners may invoke truisms such as that the

public interest disfavors torture, but that aspect of the public interest is already well served by the

existing policies and processes governing transfers and repatriations of Guantanamo detainees, as

described in the accompanying declarations.[13]  As this Court previously held:

---

[13] While petitioner invokes the generality that the "public interest lies 'in meticulous
compliance with the law,'" Petr's Mem. at 16 (quoting Fund for Animals, Inc. v. Espy, 814 F.
Supp. 12, 152 (D.D.C. 1993)), that statement merely begs a multitude of questions, beginning
with what laws are being referred to, whether a violation of those laws has been proven, whether
a future violation of those laws is imminent, and what authority the Court has to devise a judicial
remedy.  As discussed above, respondents' policy and practices governing transfer and
repatriation of Guantanamo detainees plainly do not violate any rights petitioner may have,
constitutional or otherwise.  The public interest surely does not support assuming without any

(continued...)

> [T]here is a strong public interest against the judiciary needlessly intruding upon the foreign policy and war powers of the Executive on a deficient factual record. Where the conduct of the Executive conforms to law, there is simply no benefit – and quite a bit of detriment – to the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem for the disposition of these detainees.  See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch.").

Al-Anazi, 370 F. Supp. 2d at 199.  Here, as well, the public interest disfavors an injunction.

## CONCLUSION

For the reasons stated above, respondents respectfully request that petitioner's motion for a preliminary injunction be denied.

Dated: December 27, 2005                    Respectfully submitted,

                                            PETER D. KEISLER
                                            Assistant Attorney General

                                            KENNETH L. WAINSTEIN
                                            United States Attorney

                                            DOUGLAS N. LETTER
                                            Terrorism Litigation Counsel

                                            [*signature block continued on next page*]

---

[13](...continued)
foundation that Executive Branch officials are wont to engage in constitutional violations or to otherwise violate the law unless actively supervised by the courts.

 ____/s/__Robert J. Katerberg_____
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ
EDWARD H. WHITE
PREEYA M. NORONHA
ROBERT J. KATERBERG
ANDREW I. WARDEN
NICHOLAS J. PATTERSON
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-4107
Fax:  (202) 616-8470

Attorneys for Respondents