# EXHIBIT 1

# Excerpt from CR 35 Exhibit A

SECRET//NOFORN//X1

# UNCLASSIFIED SUMMARY OF BASIS FOR DISSENTING DECISION

(Enclosure (3)(a) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL:    #19
ISN #:    940

## 1. Introduction

As the Combatant Status Review Tribunal Decision Report indicates, the Author (Tribunal Minority) has determined that this Detainee is not properly classified as an enemy combatant. In reaching its conclusions, the Author considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Author. Any classified evidence considered by the Tribunal is discussed in Enclosure (3)(b) to the Combatant Status Review Tribunal Decision Report.

## 2. Synopsis of Proceedings

The author concurs with the "Synopsis of Proceedings", as described in Enclosure (1).

## 3. Evidence Considered by the Author

The Tribunal considered the following evidence in reaching its conclusions: Same as Enclosure (1).

## 4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses

See Enclosure (1)

## 5. Discussion of Unclassified Evidence

The Author of this report determined that the Detainee has been improperly classified as an enemy combatant. The Author further finds that the Unclassified Summary (Exhibit R-1) fails to even state a prima facie case that the Detainee is an enemy combatant.

   a. The issue is whether the Detainee has been properly classified as an Enemy Combatant. In order to address this issue, the definition of enemy combatant must be examined. An enemy combatant is "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces." In other words, for a person to be properly classified as an enemy combatant he must be one of the following: 1) part of or supporting the Taliban; 2) part of or supporting al Qaida; or, 3) part of or supporting associated forces that are engaged in hostilities against the U.S. or its coalition partners.

SECRET//NOFORN//X1

ISN #940
Enclosure (3)(a)
Page 1 of 3

~~SECRET/NOFORN/X1~~

b. The Unclassified Summary (Exhibit R1) alleges that the Detainee is an enemy combatant based upon six specific allegations. First, the Detainee is accused of being "associated with al Qaida". The Detainee has denied this allegation. However, even if true, this allegation is insufficient to show that the Detainee should be classified as an enemy combatant. As indicated in paragraph 5(a), a mere association with al Qaida does not qualify as a basis for enemy combatant status. With respect to al Qaida, a person must be "part of or supporting...al Qaida forces". Therefore, this alleged association is not persuasive in that it does not even qualify the Detainee as an enemy combatant.

c. Exhibit R1 further alleges that the Detainee was employed by World Assembly of Muslim Youth (WAMY) for approximately one and a half years until his capture on 18 July 2002. As the Detainee admitted to this allegation, this fact is not in dispute. Additionally, the Detainee allegedly worked for Lajanat Dawa Islamiya (LDI) from 1986 through 1999 in Afghanistan and Pakistan. As the Detainee also admitted to this allegation, this fact is not in dispute. Both WAMY and LDI allegedly support terrorist ideals and causes. LDI allegedly "has been one of the most active non-governmental organizations (NGO's) to give logistical and financial support to mujahadin operating in Afghanistan and Pakistan." The Detainee testified that he had no knowledge concerning these alleged terrorist connections of his former employers. The Detainee explained that he held both teaching positions and administrative positions with these NGO's. In fact, the Detainee was a hospital administrator near the end of his employment with WAMY. Even if one or both of these NGO's provided some support to "terrorist ideals and causes", this fact does not incriminate the Detainee. Absent any alleged evidence that the Detainee was involved in providing this support, he cannot be deemed an enemy combatant. These NGO's presumably have numerous employees and volunteer workers who have been working in legitimate humanitarian roles. The mere fact that some elements of these NGO's provide support to "terrorist ideals and causes" is insufficient to declare one of the employees an enemy combatant. To reach such a conclusion would provide for unconscionable results. Consequently, all physicians, nurses, and aid workers' employed by alleged terrorist connected NGO's would also be declared enemy combatants.

d. Even if these NGO's provided some support to these "terrorist ideals and causes", this fact would not qualify them as being "associated forces that are engaged in hostilities against the U.S. or its coalition partners." Otherwise, every NGO that has some members who provided some support to forces engaged in hostilities against the U.S. or its coalition partners would qualify as "associated forces". Here again, the ramifications of such logic would result in both unforeseen and unconscionable results. Indeed, an individual can be deemed an enemy combatant because of his direct support of "hostilities in aid of enemy armed forces." In fact, such direct support from an individual would qualify as a belligerent act. The definition of enemy combatant expressly clarifies this point. The absence of such clarifying language as to support from an organization is highly persuasive. The distinction between direct support from the individual and direct support from an individual's employer is critical and must not be overlooked.

e. The final allegation claims that: "During the course of his duties with LDI, the

~~SECRET/NOFORN/X1~~

ISN #940
Enclosure (3)(a)
Page 2 of 3

Detainee came in contact with persons who held positions of responsibility in al Qaida." The Detainee denied knowing whether he had contact with such al Qaida members. Even if this allegation is true, it does not show that the Detainee has been properly classified as an enemy combatant. As discussed in paragraphs 5(a) and 5(b), a mere association with al Qaida does not qualify a person as an enemy combatant under the requisite definition. Otherwise, all the employees of LDI who "came in contact with al Qaida" would be deemed enemy combatants. If LDI did in fact have some terrorist connections and the Detainee was employed by this NGO for a 14-year period; then, it is not unreasonable that he may "came in contact" with al Qaida members. The fallacy of the logic that seeks to declare the Detainee an enemy combatant would provide support that a local merchant who "came in contact" with al Qaida members could be deemed an enemy combatant.

    f. In essence, the Unclassified Summary (R1) amounts to saying that the Detainee is an enemy combatant because he was employed by NGO's that provided some support for "terrorist ideals and causes" and because he "came in contact" with al Qaida members. While this information may raise some suspicion, it does not provide a basis for an enemy combatant determination. Absent any allegations that the Detainee himself "directly supported hostilities in aid of enemy armed forces", the Unclassified Summary (R1) fails to even state a prima facie case that he has been properly classified as an enemy combatant. Simply stated, even assuming all the allegations in Exhibit R1 are accurate, the Detainee does not meet the definition of an enemy combatant. Consequently, the Detainee has constructively been denied his right to prepare and participate in the Tribunal. The Detainee could not prepare for an overall allegation that he is an enemy combatant when the supporting allegations do not even qualify him as an enemy combatant. Based upon this failure to even state a prima facie case and upon the analysis of the classified evidence (see Enclosure (3)(b)), the Author finds that the Detainee has been improperly classified as an enemy combatant.

Respectfully submitted,

[signature redacted]

Major, U.S. Army
Dissenting Member

# EXHIBIT 2



U.S. Department of Defense
Office of the Assistant Secretary of Defense (Public Affairs)

## News Release

On the Web:
http://www.defenselink.mil/Releases/Release.aspx?ReleaseID=9302
Media contact: Army Public Affairs - (703) 692-2000

Public contact:
http://www.dod.mil/faq/comment.html
or +1 (703) 428-0711 +1

---

**IMMEDIATE RELEASE**

No. 124-06
February 09, 2006

---

### Guantanamo Bay Detainee Administrative Review Board Decisions Completed

The Department of Defense announced today the completion of the first round of Administrative Review Board (ARB) decisions. All of the hearings for this first round were conducted from Dec. 14, 2004, to Dec. 23, 2005. Deputy Secretary of Defense Gordon R. England, the Designated Civilian Official (DCO) for the ARB process, has made final decisions on all 463 board recommendations; these decisions consist of 14 releases (3 percent), 120 transfers (26 percent) and 329 continue to detain (71 percent).

The ARB is a review process conducted annually to determine whether each detainee should be released, transferred or further detained. The outcome is based primarily on threat assessment and intelligence value of each detainee. This is a discretionary and unprecedented process that is not required by the Geneva Convention or by U.S. or international law.

During the review, each eligible enemy combatant is given the opportunity to appear in person before an ARB panel of three military officers and provide information to support his release. The enemy combatant is provided a military officer to assist him throughout the ARB process. In advance of the ARB hearing, information bearing on this assessment is also solicited from DoD and other U.S. government agencies, and from the family and national government of the enemy combatant, through the Department of State. Based on all the information provided, the ARB makes a recommendation to the DCO who makes the final decision whether to release, transfer or continue to detain the individual. If the DCO determines that continued detention is warranted, the enemy combatant will remain in DoD control, and a new review date will be scheduled to ensure an annual review.

The review process is managed by the Office for the Administrative Review of the Detention of Enemy Combatants, headed by Rear Adm. James M. McGarrah.



**U.S. Department of Defense**
Office of the Assistant Secretary of Defense (Public Affairs)

# News Release

On the Web:
http://www.defenselink.mil/Releases/Release.aspx?ReleaseID=9302
Media contact: Army Public Affairs - (703) 692-2000

Public contact:
http://www.dod.mil/faq/comment.html
or +1 (703) 428-0711 +1

**IMMEDIATE RELEASE**

No. 124-06
February 09, 2006

### Guantanamo Bay Detainee Administrative Review Board Decisions Completed

The Department of Defense announced today the completion of the first round of Administrative Review Board (ARB) decisions. All of the hearings for this first round were conducted from Dec. 14, 2004, to Dec. 23, 2005. Deputy Secretary of Defense Gordon R. England, the Designated Civilian Official (DCO) for the ARB process, has made final decisions on all 463 board recommendations; these decisions consist of 14 releases (3 percent), 120 transfers (26 percent) and 329 continue to detain (71 percent).

The ARB is a review process conducted annually to determine whether each detainee should be released, transferred or further detained. The outcome is based primarily on threat assessment and intelligence value of each detainee. This is a discretionary and unprecedented process that is not required by the Geneva Convention or by U.S. or international law.

During the review, each eligible enemy combatant is given the opportunity to appear in person before an ARB panel of three military officers and provide information to support his release. The enemy combatant is provided a military officer to assist him throughout the ARB process. In advance of the ARB hearing, information bearing on this assessment is also solicited from DoD and other U.S. government agencies, and from the family and national government of the enemy combatant, through the Department of State. Based on all the information provided, the ARB makes a recommendation to the DCO who makes the final decision whether to release, transfer or continue to detain the individual. If the DCO determines that continued detention is warranted, the enemy combatant will remain in DoD control, and a new review date will be scheduled to ensure an annual review.

The review process is managed by the Office for the Administrative Review of the Detention of Enemy Combatants, headed by Rear Adm. James M. McGarrah.



U.S. Department of Defense
Office of the Assistant Secretary of Defense (Public Affairs)

# News Release

On the Web:
http://www.defenselink.mil/Releases/Release.aspx?ReleaseID=9302
Media contact: Army Public Affairs - (703) 692-2000

Public contact:
http://www.dod.mil/faq/comment.html
or +1 (703) 428-0711 +1

**IMMEDIATE RELEASE**

No. 124-06
February 09, 2006

## Guantanamo Bay Detainee Administrative Review Board Decisions Completed

The Department of Defense announced today the completion of the first round of Administrative Review Board (ARB) decisions. All of the hearings for this first round were conducted from Dec. 14, 2004, to Dec. 23, 2005. Deputy Secretary of Defense Gordon R. England, the Designated Civilian Official (DCO) for the ARB process, has made final decisions on all 463 board recommendations; these decisions consist of 14 releases (3 percent), 120 transfers (26 percent) and 329 continue to detain (71 percent).

The ARB is a review process conducted annually to determine whether each detainee should be released, transferred or further detained. The outcome is based primarily on threat assessment and intelligence value of each detainee. This is a discretionary and unprecedented process that is not required by the Geneva Convention or by U.S. or international law.

During the review, each eligible enemy combatant is given the opportunity to appear in person before an ARB panel of three military officers and provide information to support his release. The enemy combatant is provided a military officer to assist him throughout the ARB process. In advance of the ARB hearing, information bearing on this assessment is also solicited from DoD and other U.S. government agencies, and from the family and national government of the enemy combatant, through the Department of State. Based on all the information provided, the ARB makes a recommendation to the DCO who makes the final decision whether to release, transfer or continue to detain the individual. If the DCO determines that continued detention is warranted, the enemy combatant will remain in DoD control, and a new review date will be scheduled to ensure an annual review.

The review process is managed by the Office for the Administrative Review of the Detention of Enemy Combatants, headed by Rear Adm. James M. McGarrah.

# EXHIBIT 3

Steven T. Wax, OSB #85012
Federal Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon  97204
Tel:   503-326-2123
Fax:   503-326-5524
steve_wax@fd.org
Attorney for Petitioner

Patrick J. Ehlers, OSB #04118
Assistant Federal Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon  97204
Tel:   503-326-2123
Fax:   503-326-5524
patrick_ehlers@fd.org
Attorney for Petitioner

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ADEL HASSAN HAMAD,<br><br>                      Petitioner,<br>v.<br><br>GEORGE W. BUSH, DONALD RUMSFELD, JAY HOOD, and BRICE GYURISKO,<br><br>                      Respondents. | CV 05-1009 JDB<br><br>AFFIDAVIT OF STEVEN T. WAX |

STATE OF OREGON         :
                        : ss
COUNTY OF MULTNOMAH     :

    I, Steven T. Wax, hereby depose and state:

    1.    I am the Federal Public Defender for the District of Oregon and one of the

Page 1   AFFIDAVIT OF STEVEN T. WAX

attorneys assigned to represent Mr. Hamad on the above referenced matter.

     2.     I am the author of the Motion for Discovery submitted herewith.

     3.     All of the factual statements set forth in the Motion for Discovery from Dr. Najeeb, Salwah Othman, and Adil Al Tayab are based on my personal knowledge from my participation in conversations with them. The information set out from Engineer Ishmael is based on the conversations that one of my investigators, William Teesdale, had with at attorney in Pakistan who spoke with Engineer Ishmael.

/s/ Steven T. Wax  
Steven T. Wax  
Federal Public Defender

Sworn to and subscribed before me this 2nd day of August, 2006.

/s/ Sandra L. Showard  
Notary Public for Oregon

Page 2    AFFIDAVIT OF STEVEN T. WAX