**Steven T. Wax, OSB #85012**
**Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, Oregon  97204**
**Tel:   503-326-2123**
**Fax:   503-326-5524**
**steve_wax@fd.org**
**Attorney for Petitioner**

**Patrick J. Ehlers, OSB #04118**
**Assistant Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, Oregon  97204**
**Tel:   503-326-2123**
**Fax:   503-326-5524**
**patrick_ehlers@fd.org**
**Attorney for Petitioner**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ADEL HASSAN HAMAD,** | **CV 05-1009 JDB** |
| **Petitioner,** | |
| **v.** | **MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT** |
| **GEORGE W. BUSH, DONALD RUMSFELD, JAY HOOD, and BRICE GYURISKO,** | |
| **Respondents.** | **(ORAL ARGUMENT REQUESTED)** |

## TABLE OF CONTENTS

**PAGE**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

A.  The Summary Judgment Issues Directly Address The Authority Of The Department Of Defense To Detain Mr. Hamad . . . . . . . . . . . . . . . . . . . .  2

B.  The Stay Of More Than One Year Runs Counter To The Statutory And Constitutional  Policies Favoring Swift Resolution Of Habeas Corpus Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

C.  The Unconscionable Nature Of Mr. Hamad's Detention Warrants Consideration Of His Case Under This Court's Order Of June 27, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

D.  Even Under The Demanding Standard Of *Khalid*, This Court Has Jurisdiction To Determine The Department of Defense's Authority To Detain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

E.  *Hamdan* Resolved Any Question Of This Court's Jurisdiction To Hear This Petition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

F.  A Contrary Reading Of The Statutes Would Raise Serious Constitutional Questions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

   1.  As Construed By Respondents, The DTA Would Violate The Constitution's Prohibition Against Bills Of Attainder . . . . . . . . . .  12

   2.  As Construed By Respondents, The DTA Works An Unconstitutional Suspension Of The Writ Of Habeas Corpus . . .  17

   3.  As Construed By Respondents, The DTA Violates The Due Process Clause Of The Fifth Amendment . . . . . . . . . . . . . . . .  19

   4.  As Construed By Respondents, Congress's Effort To Overturn Supreme Court Action In *Rasul* Violates The Separation Of Powers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Application of Yamashita*,
    327 U.S. 1 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9

*In re Blodgett*,
    502 U.S. 236 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Bolling v. Sharpe*,
    347 U.S. 497 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ex parte Bollman*,
    8 U.S. (4 Cranch) 75 (1807) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Booker v. United States*,
    543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Carafas v. LaVallee*,
    391 U.S. 234 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Church of the Lukumi Babalu Aye v. City of Hialeah*,
    508 U.S. 520 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Clark v. Martinez*,
    543 U.S. 371 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 22

*Crowell v. Benson*,
    285 U.S. 22, 62 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Cummings v. Missouri,*
    71 U.S. 277 (1866) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 15

*Davis v. Adult Parole Authority*,
    610 F.2d 410 (6th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Dellinger v. Mitchell*,
    442 F.2d 782 (D.C. Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Fay v. Noia*,
    372 U.S. 391 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Fletcher v. Peck*,
       10 U.S. (6 Cranch) 87 (1810) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*Foretich v. United States*,
       351 F.3d 1198 (D.C. Cir. 2003)  . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 13, 14, 17

*Ex parte Garland*,
       71 U.S. 333 (1866) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13, 14

*Graham v. Richardson*,
       403 U.S. 365 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*In re Guantánamo Detainee Cases*,
       355 F. Supp. 2d 443 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 23

*Hamdan v. Rumsfeld*,
       126 S. Ct. 2749 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 8, 9, 10, 17, 18, 23

*Hamdi v. Rumsfeld*,
       542 U.S. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 23

*I.N.S. v. St. Cyr*,
       533 U.S. 289 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 17, 18

*Johnson v. Rogers*,
       917 F.2d 1283 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*Kahlid v. Bush*,
       355 F. Supp. 2d 311 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 7, 8, 9

*Landis v. North American Co.*,
       299 U.S. 248 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

*Lynce v. Mathis*,
       519 U.S. 433 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*McClellan v. Young*,
       421 F.2d 690 (6th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 4

*Moses H. Cone Mem. Hospital v. Mercury Construction Corp.*,
       460 U.S. 1 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

*Nixon v. Administrator of General Services*,
       433 U.S. 425 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*Plyler v. Doe*,
    457 U.S. 202 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Rasul v. Bush*,
    215 F. Supp. 2d 55 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . 10, 18, 20, 24, 25

*Rhines v. Weber*,
    544 U.S. 269 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Rochin v. California*,
    342 U.S. 165 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Romer v. Evans*,
    517 U.S. 620 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ruby v. United States*,
    341 F.2d 585 (9th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Sale v. Haitian Centers Council, Inc.*,
    509 U.S. 155 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Selective Service System v. Minnesota Public Interest Group*,
    468 U.S. 841 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Tennessee v. Lane*,
    541 U.S. 509 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States Department of Agriculture v. Moreno*,
    413 U.S. 528 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Brown*,
    381 U.S. 437 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 16

*United States v. Dorcely*,
    454 F.3d 366 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*United States v. Lovett*,
    328 U.S. 303 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Weinberger v. Rossi*,
    456 U.S. 25 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Ex parte Yerger*,
    75 U.S. (8 Wall.) 85 (1868) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Yick Wo v. Hopkins*,
     118 U.S. 356 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Yong v. INS*,
     208 F.3d 1116 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*Zadvydas v. Davis*,
     533 U.S. 678 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 16, 22

## FEDERAL STATUTES

8 U.S.C. § 1231(a)(6) (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

8 U.S.C. §1531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

28 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 18, 20, 21

28 U.S.C. § 2243 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 3

138 Cong. Rec. S4781-84 (April 2, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

U.S. Const. Art. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 9, 12, 15, 19

U.S. Const. Art. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

U.S. Const. Art. 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 25, 26

## MISCELLANEOUS

Christopher A. Chrisman, *Article III Goes to War: A Case for a Separate Federal Circuit for Enemy Combatant Cases*, 21 JOURNAL OF LAW AND POLITICS 31 (Winter 2005) . .  19

Detainee Treatment Act of 2005
     §1005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9, 10, 13, 17, 20, 23, 24, 25

International Covenant on Civil and Political Rights,
     138 Cong. Rec. 54781-84 (April 2, 1992)
     ratified by the United States March 23, 1976, 999 U.N.T.S. 171 . . . . . . . . . . .  25

International Covenant on Civil and Political Rights,
     138 Cong. Rec. 54781-84 (April 2, 1992)
     21 U.N. GOAR Supp. (n. 16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

International Covenant on Civil and Political Rights,
Convention (III) relative to the Treatment of Prisoners of War,
done at Geneva August 12, 1949 (6 U.S.T. 3316) (75 U.N.T.S. 135) . . . . . . . . . . . .  19

Petitioner, Adel Hassan Hamad, through his attorneys, Steven T. Wax and Patrick J. Ehlers, respectfully moves this Court to lift or modify the stay previously entered in this matter.

Pursuant to L. Cv. R. 7(m) counsel have conferred and been advised that Respondents oppose this motion.

**Introduction**

Mr. Hamad has filed a Motion for Summary Judgment based on uncontroverted and uncontrovertable facts that he is innocent, has never been an enemy combatant, and that Respondents have no jurisdiction to detain him.  The strength of his cause warrants immediate action by this Court and either lifting, or modifying, the stay of proceedings in this matter pending resolution of the appeals in *In Re Guantánamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005), and *Kahlid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005), that was ordered by this Court on June 27, 2005.  The stay should be lifted or modified and the merits of Mr. Hamad's petition and Motion for Summary Judgment should be reached for several reasons.  First, the unconscionable nature of Mr. Hamad's detention qualifies for consideration of the issue under this Court's stay order of June 27, 2005.  Second, even under the authority for a stay relied upon by this, and other judges of the District Court, a stay is inappropriate.  Third, the basis for the stay, the need for resolution of certain issues on appeal, has been eliminated by the decision of the United States Supreme Court in *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006).  And fourth, failure to consider the merits of the petition would constitute a bill of attainder, an unconstitutional suspension of the writ of habeas corpus,

Page 1    **MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT**

a violation of the separation of powers, and a violation of due process and equal

protection.

> **A.    The Summary Judgment Issues Directly Address The Authority Of The Department Of Defense To Detain Mr. Hamad.**

As more fully set out in his Statement of Points And Authorities In Support of

Motion for Summary Judgment and Statement of Material Facts, the Department of

Defense has no jurisdiction to hold Mr. Hamad.  Mr. Hamad was never on a battlefield

or an enemy fighter, and never provided support to the enemy.  Ex. 5, pp. 15-20, 26-28.

Rather, Mr. Hamad was a concerned employee of several charities who provided relief

to Afghan refugees, primarily in Pakistan, and who served as an administrator for a

hospital in Chamkani, Afghanistan.  Ex. 5, pp.15-20, 26-28, Ex. 7.1-7.4, 8.1-8.2.  Mr.

Hamad was arrested in the middle of the night at his home.  Ex. 5, p. 27.  Since his

incarceration in July of 2002, Mr. Hamad has steadfastly and under oath explained, to

no avail, to American authorities the facts of his innocent employment.  Ex. 3, ¶ 8, Ex. 5,

pp. 15-20, 27-29.

> **B.    The Stay Of More Than One Year Runs Counter To The Statutory And Constitutional  Policies Favoring Swift Resolution Of Habeas Corpus Claims.**

The norm for federal habeas litigation is a rapid adjudication of the issues: "A

court, justice or judge entertaining an application for a writ of habeas corpus shall

*forthwith* award the writ or issue an order directing the respondent to show cause why

the writ should not be granted ...." 28 U.S.C. § 2243 (emphasis added).  Swift resolution

is entirely warranted in the present case, in which the face of the petition and the

Respondents' Return demonstrates lack of Department of Defense jurisdiction, because

writs of habeas corpus are intended to afford a "'swift and imperative remedy in all cases of illegal restraint or confinement.'" *Fay v. Noia*, 372 U.S. 391, 400 (1963) (quoting *Secretary of State for Home Affairs v. O'Brien,* (1923) A.C. 603, 609 (H.L.)); *see Carafas v. LaVallee,* 391 U.S. 234, 238 (1968) (the purpose of the habeas corpus statute is to provide an effective and speedy instrument by which judicial inquiry may be had into the legality of detention). An indefinite or lengthy stay, in effect, constitutes a de facto denial of the claim without a hearing – also known as a suspension of the writ of habeas corpus.

The express statutory language compels prompt disposition of habeas corpus petitions. The statute explicitly directs district courts to "summarily hear and determine the facts, and dispose of [a habeas corpus petition] as law and justice require." 28 U.S.C. § 2243. Section 2243 requires the court to hold a hearing within five days of the return of the writ, which must itself be within three days, absent good cause. *Ruby v. United States*, 341 F.2d 585, 587 (9th Cir. 1965) ("The application for the writ usurps the attention and displaces the calendar of the judge or justice who entertains it and receives prompt action from him within the four corners of the application."); *McClellan v. Young,* 421 F.2d 690, 691 (6th Cir. 1970) ("Habeas corpus is a speedy remedy entitled to preferential consideration to insure expeditious hearing and determination."). Further delay would also indirectly suspend the writ. U.S. Const. art. I, § 9, cl. 2. *See Ex parte Bollman,* 8 U.S. (4 Cranch) 75, 95 (1807) ("[F]or if the means be not in existence, the privilege itself would be lost, although no law for its suspension should be enacted."); *cf. Davis v. Adult Parole Authority,* 610 F.2d 410, 414 (6th Cir. 1979) ("[A]

**MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT**

rule which would permit a court to dismiss an action for habeas relief without any consideration of the equities presented renders the habeas corpus process inadequate to test the legality of a person's conviction and, thereby, constitutes a prohibited suspension of the writ.").

In *Yong v. INS*, 208 F.3d 1116 (9th Cir. 2000), the Ninth Circuit was confronted with a similar situation involving indefinite detention of aliens subject to deportation orders that could not be effectuated. Hundreds of habeas corpus petitions had been filed in multiple jurisdictions in the Circuit with rapidly evolving law and conflicting district court decisions. The Ninth Circuit vacated an indefinite stay that had been entered by the district court to await a decision from the Circuit in another case, stating:

> We acknowledge that the district court was in an unenviable position. It was faced with a number of petitions in an evolving area of law and knew that, however it ruled, it might be required to revisit its decision if its reasoning did not comport with our ruling in *Ma*. The stay it crafted, however, placed a significant burden on Yong by delaying, potentially for years, any progress on his petition. Consequently, although considerations of judicial economy are appropriate, they cannot justify the indefinite, and potentially lengthy, stay imposed here.

*Yong*, 208 F.3d at 1120-21 (citing *Johnson v. Rogers*, 917 F.2d 1283, 1285 (10th Cir. 1990) (holding that a crowded docket, without more, is insufficient to justify lengthy delay)); *see also McClellan*, 421 F.2d at 691 (the district court "was without authority to defer action in petitioner's habeas corpus case and in twenty-five other habeas corpus actions pending before him, to await a ruling by the Supreme Court in another case"). The district court lacked authority to issue an indefinite stay of habeas proceedings to await circuit decision on a dispositive question. *Yong*, 208 F.3d at 1120.

Page 4    **MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT**

Once a petitioner satisfies the procedural requirements of the habeas corpus statutes, federal district courts have a duty to rule on the issues presented.  *See Rhines v. Weber,* 544 U.S. 269, 277 (2005) (district courts do not have the discretion to stay habeas proceedings indefinitely to await resolution of claims in other judicial proceedings); *In re Blodgett*, 502 U.S. 236, 239-240 (1992) (Court of Appeals was under duty to consider habeas corpus petitioner's claim for relief without delay, given potential for prejudice, and could not stay proceedings indefinitely to await recommendations from death penalty task force); *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 16-19 (1983) (vacating stay and holding district court must exercise its jurisdiction over a claim unless there are "exceptional circumstances" for not doing so); *Landis v. North American C*o., 299 U.S. 248, 255 (1936) (discretion was abused by a stay of indefinite duration in the absence of a pressing need).  This duty is especially pressing here when the only countervailing interest in support of continuation of the stay is judicial economy, a factor that has been rejected in many other circuits.  "Any protracted halting or limitation of plaintiffs' right to maintain their case would require not only a showing of 'need' in terms of protecting the other litigation involved but would also require a balanced finding that such need overrides the injury to the parties being stayed."  *Dellinger v. Mitchell*, 442 F.2d 782, 787 (D.C. Cir. 1971).

The harm inflicted on Mr. Hamad's interest in obtaining a prompt determination of the legality of his current detention outweighs the burden on the Court or the Respondents in addressing the motion now.  The Court should, therefore, either vacate the stay or modify it to allow litigation of the pending motions.

**C.     The Unconscionable Nature Of Mr. Hamad's Detention Warrants Consideration Of His Case Under This Court's Order Of June 27, 2005.**

In its order of June 27, 2005, this Court stayed the proceeding in Mr. Hamad's case but went on to state that the stay order shall "not, however, prevent the parties from availing themselves of the procedures set forth below, nor shall it bar the filing or disposition of any motion for emergency relief." The facts of Mr. Hamad's innocence are so clear that even an Army Major, who reviewed the case in the Combatant Status Review Tribunal proceeding in which Mr. Hamad participated at the prison in Guantánamo Bay, Cuba, used the word "unconscionable" in describing his detention. Ex. 5, p. 13. The facts that counsel for Mr. Hamad has generated through their investigation have corroborated the sworn statements of innocence that Mr. Hamad has given to United States' personnel. Ex. 5, pp. 15-20, 26-28.

The unconscionable nature of Mr. Hamad's detention is underscored by the fact that, to the best of undersigned counsel's knowledge, Mr. Hamad's last annual Administrative Review Board hearing took place more than one year ago. Ex. 3, ¶ 18. Neither he nor counsel have been informed of any determination regarding his status following that hearing. Ex. 3, ¶ 8. Based on information counsel obtained about other inmates, it appears as though there is a strong likelihood that the Respondents' determined that either Mr. Hamad is not an enemy combatant or that he no longer poses a danger and that he should be released. Ex. 3, ¶ 13.

There can be nothing more important than an individual's liberty. There can be nothing more urgent than intervention by a federal court to redress "unconscionable"

detention by the Executive.  Mr. Hamad's situation is indeed an "emergency."  As stated in the American Heritage College Dictionary, Third Edition, an emergency is a "condition of urgent need for action or assistance."  Unconscionable action to deprive an individual of his liberty qualifies as a situation calling for immediate action.

### D.    Even Under The Demanding Standard Of *Khalid*, This Court Has Jurisdiction To Determine The Department of Defense's Authority To Detain.

In *Khalid*, one of the cases whose disposition this Court believed required issuance of the stay, Judge Leon, while holding that the detainees had limited rights to review, cited to three Supreme Court cases to find clear authority for the following proposition: "[J]udicial review is limited to the question of whether Congress has given the military the authority to detain or charge the individual as an enemy combatant, rather than whether the military's decision was correct or otherwise supported by the facts."  355 F. Supp. 2d 311, 328 (citing *Ex parte Qurin*, 317 U.S. 1, 25 (1942)); *Application of Yamashita*, 327 U.S. 1 (1946); *[Johnson v.] Eisentrager*, 339 U.S. [763,] 786 (1950))."  Judge Leon cited, with emphasis, to the passage in *Yamashita* where the Supreme Court stated,  "The courts may inquire whether the detention complained of is within the authority of those detaining the petitioner."  *Khalid*, 355 F. Supp. 2d at 329 (quoting *Yamashita,* 327 U.S. at 8).  This is one of the questions Mr. Hamad raises in his Motion for Summary Judgment.  Thus, even under a restrictive view of the jurisdiction of the United States District Courts to review the detention of detainees at Guantánamo, the issues presented by Mr. Hamad are cognizable and in need of immediate resolution.

Page 7    **MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT**

In *Khalid*, the petitioners conceded that they were detained pursuant to lawful military orders. 355 F. Supp.2d at 329.[1] In contrast, Mr. Hamad asserts that, even under broad definitions of the term "enemy combatant" and, therefore, of necessity, under the standards of *Hamdan*, the Department of Defense is without jurisdiction over him. Not only is this established by the evidence submitted in support of the Motion for Summary Judgment, it is established by the Return filed by the Respondents in this case. Ex. 4-5. Thus, even under the rationale in *Khalid*, jurisdiction is appropriate.

The petitioner recognizes that the *Khalid* opinion is presently pending before the Circuit Court for the District of Columbia. Since *Khalid* was decided, however, the Supreme Court has addressed many related issues in its opinion in *Hamdan*. The intervening authority from the Supreme Court has undermined much of the reasoning of *Khalid*.[2] However, even given the great deference to Executive Branch authority in

---

[1]The opinion states, "In this case, the petitioners have conceded, as they must, that the military orders given to capture and initially detain them were lawful orders." *Khalid*, Docket No. 70 at 31. The published opinion erroneously substitutes "unlawful" for "lawful." *Khalid*, 335 F. Supp.2d at 329.

[2]The *Hamdan* Court addressed each of the World War II era cases upon which *Khalid* relied, distinguishing or otherwise marginalizing each. For example, Mr. Hamad, unlike the *Eisenberger* defendants, is not a citizen of an "enemy nation", was not tried by a military tribunal, has been imprisoned by the United States for over four years, and has denied committing any aggression against the United States. *Compare Hamdan*, 126 S. Ct. at 2793-94. Further, after an extended discussion of *Yamashita*, the Court concluded that the case had been "stripped of its precedential value." *Hamdan*, 126 S. Ct. at 2790. *Quirin* was also distinguished as "the high water mark of military power to try enemy combatants for war crimes." *Hamdan*, 126 S. Ct. at 2777. Further, the Court's ultimate decision in *Khalid* – that no cognizable rights existed for detainees – is contrary to the direct holding of *Hamdan* that Geneva Article III and other rights conferred by the Code of Military Justice apply to Guantánamo detainees. 126 S. Ct. at 2786, 2795-97.

Page 8    **MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT**

*Khalid*, that pre-*Hamdan* opinion strongly supports vacation of the stay and immediate exercise of jurisdiction over the basic question of the military's authority to detain Mr. Hamad.  The Court explicitly recognized jurisdiction to determine whether the detention is within the lawful authority of the Department of Defense and, as in *Yamashita*, that the Court would have authority to grant the writ upon a determination that the military lacked jurisdiction to hold the prisoner.

      **E.**    ***Hamdan* Resolved Any Question Of This Court's Jurisdiction To Hear This Petition.**

*Hamdan* conclusively determined that Section 1005(e)(1) of the Detainee Treatment Act of 2005 "does not strip federal court's jurisdiction over cases pending on the date of DTA's enactment. . . ."  126 S. Ct. at 2769 n.15.  The Court also recognized that Sections 1005(e)(2) and (3) are not jurisdiction-stripping provisions.  *Hamdan*, 126 S. Ct. at 2768.  The Court viewed with favor the legislative history indicating that "the amendment will not strip the courts of jurisdiction over [pending] cases."  *Hamdan*, 126 S. Ct. at 2766 n.10 (bracketed word in original).  This intervening authority establishes this Court's full jurisdiction over Mr. Hamad's habeas petition.

Despite these strong statements from the Supreme Court, the Respondents have argued in other cases that subsections 2 and 3 should be deemed as jurisdiction-stripping.  Most simply, this position is directly contrary to the controlling authority of *Hamdan*.  Even if the statements in *Hamdan* regarding pre-DTA petitions were dicta, which they are not because they are essential to the reasoning, "'carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.'"  *United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) (citations

Page 9   **MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT**

omitted).  Further, as in *Dorcely*, where the court cited to the dissent's assessment of the scope of review after *Booker v. United States*, 543 U.S. 220 (2005), the dissent in *Hamdan* assumed that the breadth of reasoning would result in a rule applicable to habeas petitioners who filed before the DTA.  *Compare Dorcely*, 454 F.3d at 374, *with Hamdan*, 126 S. Ct. at 2817-18 (Scalia, J., dissenting).  *See also Clark v. Martinez*, 543 U.S. 371, 379-80 (2005) (Justice Scalia noting for the majority that the breadth of *Zadvydas v. Davis*, 533 U.S. 678 (2001), had been anticipated in the *Zadvydas* dissent, in which he had joined).

Arguments Respondents have advanced in other cases under subsections 2 and 3 are untenable for three additional reasons.  The present case does not challenge the Combatant Status Review Tribunal, but addresses the Department of Defense's underlying jurisdiction and the basic legality of the detention.  Further, there has been no final decision of the CSRT, as required by subsection (e)(2)(A), because the Department of Defense has not implemented the procedures required by Section 1005(e)(2)(B)(ii).  Lastly, the *Hamdan* court found nothing absurd about dual jurisdiction under subsections 2 and 3.  126 S. Ct. at 2768-69.

Under *Hamdan*'s controlling authority, this Court has full jurisdiction to consider the matters raised in the motion for summary judgment.

### F.    A Contrary Reading Of The Statutes Would Raise Serious Constitutional Questions.

The direct reading of the statutes compelled by *Hamdan*, *Rasul v. Bush*, 542 U.S. 466 (2004), and *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), mandate that this Court consider the merits of the motions.  Even if there were ambiguity, the Doctrine of

Page 10   **MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT**

Constitutional Avoidance would require that any such ambiguity be construed in favor of the petitioner.  The Doctrine of Constitutional Avoidance provides that, "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' [courts] are obligated to construe the statute to avoid such problems."  *I.N.S. v. St. Cyr*, 533 U.S. 289, 299-300 (2001) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

> The canon [of constitutional avoidance] is not a method of adjudicating constitutional questions by other means . . . .  Indeed, one of the canon's chief justifications is that it allows courts to *avoid* the decision of constitutional questions.  It is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts.

*Martinez*, 543 U.S. at 381.  If the Court does not conclude that the DTA is unambiguously prospective, the Doctrine of Constitutional Avoidance applies, under which the Court must determine if the statute is amenable to a "plausible" construction that would avoid the necessity for deciding the constitutional questions.  *Martinez*, 543 U.S. at 380-81.

The arguments regarding prospective application of the DTA are, at the very least,  "plausible" competing interpretations of the statutory text. This is especially true because, under *Martinez,* the Doctrine of Constitutional Avoidance is assessed based on "the lowest common denominator," which in this case would mean the Court should assume the petitioner is absolutely innocent and the Respondents wholly lack a jurisdictional basis to hold him.  *Martinez*, 543 U.S. at 380 ("the lowest common denominator, as it were, must govern.").  If the Court concludes that the statute is

ambiguous regarding retroactivity, the Court must give Congress credit for not intending to enact legislation that would raise serious questions regarding the constitutional protections related to bills of attainder, due process, equal protection, habeas corpus, and separation of powers.

>    1.    As Construed By Respondents, The DTA Would Violate The
>          Constitution's Prohibition Against Bills Of Attainder.[3]

The DTA's amendment to § 2241, customized to deny habeas and other court access to a small, distinct, and unpopular group, is a classic Bill of Attainder prohibited by Article I, § 9, clause 3, of the Constitution ("No Bill of Attainder . . . shall be passed."). It is precisely this type of "deprivation of any rights, civil or political," including "the privilege of appearing in the courts," especially when imposed on a disfavored minority, that has been condemned by the Supreme Court.  *Cummings v. Missouri*, 71 U.S. 277, 320 (1866); *accord United States v. Brown*, 381 U.S. 437, 445-47 (1965).

To qualify as a Bill of Attainder, a legislative enactment must (1) apply with specificity to an identified individual or group, and (2) impose punishment. *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003). The element of specificity is satisfied if a statute singles out a person or class by name or applies to "easily ascertainable members of a group."  *United States v. Lovett*, 328 U.S. 303, 315 (1946).

The target group of the DTA is any "alien detained by the Department of Defense at Guantánamo Bay, Cuba." § 1005(e)(1).  These individuals could not be more

---

[3]Mr. Hamad notes that any new legislation that would seek to strip the federal courts of jurisdiction over his petition would be unconstitutional for the reasons set forth in this pleading.

discretely identified: the only persons detained at the detention camp are those whom the Executive Branch puts there.  The individuals to whom the DTA applies are the named persons who have petitioned for habeas relief, the as yet unnamed John Doe detainees at Guantánamo Bay, and any others held at the Guantánamo Bay prison. The DTA easily meets the specificity criterion for classification as a Bill of Attainder.

The DTA also easily meets the punishment requirement for a Bill of Attainder. From the time of Chief Justice Marshall, the scope of forbidden punishment falling within the attainder prohibition has included banishment, deprivation of the right to vote, corruption of blood, and confiscation of property.  *Foretich,* 351 F.3d at 1217. Following the Civil War, Congress and the States enacted legislation aimed at persons who had rebelled against the United States, barring practice of certain professions without an expurgatory oath of loyalty.  In *Cummings*, the Court freed a priest who ministered without swearing the oath, stating:

> *The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact.*  Disqualification from office may be punishment, as in cases of conviction upon impeachment.  Disqualification from the pursuits of a lawful avocation, or from positions of trust, *or from the privilege of appearing in the courts*, or acting as an executor, administrator, or guardian, may also, and often has been, imposed as punishment.

71 U.S. at 320 (emphasis added).  Similarly, in *Ex parte Garland*, 71 U.S. 333 (1866), loyalty oath legislation that barred an attorney from the courtroom was held to constitute a Bill of Attainder:

> As the oath prescribed cannot be taken by these parties, the act, as against them, operates as a legislative decree of perpetual exclusion.  And exclusion from any of the professions or any of the ordinary avocations of

Page 13   **MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT**

> life for past conduct can be regarded in no other light than as punishment
> for such conduct.

71 U.S. at 377.  The Civil War cases make clear that Congress cannot legislate to the

detriment of a group – irrespective of size – that is defined by the status of its members

so as to permanently exclude them, on the basis of that status, from civil liberties

ordinarily available to all.[4]

Determination of the punitive aspect of legislation barred by the Bill of Attainder

Clause analysis has included consideration of three factors:  "(1) whether the

challenged statute falls within the historical meaning of legislative punishment; (2)

whether the statute, 'viewed in terms of the type and severity of burdens imposed,

reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the

legislative record 'evinces a congressional intent to punish.'" *Foretich,* 351 F.3d at 1218

(quoting  *Selective Service System v. Minnesota Public Interest Group*, 468 U.S. 841,

852 (1984)).  A statute need not satisfy all three factors to be a Bill of Attainder; they are

merely factors to be considered.  *Selective Service System*, 468 U.S. at 852.  "Our

treatment of the scope of the Clause has never precluded the possibility that new

_____

[4]In *Brown*, the Court found that the Bill of Attainder prohibition stemmed from
separation of powers concerns:

> [T]he Bill of Attainder Clause not only was intended as one implementation
> of the general principle of fractionalized power, but also reflected the
> Framers' belief that the Legislative Branch is not so well suited as
> politically independent judges and juries to the task of ruling upon the
> blameworthiness, of, and levying appropriate punishments upon, specific
> persons.

*Brown*, 381 U.S. at 445.

Page 14  **MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY
JUDGMENT**

burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee." *Nixon v. Administrator of General Services*, 433 U.S. 425, 475 (1977). The test is functional rather than dependent upon legislative labeling. *Cummings*, 71 U.S. at 325 ("The Constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name.").

Denial of equal access to the courts meets the historic definition of punishment. If exclusion from vocations constitutes punishment – including "appearing in the courts" as in *Cummings* – then barring a prisoner from bringing a claim for habeas relief before the district court can only be an even more punitive measure. This is especially true because the DTA's exclusion cripples the ability of Guantánamo detainees to attack the constitutional legitimacy of their confinement and destroys any opportunity they might otherwise have had in habeas litigation to develop facts to counter the one-sided record created in the Combatant Status Review Tribunals (CSRT). Consequently, as construed by the Respondents, the DTA ensures that the petitioners' detention will be prolonged and indefinite; a state of affairs which the *Cummings* court – citing to Blackstone – listed as an historically-recognized form of punishment. 71 U.S. at 321 (quoting William Blackstone, 4 Commentaries *377). *See also Lynce v. Mathis*, 519 U.S. 433, 442 (1997) (discussing constitutional bases for the prohibitions on retroactive legislative action and removal of eligibility for a benefit as punishment).[5]

---

[5]The discussion in *Lynce*, 519 U.S. at 440 n.12, suggests that the punitive aspect of the DTA also implicates the Ex Post Facto Clause of Article I, Section 9.

**MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT**

The punitive aspects of the DTA, as a practical matter, are extreme.

Imprisonment itself is punitive – whether brief or prolonged and regardless of the

conditions.  *Brown*, 381 U.S. at 458 (imprisonment regardless of its purpose is

punishment).  Here, Mr. Hamad has been in onerous custody, virtually incommunicado,

for more than four years.  Given the length of custody and suffering Mr. Hamad has

endured, the continued indefinite detention is at the apex of punitive treatment.

*Zadvydas*, 533 U.S. at 690.

The punitive reality of the DTA  accords with the animus toward the detainees

that has been expressed by some members of both the Legislative and Executive

branches.  The detainees have been repeatedly prejudged and characterized as

terrorists.  This animus is especially anomalous in light of indications from the

declassified CSRT proceedings that only a minority are alleged to have taken up arms

against the United States and very few belong to al Qaeda.  Mark Denbeaux, *Report on

Guantánamo Detainees: A Profile of 517 Detainees Through Analysis of Dept. of

Defense Data,* Seton Hall University of Law, Feb. 2006, *available at* http://law.shu.edu/

news/guantanamo_report_final_2_08_06.pdf.

Historically, members of political groups believed to present a threat to national

security have been the "targets of the overwhelming majority of English and early

American bills of attainder."  *Brown*, 381 U.S. at 453; *see Fletcher v. Peck*, 10 U.S. (6

Cranch) 87, 137-38 (1810) ("[I]t is not to be disguised that the framers of the constitution

viewed, with some apprehension, the violent acts which might grow out of the feelings

of the moment; and that the people of the United States, in adopting that instrument,

have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed."). Politically-suspect groups are most likely to draw the fire of legislative censure and condemnation. For a statute to be declared a Bill of Attainder, all that is necessary "is that the legislative process and the law it produces indicate a congressional purpose to behave like a court and to censure and condemn." *Foretich*, 351 F.3d at 1226. That is what has happened with the DTA.

The nonpunitive purposes of the DTA are negligible compared to the punitive consequences. The statutory text lacks any formal statement of purpose or findings regarding § 1005. The Guantánamo Bay detainee litigation raises critical questions which address the very heart of our Constitution's meaning in the real world. The protective order and its enforcement mechanisms have addressed the needs of national security sufficiently to allow the claims of an innocent petitioner, who is beyond the jurisdiction of the military, to have his claims heard.

> 2.    *As Construed By Respondents, The DTA Works An Unconstitutional Suspension Of The Writ Of Habeas Corpus.*

The *Hamdan* opinion directly addressed concerns that the DTA works an unconstitutional suspension of the writ of habeas corpus. 126 S. Ct. at 2769. The writ of habeas corpus, "[a]t its historical core, . . . has served as a means of reviewing the legality of Executive detention, and it is in that context that the protections have been strongest." *St. Cyr*, 533 U.S. at 301. Permanent denial of access to the writ of habeas corpus for the Guantánamo Bay detainees is unprecedented and would constitute a suspension of the writ.

Page 17    **MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT**

Even if the DTA were construed to abrogate jurisdiction under 28 U.S.C. § 2241, review would remain available in the district courts under the common law writ of habeas corpus. In *Rasul* and *Hamdan,* the Court discussed at length *Eisentrager*, 339 U.S. 763. *Rasul*, 542 U.S. at 475-480. In *Eisentrager,* the six factors that militated against a right to the writ related "only to the question of the prisoners' *constitutional* entitlement to habeas corpus." *Rasul*, 542 U.S. at 476. The Court observed that the Court of Appeals in *Eisentrager* had found a constitutional right to the writ protected by the Suspension Clause. 542 U.S. at 477. "In essence, the Court of Appeals concluded that the habeas statute, as construed in *Ahrens*, had created an unconstitutional gap that had to be filled by reference to 'fundamentals.'" 542 U.S. at 478.

Nowhere in the Court's discussion is there any indication that a "fundamental" non-statutory (*i.e.* constitutional) right to petition for habeas relief does not exist. The Supreme Court noted the constitutional basis for seeking habeas relief in *St. Cyr*:

> In sum, even assuming that the Suspension Clause protects only the writ as it existed in 1789, there is substantial evidence to support the proposition that pure questions of law like the one raised by the respondent in this case could have been answered in 1789 by a common-law judge with power to issue the writ of habeas corpus.

533 U.S. at 304-05. The Court expressly rejected the government's position that habeas can be eliminated by statute: "[A] serious Suspension Clause issue would be presented if we were to accept the INS' submission that the 1996 statutes have withdrawn that power from federal judges and provided no adequate substitute for its exercise." *St. Cyr*, 533 U.S. at 305; *see also Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 96 (1868) ("It would have been, indeed, a remarkable anomaly if this court, ordained by the

Page 18  **MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT**

Constitution for the exercise, in the United States, of the most important powers in civil cases of all the highest courts of England, had been denied, under a constitution which absolutely prohibits the suspension of the writ, except under extraordinary exigencies, that power in cases of alleged unlawful restraint, which the Habeas Corpus Act of Charles II expressly declares those courts to possess.").

The inherent power of the judiciary under Article III, the common law history of the writ imported into the Constitution in the Suspension Clause, and the checks on judiciary power given to Congress in Article I, provide a sound basis for recognition of a right to habeas review that cannot be nullified by the legislature.  *See* Christopher A. Chrisman, *Article III Goes to War: A Case for a Separate Federal Circuit for Enemy Combatant Cases*, 21 JOURNAL OF LAW AND POLITICS 31 (Winter 2005).

> 3.    *As Construed By Respondents, The DTA Violates The Due Process Clause Of The Fifth Amendment.*

The Due Process Clause of the Fifth Amendment provides that "no person shall be . . . deprived of life, liberty, or property, without due process of law."  This clause includes both procedural and substantive protections and requires equal protection of the laws.  The government's interpretation of the DTA runs afoul of these concepts.

> a.    Legislation Based On Alienage Would Violate The Detainees' Right To Equal Protection Of The Laws.

The Fifth Amendment's guarantee of due process incorporates the Fourteenth Amendment's equal protection clause. *Bolling v. Sharpe*, 347 U.S. 497, 498-500 (1954). Although the government retains the power to classify, particularly in the area of economics and social welfare, classifications "based on alienage . . . are . . . subject to

close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 372 (1971).  In *Rasul*, the

Court found that § 2241 applied equally to United States citizens and to aliens held at

Guantánamo Bay: "Considering that the statute draws no distinction between

Americans and aliens held in federal custody, there is little reason to think that

Congress intended the geographical coverage of the statute to vary depending on the

detainee's citizenship."  542 U.S. at 481.

The DTA, by its express terms, strips aliens detained in Guantánamo of access

to the courts, while maintaining the rights of United States citizens to such access (". . .

an application for a writ of habeas corpus filed by or on behalf of an *alien* . . . or . . . any

other action . . . relating to any aspect of the detention of an *alien* . . .").  § 1005(e)(1)

(emphasis added).  The DTA's new statutory distinction based on alienage, regardless

of legal status, violates the guarantee of equal protection under law.

The restriction on access to the courts based on national origin requires strict

scrutiny for two reasons.  First, discrimination based on alienage is inherently suspect.

Disparate treatment of persons based on their alienage, without respect to legal status,

is generally prohibited as a classification based on national origin. *Plyler v. Doe,* 457

U.S. 202, 214 (1982) (Fourteenth Amendment's phrase "person within its jurisdiction"

"sought expressly to ensure that the equal protection of the laws was provided to the

alien population."); *Yick Wo v. Hopkins,* 118 U.S. 356, 369 (1886) ("The fourteenth

amendment to the constitution is not confined to the protection of citizens. . . .  [Its]

provisions are universal in their application, to all persons within the territorial

jurisdiction, without regard to any differences  of race, of color, or of nationality; and the

Page 20  **MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT**

equal protection of the laws is a pledge of the protection of equal laws.").  By limiting the habeas-stripping provisions to aliens, the DTA recognized the court's continued § 2241 jurisdiction over United States citizens at Guantánamo Bay.

Second, discrimination regarding a fundamental right, such as access to the courts, triggers heightened protections. *Tennessee v. Lane,* 541 U.S. 509, 529 (2004) (right of access to the courts "call[s] for a standard of judicial review at least as searching, and in some cases more searching, than the standard that applies to sex-based classifications."); *Romer v. Evans*, 517 U.S. 620, 633 (1996) ("Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance.").  Strict scrutiny is also required because the target group of aliens is de facto Muslim, which implicates equal protection as well as First Amendment concerns.  *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542 (1993).  Constitutional and statutory prohibitions on arbitrary detention and torture mean little without a judicial remedy, especially where a suspect class is the target.

Congressional hostility to the Guantánamo Bay detainees and prejudgment of the merits of their claims does not provide a rational basis for discrimination against them. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."  *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 534 (1973).

b.    Indefinite Detention And Unredressable Torture
Violate Substantive Due Process.

In considering the constitutionality of the authorization for detention contained in

8 U.S.C. § 1231(a)(6) (1994), the Supreme Court stated in *Zadvydas*:

> A statute permitting indefinite detention of an alien would raise a serious
> constitutional problem.  The Fifth Amendment's Due Process Clause
> forbids the Government to 'depriv[e] any 'person . . . of . . . liberty . . .
> without due process of law.'  Freedom from imprisonment – from
> government custody, detention, or other forms of physical restraint – lies
> at the heart of the liberty that Clause protects.

533 U.S. at 690.  The Court ultimately resolved the case by interpreting the statute to

forbid indefinite detention.  Identical concerns arising out of the substantive liberty

component of the Due Process Clause apply here.  Should the Court accept the

Respondents' interpretation of the statute, it would be required to address the due

process question raised but avoided in *Zadvydas* and *Martinez*.

The substantive due process issues are even more acute because of the

detainees' claims of torture and mistreatment.  The Respondents make the Orwellian

claim that the DTA bars torture while at the same time depriving torture victims of

meaningful access to the courts.  The moral identity of our Republic, as well as its

prestige abroad, is compromised by this position, which implicates substantive due

process.  *Rochin v. California*, 342 U.S. 165, 167-73 (1952), as well as the Convention

Against Torture, the international humanitarian law analog of substantive due process).

c.    The DTA's Limitations On Judicial Review Violate
Procedural Due Process.

The DTA offers no other substantive procedural protections than those found to

be constitutionally inadequate by the district court in *In re Guantánamo Detainee Cases,* 355 F. Supp. 2d 443, 468 (D.D.C. 2005).  Given the Supreme Court's rationale in *Hamdan*, views expressed in opinions such as *Khalid*, to the extent they are inconsistent, are no longer valid precedent because intervening authority from a superior court has undermined the reasoning.[6]

In reliance on *Hamdi*, a number of district courts have found that the failure of the CSRT process to provide detainees access to the material evidence upon which the CSRT affirmed "enemy combatant" status and the failure to permit the assistance of counsel were general procedural defects rendering the proceedings unconstitutional.  *In re Guantánamo Detainee Cases*, 355 F. Supp. 2d at 465-72.  In *Hamdan*, the Court emphasized the need for procedural regularity in military proceedings involving loss of liberty.  126 S. Ct. at 2786-2798.  The published transcripts of 360 CSRT and ARB proceedings illustrate the systemic inadequacies of the process.

Some district courts have also found that reliance on coerced statements and a vague and overly broad definition of "enemy combatant" were specific defects of the process.  *See In re Guantánamo Detainee Cases*, 355 F. Supp. 2d at 473.  With the exception for use of coerced evidence, the DTA does not address, much less overcome these deficiencies.  The only "improvement" in the CSRT process purportedly provided by the DTA requires consideration of the "probative value" of coerced statement.  §1005(b)(1).  Even that provision is inconsistent with the Convention Against Torture,

---

[6]Under the Doctrine of Constitutional Avoidance, the conflict at least demonstrates serious constitutional doubt regarding the requisite procedural protections.

Page 23   **MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT**

which the State Department has expressly admitted applies to CSRT and ARB

proceedings. Moreover, the DTA prohibits reconsideration of any past determination of

"enemy combatant" status derived from coerced statements. §1005(b)(2).[7]

Consequently, the "improvement" purportedly provided by Section 1005 is illusory.

Where, as here, the established procedures are unconstitutional, judicial oversight

through habeas corpus is even more critically important.  The DTA's limitation on

judicial review fails to satisfy due process.

> 4.    *As Construed By Respondents, Congress's Effort To Overturn Supreme Court Action In* Rasul *Violates The Separation Of Powers.*

In *Rasul*, the Court addressed the lease agreements and treaty with Cuba and

concluded that Guantánamo Bay is "a territory over which the United States exercises

plenary and exclusive jurisdiction, but not 'ultimate sovereignty.'"  *Rasul*, 542 U.S. at

475.  "By the express terms of its agreements with Cuba, the United States exercises

'complete jurisdiction and control' over the Guantánamo Bay Naval Base, and may

continue to exercise such control permanently if it so chooses."  *Rasul*, 542 U.S. at 480.

The Court concluded that, for aliens detained at Guantánamo Bay, the courts had

jurisdiction to review the actions of custodians over whom "no party question[ed] the

District Court's jurisdiction. . . ."  *Rasul*, 542 U.S. at 483.

---

[7]The due process inadequacies of the DTA are in stark contrast to the rules of procedure established in the Alien Terrorist Removal Court of the United States.  There, suspected terrorists are afforded a myriad of procedural due process rights before they may be removed from the United States, including neutral judicial involvement, access through appointed counsel to classified evidence, discovery, proof by a preponderance of terrorist status, and significantly, appeal rights.  8 U.S.C. §1531 *et seq.*  Alleged terrorists facing removal are further entitled to consideration for release pending removal, and review of detention at least every six months.

Page 24   **MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT**

In the absence of any change in the relevant agreements and treaty, Congress purported to overrule *Rasul's* jurisdictional ruling by redefining the geography of the United States: "For purposes of this section, the term 'United States', when used in a geographic sense, is as defined in section 101(a)(38) of the Immigration and Nationality Act and, in particular, does not include the United States Naval Station, Guantánamo Bay, Cuba." § 1005(g). This section of the DTA creates separation of powers problems because it seeks to reverse *Rasul* by adopting the *Rasul* district court analysis.

The *Rasul* district court denied relief based on its conclusion that the military base at Guantánamo Bay, Cuba, is outside the sovereign territory of the United States. *Rasul v. Bush*, 215 F. Supp.2d 55, 68-70 (D.D.C. 2002). The Supreme Court's reversal, however, was premised on the effect of our Nation's agreements and treaties with Cuba, not on whether Guantánamo Bay is geographically part of the United States. *Rasul*, 542 U.S. at 480-81. Because the *Rasul* decision is based on the Supreme Court's interpretation of a treaty, and the DTA does not contain an "affirmative expression of congressional intent to abrogate the United States' international obligations," the congressional enactment does not overturn this aspect of *Rasul*. *See Weinberger v. Rossi,* 456 U.S. 25, 32 (1982).

The DTA abrogates other treaties without an affirmative expression of congressional intent. For example, in 1992, the Senate ratified the International Covenant on Civil and Political Rights (ICCPR), 138 CONG. REC. S4781-84 (April 2, 1992). Article 9 of the ICCPR provides that "[n]o one shall be subjected to arbitrary arrest or detention." International Covenant on Civil and Political Rights, March 23,

Page 25  **MOTION TO LIFT OR MODIFY STAY FOR CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT**

1976, 999 U.N.T.S. 171.  The result of the DTA is to abrogate these treaty obligations.

*See Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 178 (1993).

**Conclusion**

Mr. Hamad's case involves unconscionable detention of a prisoner who has submitted compelling evidence of his innocence to the Court.  The evidence provided by Respondents in their Return to Mr. Hamad's petition for writ of habeas corpus, and the evidence submitted by Mr. Hamad in support of his Motion for Summary Judgment, also show that Respondents lack jurisdiction to detain him.  His detention calls for immediate attention by this Court.

For all of the reasons set forth herein, we urge the Court to lift or modify the stay in order to hear the petitioner's motion for summary judgment or, in the alternative, to issue an order to show cause.

Respectfully submitted this 21st day of September, 2006.

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Patrick J. Ehlers
Patrick J. Ehlers
Assistant Federal Public Defender