**Steven T. Wax, OSB #85012**
**Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, Oregon  97204**
**Tel:   503-326-2123**
**Fax:   503-326-5524**
**steve_wax@fd.org**
**Attorney for Petitioner**

**Patrick J. Ehlers, OSB #04118**
**Assistant Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, Oregon  97204**
**Tel:   503-326-2123**
**Fax:   503-326-5524**
**patrick_ehlers@fd.org**
**Attorney for Petitioner**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ADEL HASSAN HAMAD,** | **CV 05-1009 JDB** |
| **Petitioner,** | |
| **v.** | **MOTION FOR SUMMARY** |
| | **JUDGMENT AND EXPEDITED** |
| **GEORGE W. BUSH, DONALD** | **HEARING, STATEMENT OF** |
| **RUMSFELD, JAY HOOD, and BRICE** | **MATERIAL FACTS, AND** |
| **GYURISKO,** | **MEMORANDUM OF POINTS AND** |
| | **AUTHORITIES** |
| **Respondents.** | |
| | **(ORAL ARGUMENT REQUESTED)** |

### TABLE OF CONTENTS

**PAGE**

I. MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING . . . . . . . . . . 1

II. STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.       INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.       SUMMARY JUDGMENT IS AN APPROPRIATE VEHICLE FOR
            RESOLVING THIS CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

           1.    The Power Of The Writ Of Habeas Corpus . . . . . . . . . . . . . . . . 12

           2.    The Legal Standards For Summary Judgment . . . . . . . . . . . . . 13

    C.       ENEMY COMBATANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    D.       FACTUAL RETURN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    E.       ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

           1.    The Return Filed By The Government Does Not Show Any
                Basis For Seizing Or Detaining Mr. Hamad As An Enemy
                Combatant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

           2.    The Facts Set Forth In Respondents' Return Do Not Satisfy
                The Requirements For Detaining A Person As An Enemy
                Combatant As Set Out In The Decisions In *Hamdi* And
                *Hamdan* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

           3.    The Facts Set Forth In The Return Do Not Show Any Authority
                To Seize Or Detain Mr. Hamad Under The President's Authority
                As Commander In Chief Or Any Of The Laws And Usages Of
                War . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

           4.    Even Under The Definition Of The Global War On Terror Posited
                By Respondents, A Position That Mr. Hamad Rejects, His
                Detention Is Unlawful Because He Is A Civilian . . . . . . . . . . . . 31

           5.    The Seizure Of Mr. Hamad Violated Article 20 Of The Fourth
                Geneva Convention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

i

6.    Respondents' Action With Respect To Mr. Hamad At An
      Administrative Review Board Proceeding In 2005 Underscores
      The Unconscionable Nature Of His Continued Detention . . . . . .  35

7.    Remedy  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

**TABLE OF AUTHORITIES**

**PAGE**

## I. MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING

Petitioner, Adel Hassan Hamad, through attorneys, Steven T. Wax and Patrick J. Ehlers, respectfully moves this Court pursuant to Fed. R. Civ. P. 56 for summary judgment on the petition for writ of habeas corpus filed in this Court on May 18, 2005, as amended in the first amended petition filed by counsel on December 12, 2005.  Upon granting of this motion, Mr. Hamad seeks an order from the district court that he be immediately repatriated to his home country, the Republic of Sudan.

Pursuant to L. Cv. R. 7(m) counsel have conferred and been advised that Respondents oppose this motion.

## II. STATEMENT OF MATERIAL FACTS

1.    No allegation has ever been made by Respondent that Mr. Hamad engaged in terrorism, acts supporting terrorism, violence against the United States, or any belligerent act.  Ex. 5.  He was not captured on a battlefield.  Instead, he was arrested and taken in the middle of the night from his home in Peshawar, Pakistan.  Ex. 5, p. 17.

2.    Prior to, and at all times during the Authorization for Use of Military Force, Mr. Hamad worked for non-governmental charitable organizations.  Ex. 5, pp. 15-20, 26-28, Ex. 7.1-7.4, 10, ¶¶ 2, 4, 5, Ex. 11, ¶¶ 3, 5, 8, 9.

3.    At the time of his arrest in July 2002, Mr. Hamad was legally present in Peshawar, Pakistan, possessed a legal passport, and a valid work visa and documents.  Ex. 5, p. 17, Ex. 11, 3,  ¶ 17.

4.    Mr. Hamad has never undertaken an act of violence against the United States or any member of the United States military.  Ex. 5, p. 15-20, 26-28.

5.    Mr. Hamad has never committed an act of terrorism, engaged in terrorist activities, or supported terrorist efforts.  Ex. 5, pp. 15-20, 26-28, Ex. 7.1-7.4, 10, ¶¶ 2, 4, 5, 15, Ex. 11, ¶¶ 3, 5, 8, 9, 16.

6.    Mr. Hamad presented his legal papers and demonstrated his lawful authority to reside in Pakistan at the time of his arrest.  Ex. 5, p. 17.

7.    Despite having legal permission to reside in Pakistan, and having undertaken no unlawful action, Mr. Hamad was arrested at the direction of a United States government official.  Ex. 5, p. 17.

8.    A member of the CSRT that reviewed Mr. Hamad's case at Guantánamo Bay, Cuba, a Major in the United States Army, used the word "unconscionable" in describing Mr. Hamad's detention and dissented from the finding that his detention was warranted.  Ex. 5, pp. 13-14.

9.    The dissenting CSRT member emphasized that there has been no showing to date that Mr. Hamad has engaged in any wrongdoing and that all allegations against him were based solely on the flawed premise that Mr. Hamad's employment by organizations that do or might hold terrorist ideals somehow implicates Mr. Hamad.  Ex. 5, pp. 13-14.  Respondents' unclassified exhibit states that the dissenting Major's conclusion was based on "analysis of the classified evidence."  Ex. 5, pp. 13-14.

**MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING, STATEMENT OF MATERIAL FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES**

10.     On or about March 3, 2005, Mr. Hamad filed a hand-written petition for writ of habeas corpus with the United States District Court for the District of Columbia.  Ex. 9.

11.     On December 12, 2005, undersigned counsel filed an Amended Petition for a Writ of Habeas Corpus in the United States District Court for the District of Columbia on behalf of Mr. Hamad.  CR 19.

12.     In the summer of 2005, an Administrative Review Tribunal Proceeding was held on Mr. Hamad's status in Guantánamo Bay, Cuba.  Ex. 3, ¶ 19.

13.     No determination regarding Mr. Hamad's status has been provided to Mr. Hamad or his counsel subsequent to the ARB proceeding.  Ex.3, ¶ 8.

14.     On May 1, 2006, the government filed a Return to Mr. Hamad's petition. The pleading portion of the Return stated that the government was filing the proceedings of the CSRT as its Return.  Ex. 4.

15.     The charges listed against Mr. Hamad in the unclassified portion of the CSRT proceedings are as follows:

3.     a.     The detainee is associated with Al Qaeda.

3.     a.     1.     The detainee was employed by the World Assembly of Muslim Youth (WAMY) in Afghanistan and Pakistan for approximately 1 ½ years until the time of his capture 18 July 2002.

3.     a.     2.     WAMY supports terrorist ideals and causes.

3.     a.     3.     During the period 1986 through 1999, the detainee was employed by Lajanat Dawa Islamiya (LDI) in Afghanistan and Pakistan.

3.     a.     4.     LDI has been one of the most active Islamic non-governmental organizations to give logistical and financial support to Mujahaddin operating in Afghanistan and Pakistan area.

3.     a.     5.     During the course of his duties with LDI, the detainee came in contact with persons who held positions of responsibility in Al Qaeda.

Ex. 5, pp. 9-10.

16.     Mr. Hamad participated in both the CSRT and ARB proceedings.  Ex. 5, pp. 15-20, 26-28, Ex. 3, ¶ 18.  He provided sworn and oral statements. Ex. 5, pp. 15, 26-28, Ex. 3, ¶ 18.  He answered questions from the Tribunal and Board members.  Ex. 5, pp. 18-20, Ex. 3, ¶ 18.  The essence of Mr. Hamad's response on both occasions was to fully acknowledge his work for LDI and WAMY.  Ex. 5, pp. 15-20, 26-28.  He denied, however, any belief in, or support for, Al Qaeda or the Taliban.  Ex. 5, pp. 16-17, 26-28, Ex. 3, ¶¶ 19-20.  He denied ever having met several of the individuals who are alleged to have been at refugee camps to which he delivered food or at which he worked in 1987 and later in the 1980s.  Ex. 3, ¶ 21.

17.     Mr. Hamad queried the Tribunal about the propriety of guilt by association. Ex. 5, p. 17.  He pointed out that he did not share all of the beliefs of his employers and that he believes that the Al Qaeda and Taliban views of Islam are a perversion of the true teachings of the faith.  Ex. 5, p. 16.

18.     The guilt by association theory used against Mr. Hamad was rejected by the dissenting member of the Combatant Status Review Tribunal.  Ex. 5, pp. 13-14.

**MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING, STATEMENT OF MATERIAL FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES**

19.    The Return does not allege that LDI and WAMY "are" affiliated with Osama Bin Laden and Al Qaeda.  The allegation is rather that they "may be" affiliated.  Ex. 3, ¶ 22.

20.    Mr. Hamad was a field worker and hospital employee at LDI and WAMY respectively.  Ex. 5, pp. 15-20, 26-28, Ex. 7.1-7.4.  All of Mr. Hamad's employment with LDI concluded well prior to the AUMF.  Ex. 5, p. 16.  There is no temporal or substantive evidence to support the idea that any of Mr. Hamad's conduct during his employment with LDI validates any finding that he acted as an enemy combatant during his employment for LDI.  Similarly, there is no support for such an allegation related to his employment with WAMY.

21.    Mr. Hamad left his employment with LDI in 1999, two years before the United States's armed involvement in Afghanistan.  Ex. 5, p. 16.

22.    Mr. Hamad held a number of different jobs for LDI.  Ex. 5, p. 17.  Much of Mr. Hamad's work was as a teacher or administrator on several occasions.  Mr. Hamad delivered food to a number of refugee camps in the late 1980's or early 1990's.  Ex. 3, ¶ 19.

23.    Mr. Hamad does not subscribe now nor has he ever subscribed to any terrorist views of any kind including those views alleged to be held by organizing members of LDI or WAMY.  Ex. 5, pp. 16, 18, 26, Ex. 10, ¶ 5, Ex. 11, ¶ 16.

24.    Mr. Hamad was legitimately employed at WAMY from 2000 through the time of his arrest in 2002.  Ex. 5, pp. 15-20, 26-28, Ex. 7.1-7.4, Ex. 11, ¶¶ 3, 5, 8, 9.

25.    Mr. Hamad spent most of his time employed with WAMY as an administrator at its hospital in Chamkani, Afghanistan.  Ex. 5, pp. 15-20, Ex. 7.1-7.4.

26.    Mr. Hamad left Afghanistan in September 2001, along with many other foreign nationals, because it was not safe.  Ex. 3, ¶ 9.

27.    Mr. Hamad was not personally told to leave Afghanistan by any Afghan government officials, it was part of a general warning to foreigners.  Ex. 3, ¶ 9, Ex. 11, ¶ 11.

28.    After leaving Afghanistan in September 2001, Mr. Hamad continued working for WAMY out of the Peshawar, Pakistan, office.  Ex. 5, pp. 26-27, Ex. 11, ¶ 11.

29.    The WAMY general hospital in Chamkani, Afghanistan was a legitimate hospital with no political affiliation.  Ex. 7.1-7.4, 8.1-8.2, 12, p. 1, 15-19. Doctors who worked at the hospital and were friendly with Mr. Hamad and had anti-Taliban views.  Ex. 7.2-7.3. Those who worked directly with Mr. Hamad at the hospital describe him as peaceful, non-violent, uninterested in politics, and as a person singularly committed to the cause of bringing medical aid to those in need.  Ex. 7.1-7.3.  Mr. Hamad's only other devotion in life was to his family.  Ex. 10, 11.

**MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING, STATEMENT OF MATERIAL FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES**

30.　The WAMY hospital in Chamkani, Afghanistan provided 24 hour medical care to the general civilian population in that portion of Afghanistan.  Ex. 7.1-7.4.  Mr. Hamad would normally work approximately 25 days at the hospital and then have 5-6 days off to spend with his family in Pakistan.  Ex. 7.1, 11.

31.　Personnel from the United Nations Commission on Human Rights (UNHCR), World Health Organization (WHO), and other international agencies regularly visited the WAMY general hospital in Chamkani.  Ex. 7.1 - 7.4, 8.1-8.2, 17, 17.2, 17.6-17.17.

32.　WAMY is a charitable organization employing more than 2,000 people in more than 50 countries.  Ex. 3, p. 23.

33.　WAMY websites are publicly available on the internet.  Ex. 3, ¶ 23.

34.　Mr. Hamad took a vacation from his job at WAMY in June 2002 and returned with his wife and five children to their home in Khartum, Sudan.  Ex. 5, p. 27, Ex. 11, ¶ 11.

35.　During the time that Mr. Hamad was vacationing in Sudan, his father-in-law died.  Ex. 11, ¶ 12.

36.　Prior to his return to his job in Pakistan in July 2002, Mr. Hamad called his supervisor at WAMY, Abu Hadifa, to inquire whether it was safe to return to Pakistan.  Ex. 2, ¶ 31, Ex. 3, ¶ 15, Ex. 11, ¶ 13.  Mr. Hamad was advised that it was safe to return and that he was needed back at work.  Ex. 2, ¶ 31, Ex. 3, ¶ 15, Ex. 11, ¶ 13.  At the time, it was decided that Mr.

Hamad's family should remain in Khartum, Sudan.  Ex. 10, ¶¶ 7-11, Ex. 11, ¶ 11.

37.     Mr. Hamad's residence in Peshawar, Pakistan, was a house shared by two families.  Mr. Hamad's residence was on the second floor of the house and Ameur Mammar, ISN 939, lived with his family on the first floor.  Ex. 3, ¶¶ 11-12, Ex. 11, ¶ 10.

38.     The landlord of the house in which Mr. Hamad resided is female.  Ex. 2, ¶ 25, Ex. 8.3.  Her representative in dealing with tenants is Engineer Ishmael, a professor at the Polytechnic Institute in Peshawar, Pakistan. Ex. 8.3.

39.     The actual lease on the house was held by Ameur Mammar, the downstairs neighbor, who subleased the second floor to Mr. Hamad.  Ex. 3, ¶ 10, Ex. 8.3.

40.     On July 18, 2002, at 1:30 a.m., Mr. Hamad and Mr. Mammar were arrested at their Peshawar residence.  Ex. 3, ¶¶ 11-12, Ex. 5, p. 27. During the arrest, Mr. Mammar was separated from his family on the first floor and taken to the second floor with Mr. Hamad.  Ex. 3, ¶ 12.

41.     Mr. Hamad was in possession of no other person's identification in his home.  Any identification documents of Mr. Mammar that were present in Mr. Hamad's portion of the residence were brought there during the simultaneous arrest of both Mr. Hamad and Mr. Mammar.  Ex. 3, ¶ 12.

**MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING, STATEMENT OF MATERIAL FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES**

42.    In fact, the refugee card that Mr. Hamad is alleged to have possessed was that of Mr. Mammar.  Ex. 3, ¶ 12.  At the time of his arrest, Mr. Hamad displayed his own lawful passport and work visa to both Pakistani and American personnel.  Ex. 5, p. 27.

43.    During his detention, Mr. Hamad has learned that the youngest of his five daughters died.  Ex. 11, ¶ 14.

### III.  MEMORANDUM OF POINTS AND AUTHORITIES

**A.    INTRODUCTION**

In his Statement of Material Facts, Mr. Hamad has presented uncontroverted and uncontrovertable facts that he is innocent and has never been an Enemy Combatant. The illegality of his detention is so clear that even a United States Army Major sitting at the Combatant Status Review Tribunal to hear his case dissented and used the word "unconscionable" in describing his detention.  Ex. 5, p. 13.  Mr. Hamad was arrested in his apartment in Peshawar, Pakistan, at 1:30 a.m. on the night of July 18, 2002, after returning from a month-long vacation with his wife and five daughters in their home in Sudan.  Ex. 5, p. 10, 17.  He was in Peshawar legally and presented all necessary documentation to the Pakistani Security forces who seized him at the direction of an American.  Ex. 3, ¶ 17, Ex. 5, p. 17.  Mr. Hamad had been working in Pakistan and Afghanistan since 1986 for two international charities helping refugees of the Afghan wars.  Ex. 5, passim, Ex. 10, 11.  His employer, when the American action in Afghanistan commenced in 2001 and when he was arrested, was the World Assembly for Muslim Youth (WAMY), an organization that is not listed on the United States

Government Terrorism watch lists.  Ex. 2, ¶ 4, 19, 30, 51.  The facts set out in the

Return filed by Respondents do not satisfy even a broad definition of Enemy

Combatant.  The facts set out in the affidavits and statements submitted by Mr. Hamad

make that even more clear.  They include statements from his former employer,

colleagues, Afghan government, ministry employees, family members, and landlord

confirming his accounts and statements.

Mr. Hamad's counsel has obtained statements from ten witnesses in

Afghanistan, Pakistan, and Sudan.  Seven are submitted as exhibits to this motion as

sworn video tape statements.  Two are submitted as sworn written statements.

- **Dr. Najibullah Zalmai**, surgeon and former director of the hospital in Chamkani, Afghanistan where Mr. Hamad worked, provided a sworn video statement confirming Mr. Hamad's employment and describing him as a good administrator, nice person, and in no manner an extremist.  Ex. 6.1.

- **Dr. M. Sharif Sailani**, an ear, nose, and throat specialist at the Indira Ghandi Institute of Child Health, worked at the hospital in Chamkani after escaping from the Taliban in Kabul.  He confirmed Mr. Hamad's employment and recalled Mr. Hamad as an excellent administrator, good and non-political person.  Ex. 6.2.

- **Dr. Samiullah Roghman**, who currently works in Jalalabad, Afghanistan, provided a sworn video statement.  Dr. Roghman described working at the hospital in Chamkani for several years after he left the Taliban-run areas.  Dr. Roghman recalled that Mr. Hamad fondly as an honest and loving man, not a supporter of the Taliban, and someone who did a good job for the hospital.  Ex. 6.3.

- **Hakim Nasiry** is an Afghan government employee, whose ministry sent a delegation to Chamkani that asked questions about Mr. Hamad on our behalf and received back positive answers that he was a good fellow and former administrator of the hospital in Chamkani.  Ex. 6.4.

- **Deputy Minister of Labor and Social Affairs Wasil Noor Murmand** provided a video statement regarding current activities of WAMY in Afghanistan in relation to his ministry.  He reported that WAMY has a

**Page 10**    **MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING, STATEMENT OF MATERIAL FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES**

protocol agreement with the government to run 10 orphanages, its activities are reviewed regularly, and that WAMY has done a good job and has the best students. Ex. 7.1.

- **Engineer Naquibudin** is the head of WAMY in Afghanistan and provided a sworn video statement. He recalled Mr. Hamad personally as the administrator of the hospital in Chamkani and described Mr. Hamad as doing a good job. He related that WAMY does a lot of great work in Afghanistan with schools, orphanages, food cultivation, hospitals etc. Engineer Naquibudin provided many documents which demonstrate the bona fides of WAMY. Ex. 7.2.

- **Abu Hadifa** is head of WAMY in Pakistan. He recalled Mr. Hamad fondly as a good employee and provided a video tape of the hospital in Chamkani. Ex. 2, ¶ 32-33.

- **Engineer Ishmael**, the representative of landlord of the rental house in Peshawar where Mr. Hamad lived, provided a sworn video statement in Peshawar, Pakistan. He recalled Mr. Hamad as a tenant who occupied the upper floor of the house on Bilal Lane. Mr. Hamad paid the rent on time and there were no complaints about him. Ishmael was questioned by Pakistani intelligence about Mr. Hamad later and gave them the same information. Ex. 7.3.

- **Adil Al-Tayyib Ahmad**, Mr. Hamad's brother-in-law, described his knowledge of Mr. Hamad's work for both WAMY and LDI. Mr. Al-Tayyib Ahmad visited Mr. Hamad when he lived in Pakistan and observed some of his work. He described Mr. Hamad as a loving, non-political person. Ex. 10.

- **Salwa Othman Ahmad Othman**, Mr. Hamad's wife, described their life together in Pakistan. She describes Mr. Hamad as always working for charitable causes and never being involved in any political or extremist activity. Ex. 11.

This memorandum first sets out the law and definitions that govern the issues before the Court. It then analyzes the facts under the broadest definition of enemy combatant before analyzing the facts under the law as set forth by the Supreme Court in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), and *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006).

**Page 11      MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING, STATEMENT OF MATERIAL FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES**

**B.    SUMMARY JUDGMENT IS AN APPROPRIATE VEHICLE FOR RESOLVING THIS CASE**

**1.    The Power Of The Writ Of Habeas Corpus.**

For the 800 year history of the writ of habeas corpus, it has remained the most powerful check on usurpation of power by the Executive, whether an English monarch or an American president.  As stated in *Rasul*, habeas corpus is a writ antecedent to statute.  *Rasul v. Bush*, 542 U.S. 466, 473 (2004) ("Habeas corpus is, however, a writ antecedent to statute, . . . throwing its root deep into the genius of our criminal law.") (citing *Williams v. Kaiser*, 323 U.S. 471, 484 n.2 (1945)).  "'[A]t its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention and it is in that context that its protections are the strongest.'"  *Rasul*, 542 U.S. at 474 (citing *INS v. St. Cyr*, 533 U.S. 289, 301 (2001).  One of the fundamental purposes of the writ is to wrest from Executive control the body of a person whom the Executive has imprisoned without  recourse to lawful procedures. *Hamdi*, 542 U.S. at 525; *Rasul*, 542 U.S. at 474.  The most fundamental aspect of lawful procedure is a basis to exercise jurisdiction over the person the Executive seeks to detain.  *Hamdi*, 542 U.S. at 525 (habeas corpus "has remained a critical check on the Executive, ensuring that it does not detain individuals except in accordance with law.")

In its opinion in *Hamdi*, the Court specifically referred to the manner in which humanitarian relief work creates a risk of mistaken detention:

> Indeed, as amicus briefs from media and relief organizations emphasize, the risk of erroneous deprivation of a citizen's liberty in the absence of sufficient process here is very real.  *See* Brief for AmeriCares, et al. as Amici Curia, 13-22 (noting ways in which "[t]he nature of humanitarian

relief work and journalism present a significant risk of mistaken military detentions").

*Id.* at 530. Use of the writ of habeas corpus to inquire into the legality of Mr. Hamad's detention by the Executive based on minimal process is particularly important in light of the Supreme Court's statement in *Hamdi*.

### 2.    The Legal Standards For Summary Judgment.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Federal Rules of Civil Procedure are "applicable to proceedings for. . . habeas corpus. . ., to the extent that the practice in such proceedings is not set forth in statutes of the United States, the Rules Governing Section 2254 Cases, or the Rules Governing Section 2255 Proceedings, and has heretofore conformed to the practice in civil actions." Fed. R. Civ. P. 81(a)(2). Summary judgment has been held to be an appropriate vehicle for deciding habeas corpus cases. *See Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977).

The Court's threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment. . . against a party

who fails to make a showing sufficient to establish the existence of an element essential

to that party's case, and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Upon a motion for summary judgment, "an adverse party may not rest upon the

mere allegations or denials of the adverse party's pleading, but the adverse party's

response. . . must set forth specific facts showing that there is a genuine issue for trial.

If the adverse party does not so respond, summary judgment, if appropriate, shall be

entered against the adverse party."  Fed. R. Civ. P. 56(e); *see also Kingman Park Civic*

*Ass'n v. Williams,* 348 F.3d 1033, 1041 (D.C. Cir. 2003); *Laningham v. United States*

*Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  Mere conclusory allegations by the

non-movant cannot defeat summary judgment. *See Harding v. Gray,* 9 F.3d 150, 154

(D.C. Cir. 1993)*; Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Banks v.*

*Chesapeake and Potomac Tel. Co.*, 802 F.2d 1416, 1430-31 (D.C. Cir. 1986).

As argued below, the facts set forth in the Statement of Material Facts render this

a compelling case for summary judgment.

## C.    ENEMY COMBATANT

In its Return, the government asserts the authority to detain Mr. Hamad because

he is an "enemy combatant."  Ex 5, p. 3.  That term is unconstitutionally vague, but even

under the vague definitions, none describe Mr. Hamad.  The common elements of the

varying definitions are that the person has engaged in hostilities against the United

States, or directly supported those who have, during the time of armed conflict with the

Taliban or Al Qaeda forces.

As applicable to this case, the origin of the term "enemy combatant" must be traced back to the authorization for use of military force enacted by Joint Resolution of Congress on September 18, 2001. The AUMF enacted by Joint Resolution of Congress on September 18, 2001, authorized the President to:

> use all necessary and appropriate force against those nations, or persons he determines *planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons* in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons.

Ex. 21.

Pursuant to the AUMF, on November 13, 2001, the President issued a military order to govern the "detention, treatment, and trial of certain noncitizens in the war against terrorism." 66 Fed. Reg. 57833. Ex. 22. As described by the Supreme Court in *Hamdan*, that order authorized the detention of

> any noncitizen for whom the President determines 'there is reason to believe' that he or she (1) 'is or was' a member of Al Qaeda or (2) has engaged or participated in terrorist activities aimed at or harmful to the United States.

*Hamdan*, 126 S.Ct. at 2760. The order went on to authorize the establishment of military commissions to try individuals detained pursuant to the order. *Id.*

The full text of the Executive Order included the following:

SEC. 2. Definition and Policy.

(a)    The term "individual subject to this order" shall mean any individual who is not a United States citizen with respect to whom I determine from time to time in writing that:

> (1)    There is reason to believe that such individual, at the relevant times,

**Page 15**    MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING, STATEMENT OF MATERIAL FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES

(i)     is or was a member of the organization known as Al Qaeda;

(ii)    has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefor, that have caused, threatened to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or

(iii)   has knowingly harbored one or more individuals described in subparagraph (i) or (ii) of Subsection 2(a)(1) of this order; and

(2)    It is in the interest of the United States that such individual be subject to this order.

Ex. 22.

Subsequent to the decision in *Rasul*, Deputy Security of Defense Paul Wolfowitz issued a memorandum dated July 7, 2004, that provided the definition of "enemy combatant" that was utilized in *Hamdan*:

An individual who was part of or supporting Taliban or Al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners.  This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.

Ex. 23.  *See Hamdan*, 126 S.Ct. at 2761 fn. 1.

A little less than a year later, the Joint Chiefs of Staff provided a slightly different definition of enemy combatant in Joint Publication 3-63, "The Joint Doctrine For Detainee Operations" that was issued on March 23, 2005.  That document provides:

There is a comprehensive list of terrorists and terrorist groups identified under Executive Order 13224, located at http://www.treas.gov/ofac/. Anyone detained that is affiliated with these organizations will be classified as EC.  Furthermore, there are individuals that may not be affiliated with the listed organizations that may be classified as an EC.  On these specific individuals, guidance should be obtained from higher

Page 16       **MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING, STATEMENT OF MATERIAL FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES**

headquarters.  As defined by the Deputy Secretary of Defense, an EC is defined as: '[A]ny person that U.S. or allied forces could properly detain under the laws and customs of war.  For purposes of the war on terror an enemy combatant includes, but is not necessarily limited to, a member or agent of Al Qaeda, Taliban, or another international terrorist organization against which the United States is engaged in an armed conflict.  This may include those individuals or entities designated in accordance with references E or G as identified in applicable Executive Orders approved by the Secretary of Defense.'  Deputy Secretary of Defense, Global Screening Criteria, Feb. 20, 2004.

Joint Doctrine for Detainee Operations, pg. I-11-I-12.  Ex. 24.

## D.    FACTUAL RETURN

On May 1, 2006, the government filed its "factual return" to Mr. Hamad's petition for writ of habeas corpus.  In the brief pleading portion of the Return, the government asserted that Mr. Hamad's detention is "pursuant to the President's power as Commander and Chief or otherwise."  Ex. 4, p. 1.  Respondents submitted "the final record of proceedings before the Combatant Status Review Tribunal pertaining to Petitioner Hassan Adel Hussein (listed in the petition as Adel Hassan Hamad) as a factual return . . .."  A redacted portion of the CSRT proceedings was submitted as Exhibit A and is submitted herewith as Exhibit 5.  That document sets forth the bases for the assertion that Mr. Hamad should be considered an enemy combatant:

3.    a.    The detainee is associated with Al Qaeda.

3.    a.    1.    The detainee was employed by the World Assembly of Muslim Youth (WAMY) in Afghanistan and Pakistan for approximately 1 ½ years until the time of his capture 18 July 2002.

3.    a.    2.    WAMY supports terrorist ideals and causes.

**MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING, STATEMENT OF MATERIAL FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES**

3.    a.    3.    During the period 1986 through 1999, the detainee was employed by Lajanat Dawa Islamiya (LDI) in Afghanistan and Pakistan.

3.    a.    4.    LDI has been one of the most active Islamic non-governmental organizations to give logistical and financial support to Mujahaddin operating in Afghanistan and Pakistan area.

3.    a.    5.    During the course of his duties with LDI, the detainee came in contact with persons who held positions of responsibility in Al Qaeda.

Ex. 5, pp. 9-10.

The factual return does not allege that Mr. Hamad took up arms against the coalition forces, that he committed a belligerent act, or that he was ever present on the battlefield. The essence of the information submitted in the Return is that Mr. Hamad worked for two different charities, LDI and WAMY, for 17 years. Ex. 5, p. 9. During that time, he provided relief supplies to Afghan refugees (primarily in Pakistan), taught school, served in administrative capacities, and served as an administrator at a regional hospital in Afghanistan. Ex. 3, ¶¶ 19, 24, Ex. 5, pp. 16-19. The Return states that other individuals in the two charities have taken anti-American positions and may be associated with or have supported in some way the Taliban or Al Qaeda. Ex. 5, pp. 15, 16-23. The Return also states that Mr. Hamad came in contact with either Taliban or Al Qaeda people at some point or points during his employment. Ex. 5, pp. 9, 23. Nothing in the Return, however, states that Mr. Hamad ever personally did anything to provide support to the Taliban or Al Qaeda, let alone after the fall of 2001.

The argument for summary judgment relief presented by Mr. Hamad proceeds on two levels. The first level follows the analytic approach taken by the Major who

Page 18        MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING, STATEMENT OF MATERIAL FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES

dissented in the CSRT proceeding.  On that level, Mr. Hamad need not dispute any of the facts presented in the Return, nor add to them because they do not show that he ever participated in or assisted terrorist activities.  Rather, he states that even if all of those assertions are true, they do not, as a matter of law, support his detention.  The second level of response presents the Court with additional irrefutable evidence that directly contradicts the conclusory allegations in the Return.  Thus, summary judgment should be granted either based on review solely of the facts submitted by the Respondents or, alternatively, based on review of the irrefutable facts of innocence with which Mr. Hamad has supplemented the facts that the Respondents provided to the Court.

**E.    ARGUMENT**

    **1.    The Return Filed By The Government Does Not Show Any Basis For Seizing Or Detaining Mr. Hamad As An Enemy Combatant.**

While arguing for unprecedented Executive power, the Department of Justice in all its pleadings in the Guantánamo Bay cases has, nonetheless, recognized that it must base its arguments on law.  For example, in its Supreme Court brief in *Hamdan*, the government cited to various authorities justifying its detention of enemy combatants, including the Authorization for Use of Military Force of September 18, 2001, the Presidential Order of November 13, 2001, in particular, and more generally the President's Article II powers, the Code of Military Justice, and the Articles of War.  Br. at 16-17 filed in *Hamdan*.  Ex. 27.  In the Return in this case, the government has been less specific, referring to "the President's power as Commander in Chief or otherwise."  Ex. 4.  Contrary to the government's arguments, neither the AUMF, the Presidential

**MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING, STATEMENT OF MATERIAL FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES**

Order of November 13, 2001, nor any other bases for Executive authority authorize the
seizure of civilians who are not on a battlefield and gave the Department of Defense no
jurisdiction over Mr. Hamad.

   **a.    The Authorization For The Use Of Force And The Order Of
           November 13, 2001.**

   The AUMF and Presidential Order of November 13, 2001, do not provide any
basis for jurisdiction and detention of Mr. Hamad.

   In *Hamdi*, the Supreme Court made clear that the AUMF provided authorization
for detention of individuals in the "narrow category" described.  *Hamdi*, 542 U.S. at 517.
Nothing in the Return filed by the government against Mr. Hamad satisfies any of the
terms in the AUMF.  To the extent the government relies on the AUMF for authorization
for Mr. Hamad's detention, it is unlawful.

   With respect to the Presidential Order, nothing in the Return filed by
Respondents alleges that Mr. Hamad "is or was" a member of Al Qaeda or that he ever
engaged, or participated, in any terrorist activities, the activities that give jurisdiction
under the Executive Order.  Neither the AUMF nor the order of November 13, therefore,
provides any legal basis for the detention of Mr. Hamad.

   **b.    The "Enemy Combatant" Orders Of The Department of
           Defense.**

   Respondents have treated Mr. Hamad as if his detention were authorized
pursuant to the order issued by the Department of Defense on July 7, 2004, that set out
a definition of "enemy combatant" and established certain procedures for dealing with
enemy combatants.  Ex. 5.  To the extent that the detention of Mr. Hamad is argued to

be authorized under that order, the order is unlawful because the definition set out therein exceeds the definition contained in the AUMF of September 18, 2001, the only possible justification for it.

However, even utilizing the Respondents' definition of "enemy combatant"[1] without reference to any limitations imposed by the decisions in *Hamdi* or *Hamdan*, review of the Return reveals that it does not even allege that Mr. Hamad ever committed any acts that fit within the broadest definition.  At most, the Return alleges that Mr. Hamad "associated with Al Qaeda," which does not allege being a "part of" or "supporting" Al Qaeda.  Ex. 5, p. 15.  None of the specific "facts" recited in support of the allegation of "associating" involves "direct[] support[] [of] hostilities in aid of enemy armed forces."  Ex. 21-23.  The allegations contained in the Return do not satisfy even the broad and vague standard of the July 7, 2004 order.

The Return shows that Mr. Hamad's role with WAMY was entirely that of employee and administrator, including administrator of a legitimate fully operational general hospital in Chamkani, Afghanistan, that worked regularly with the United Nations, World Health Organization, and World Food Program.  Ex. 5,p p. 8, 15-20, 26-28.  Nowhere is there even a suggestion that the activities in which Mr. Hamad engaged for WAMY were anything other than legitimate activities.  The fact that WAMY, or some people in WAMY, may support terrorist ideals and causes is irrelevant to the question of

---

[1] Mr. Hamad believes that the definition of "enemy combatant" used by the Department of Defense is overbroad, vague and unconstitutional and refers to it here without in any manner accepting its validity.

whether Mr. Hamad was part of or supported the Taliban or Al Qaeda or any associated force or committed any belligerent acts or acts of support.

It is critical to note that WAMY is NOT listed as a terrorist organization.[2]  Ex. 2, ¶ 51.  In March 2005, the Department of Defense, through Joint Publication 3-63, the "Joint Doctrine for Detainee Operations," provided additional guidance on the definition of "enemy combatant."  Ex. 24.  That publication provides that anyone who "is affiliated" with an organization listed as a "terrorist group" under Executive Order 13224 will be classified as an "EC."  Ex. 24.  Review of the "comprehensive list" maintained at www.treas.gov/ofac/ as of the filing of this pleading shows that WAMY is not listed.  Ex. 2, ¶ 51.

The other three specifications in the Return relate to LDI.[3]  At most the specifications say that Mr. Hamad "came in contact" with persons with responsibility in Al Qaeda.  Ex. 5, p. 23.  That "fact" does not show what Mr. Hamad did, with whom, or whether the activity in any manner meets the definition of an enemy combatant.

The allegations in the Return regarding possible contact with Al Qaeda members while he was working at LDI date from the late 1980's and 1990's.  Ex. 5, p. 29.  These allegations are so stale that they cannot fall within any lawful authority to detain.  Moreover, as the sworn evidence shows, Mr. Hamad's work with LDI was entirely innocent.  Thus, the fact that Mr. Hamad left his employment with LDI in 1999, before

---

[2]WAMY is an International Muslim Youth organization with chapters worldwide. WAMY provides humanitarian support to the needy.  Ex. 2, ¶ 16, Ex. 7.1- 7.4, 8.1-8.2, 15-19.

[3]LDI is an organization that provides humanitarian support.

**MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING, STATEMENT OF MATERIAL FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES**

any legal justification for seizures was enacted, means that his employment with LDI cannot provide jurisdiction for his detention.

With respect to both WAMY and LDI, the Return includes unrefuted facts showing that Mr. Hamad was engaged in legitimate and lawful charitable work for both organizations.   Ex. 5, pp. 15-20, 26-28.  The Return does not show that Mr. Hamad was ever part of or supported the Taliban or Al Qaeda, or any associated force, committed a belligerent act, or directly supported hostilities in aid of enemy armed forces.

2.      **The Facts Set Forth In Respondents' Return Do Not Satisfy The Requirements For Detaining A Person As An Enemy Combatant As Set Out In The Decisions In *Hamdi* And *Hamdan*.**

In the preceding section, Mr. Hamad argued that his detention is unlawful even under the broad and vague definition of enemy combatant utilized by Respondents. After the decisions in *Hamdi* and *Hamdan*, however, it is clear that the detention can only be lawful if it satisfies the requirements of the laws of war, requirements that are not on their face included in the Department of Defense statements.  The recognition that the laws of war limit the authority to try a person who has been seized necessarily extends to the right to detain at all.  The holding of the Supreme Court has now been expressly adopted by Respondents in the Memorandum issued by Deputy Secretary of Defense Gordon England on July 7, 2006.  Ex. 25.

a.      **The Department Of Defense Admission.**

In a "Memorandum for Secretaries of the Military Departments" subject "Application of Common Article Three of the Geneva Convention to the Treatment of

**Page 23**        **MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING, STATEMENT OF MATERIAL FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES**

Detainees in the Department of Defense," dated July 7, 2006,  Deputy Secretary of

Defense Gordon England directed that "all DoD personnel" are to adhere to the

standards of Common Article Three of the Geneva Convention as to any person

detained in "the conflict with Al Qaeda."  Ex. 25.  This admission by a party opponent in

the habeas corpus litigation moots any contrary position taken by Department of Justice

attorneys regarding the applicability of portions of the decision in *Hamdan* to

Guantánamo detainees who have not been charged in military commission

proceedings.

**b.    Law Of War Principles From *Hamdi* and *Hamdan*.**

Several principles emerge from the decisions in *Hamdi* and *Hamdan* that control

analysis of this motion.

Mr. Hamad was a civilian living outside of a war zone.  Ex. 3, ¶¶ 15, 17, Ex. 5,

pp. 15-20, 26-28, Ex. 8.3, 11, 14.  Such a person, under long-standing principles of the

usages of war, cannot be seized by a military commander unless he has violated the

laws of war.  *See* William Winthrop, MILITARY LAW AND PRECEDENTS 816 (Rev'd 2d Ed.

1920) (hereafter Winthrop).  In Winthrop's treatise on the laws of war, cited with

approval throughout *Hamdan*, the author recognized the general rule of liberty with

exceptions for charged and adjudicated violations of the law of war:

> While the peaceable citizens of a country under Military Government are
> in general exempt from military arrest or restraint of the person, the
> governing commander is authorized to apprehend and restrain all persons
> guilty of violation of the laws of war, hostile demonstrations, or public
> disorders, and in extreme cases to inflict upon them summary punishment.

Winthrop, at 816.  This principle is entirely consistent with the different degrees of

authority required for a battlefield commander dealing with combatants and a person

dealing with a civilian far from a battlefield.

    *Hamdi* and *Hamdan* make clear that  the authority of the Executive to imprison

Mr. Hamad is controlled by the law of war.  In *Hamdi*, the Court referred to the "law of

war" as limiting the length of detention to which a person could be subjected.  542 U.S.

at 520.  In discussing the authority granted by Congress in the AUMF, the Court based

its understanding on "long standing law-of-war principles." *Id.* at 521.  The authority to

seize under these principles is, however, limited to seizures that take place "on the

battlefield."  See *Id.* at 534.

    This is entirely consistent with the realities of warfare that must accord flexibility

to the field commanders who make the initial decision regarding battlefield seizure of a

person as an enemy combatant, but then accord far more process to decisions to seize

people in other countries, in the middle of the night, in their homes.  *Id.*

    The brief references to the law of war in *Hamdi* became central to the analysis in

*Hamdan*.  With respect to the President's authority to convene military commissions, the

Court stated that even in the broad decision in *Ex Parte Quirin*, 317 U.S. 1 (1942),

> Congress had simply preserved what power, under the Constitution and
> the common law of war, the President had had before 1916....

126 S.Ct. at 2774.   In such a setting, the Court made clear that the President must

comply "with the law of war."  126 S.Ct. at 2775.

> Together, the UCMJ, the AUMF, and the DTA at most acknowledge a general
> Presidential authority to convene military commissions in circumstances where
> justified under the "Constitution and laws," including the law of war.

*Id.*

The Court then identified three circumstances under which the President could convene military commissions. *Hamdan*, 126 S.Ct. at 2775-76. Only the third, that convened as an "incident to the conduct of war," was held to be applicable to the men imprisoned in Guantánamo. Such a commission can only be convened

> when there is a need "to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war."

*Hamdan*, 126 S.Ct. at 2776 (quoting *Quirin*, 317 U.S. at 28-29). Thus, in order for the detention of Mr. Hamad to be lawful, the Return filed by Respondents must establish that he has violated the law of war and that his seizure and detention was consistent with the laws and usages of war.

In *Hamdan*, the court identified four "preconditions for exercise of jurisdiction" by a "law-of-war commission." 126 S.Ct. at 2777. As relevant to this case, these are:

> 1.    The offense must have been "committed within the field of the command of the convening commander."

> 2.    "[T]he offense charged 'must have been committed within the period of the war'."

> 3.    "[O]nly 'individuals of the enemy's army who have been guilty of illegitimate warfare or other offense in violation of the laws of war'" may be charged.

> 4.    The offenses must involve either "'[v]iolations of the laws and usages of war cognizable by military tribunals'."

*Id.* (quoting Winthrop, 836-39).

### i.    Violations Of Laws And Usages Of War.

None of the four preconditions for the exercise of jurisdiction by any military commission or tribunal described in *Hamdan* is met.  First, Mr Hamad is not even alleged to have done anything "within the field of command of the convening commander."  This is true whether the "convening commander" is considered to be the commander at Guantánamo, or a commander in the Afghan theater of war, or some other commander.  Mr. Hamad was seized from his home in Peshawar, Pakistan.  Ex. 5, p. 17.  When seized, the only activity in which he was engaged was domestic activities within his home.  Ex. 5, p. 17.  He had spent the previous day engaged in his legitimate work duties.  Ex. 3, ¶ 15.  He had spent the preceding month at home in Sudan with his family on vacation.  Ex. 5, p. 7, Ex. 10, ¶¶ 7-11, Ex. 11, ¶¶ 11-13.

With respect to the types of offenses that can be charged in a military commission, the Court held that conspiracy is not an offense that constitutes a violation of "the laws and usages of war."  *Id.* at 2783.  In order for a commission to have jurisdiction, the charge filed against a prisoner must properly set forth "not only the details of the act charged, but the circumstances conferring jurisdiction."  *Id.* at 2777 (quoting Winthrop, 842 (emphasis omitted)).

The phrase "the laws and usages of war" refers to an "American common law of war."  *Hamdan*, 126 S.Ct. at 2786.  What is proscribed under the law of war is found in a number of sources.  These include 18 U.S.C. § 2441 (which defines "war crimes"), the Uniform Code of Military Justice, and the Geneva Conventions.  While, prior to June 2006, there was some dispute about the applicability of the Geneva Conventions to the Guantánamo detainees, *Hamdan* laid that to rest by specifically referring to the "four

**MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING, STATEMENT OF MATERIAL FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES**

Geneva Conventions" as governing the scope of permissible government action.  *Id.*  As noted above, Respondents have acknowledged that at least Common Article III of the Geneva Conventions applies.

18 U.S.C. § 2441 includes in its definition of "war crime" any act in violation of the Geneva Conventions of 1949, certain articles of the Hague Convention IV of 1907, and certain uses of mines and booby-traps.  Proscribed in these documents are such acts as inhumane treatment, rape, murder, torture, and the like.  None include anything remotely resembling charity work for an organization that has, or some of whose members have, espoused anti-American ideas.  Nor does "associating" or "coming in contact" with certain people violate the laws and usages of war.  None of the facts in the Return even remotely suggests that Mr. Hamad violated any of the laws or usages of war.

### ii.    The Temporal And Territorial Boundaries Of War.

*Hamdan* makes clear that "the offense alleged must have been committed both in a theater of war and *during*, not before, the relevant conflict." *Hamdan*, 126 S.Ct. at 2779.

The earliest date for jurisdiction is September 11, 2001. *Hamdan*, 126 S. Ct. at 2777 n. 31. The *Hamdan* Court stated that any offense "must have been committed within the period of the war." 126 S.Ct. at 2777 (quoting Winthrop at 837).

As the *Hamdan* Court held, the offense alleged must have been committed "*during*, not before, the relevant conflict." 126 S.Ct. at 2779; *see also Hamdi*, 542 U.S. at 518 (detention applies to individuals who fought against the United States "for the duration of the particular conflict in which they were captured"). The *Hamdan* Court expressly disregarded any claims pertaining to acts prior to September 11, 2001. *Hamdan*, 126 S.Ct. at 2778.

> As in the ordinary criminal law one cannot legally be pu[n]ished for what is not an offence at the time of the sentence, so a military commission cannot, (in the absence of specific statutory authority,) legally assume jurisdiction of, or impose a punishment for, an offence committed either before or after the war or other exigency authorizing the exercise of military power."

Winthrop at 837.

The territorial limitation is similarly clarified in *Hamdan*. Quoting from Winthrop, *Hamdan* stated that jurisdiction extends only to those "offenses committed within the field of the command of the convening commander." *Hamdan*, 126 S.Ct. at 2777 (quoting Winthrop 836).

The field of command is synonymous with the theater of war, and extends no further than the battlefield. The seizure and detention of Mr. Hamad in his home in Pakistan was geographically outside the bounds of the laws and usages of war. With respect to the temporal limit, most of the facts alleged in the Return involve activities that occurred before the United States was involved in the war in Afghanistan. Thus, the precondition that the offenses be committed within the period of the war, is not met.

> **3.     The Facts Set Forth In The Return Do Not Show Any Authority To Seize Or Detain Mr. Hamad Under The President's Authority As Commander In Chief Or Any Of The Laws And Usages Of War.**

In various pleadings submitted throughout the course of the habeas corpus litigation involving other detainees and in its Return in this case, Respondents have argued that the detention of individuals in Guantánamo Bay proceeds from the President's inherent authority as Commander-In-Chief. In *Hamdi*, the Supreme Court noted that it did not need to address that issue. *Hamdi,* 542 U.S. at 516-17. While Mr. Hamad does not believe that authority exists for the President to seize and detain civilians who are not on a battlefield and not engaged in any hostilities, he does not believe it is necessary to reach any such issue because any such inherent authority would be cabined by the laws and usages of war. In various pleadings in the cases of other detainees, the government has acknowledged that its Article Two assertions of Executive authority are cabined by the laws of war, *see, e.g.,* Resp. Brief in *Boumediene, et al v. Bush*, 04 CV 1166 at p. 9. Ex. 20. Following the decision in *Hamad*, there can be no dispute about this issue. As set out above, the Return does not

set forth any facts that would support the seizure or detention of Mr. Hamad under the laws and usages of war.

The Return shows that Mr. Hamad was seized in a friendly nation, from his home, that he was unarmed at the time of the seizure, and that no evidence was found in his home that linked him to any terrorist or combatant activities.  Ex. 5, p. 17.  As a civilian citizen of a foreign state, Sudan, with which the United States has diplomatic relations and is not at war, and as a legal resident of Pakistan, a friendly state with whom the United States has and had diplomatic relations and is not at war, Mr. Hamad enjoyed and enjoys the rights of all civilian nationals of friendly states.  These include the rights set out in the Extradition Treaty that the United States has with Pakistan. Extradition Treaty, U.S. - Pakistan, Dec. 22, 1931, 47 Stat. 2122.  Under 18 U.S.S.G. § 3184, the United States is to follow the extradition treaties when it seeks to pursue criminal charges against an individual resident in a foreign country.  Its failure to do so is undisputed and is cognizable in habeas corpus.  *See Jimenez v. United States District Court for the Southern District of Florida, Miami Division*, 84 S.Ct. 14 (1963).  The writ should issue because no inherent authority in the Executive can justify detention in the circumstances of this case.

      **4.     Even Under The Definition Of The Global War On Terror Posited By Respondents, A Position That Mr. Hamad Rejects, His Detention Is Unlawful Because He Is A Civilian.**

The Geneva Conventions of 1949, to which the United States is a party, are intended to cover all persons who reside in or near a war zone.

      Every person in enemy hands must have some status under international law: he is either a prisoner of war and, as such, covered by the Third

> [Geneva] Convention, a civilian covered by the Fourth [Geneva]
> Convention, or [again] a member of the medical personnel of the armed
> forces who is covered by the First [Geneva] Convention.  There is no
> intermediate status; nobody in enemy hands can be outside the law.

Oscar M. Uhler, et al., III, COMMENTARY IV:  GENEVA CONVENTION RELATIVE TO THE

PROTECTION OF CIVILIAN PERSONS IN TIME OF WAR 51 (Jean S. Pictet ed., 1958).  Article

Four of the Fourth Geneva Convention makes clear that it applies to all persons who

are not protected by the other three 1949 Geneva Conventions who "find themselves, in

case of a conflict or occupation, in the hands of a Party to the conflict or Occupying

Power of which they are not nationals."

The Return, on its face, shows that Mr. Hamad is being held in violation of the

Fourth Geneva Convention.  He is a civilian and privileged person not subject to

detention in a prison setting such as Guantánamo.  Ex. 5, passim, Ex. 10, 11.

In addition to violation of the Geneva Conventions, the Return shows that Mr.

Hamad's detention violates other treaties.  The International Covenant on Civil and

Political Rights, ratified by the United States in 1992, provides, *inter alia*, in Article 9.1,

that "no one shall be subjected to arbitrary arrest or detention."  *International Covenant*

*on Civil and Political Rights,* March 23, 1976, 999 U.N.T.S. 171.  The uncontroverted

facts in the Return show that Mr. Hamad was a civilian living in a foreign country,

engaged in no unlawful conduct.  As such, his arrest and detention were arbitrary and

unlawful.

### 5.    The Seizure Of Mr. Hamad Violated Article 20 Of The Fourth Geneva Convention.

The Court in *Hamdan* held, and the Deputy Secretary of Defense has now agreed, that Common Article Three of the Geneva Conventions is applicable to the war with Al Qaeda.  Ex. 25.  In *Hamdan*, the Court stated that it was not necessary to decide whether the protections of all of the Geneva Conventions were applicable to the detainees at Guantánamo because it was clear that Common Article Three did apply. *Hamdan*, 126 S.Ct. at 2795-96.  In a footnote, however, the Court noted that President Bush, a party opponent in this proceeding, has stated that the Geneva Conventions do apply to the conflict with the Taliban.  *Hamdan,* 126 S.Ct. at 2795 fn. 60.  That statement by the President is an admission by a party opponent.

The Return filed in this case asserts that Mr. Hamad is an enemy combatant based on a definition that does not distinguish between the Taliban and Al Qaeda, nor does it focus solely on alleged associations with Al Qaeda.  Ex. 21-24.  If there is a distinction between the applicability of the Geneva Conventions to the war with the Taliban and the war with Al Qaeda, a distinction which Mr. Hamad rejects, it is not clear that this distinction is applicable in this case.  Moreover, in the event that there is any doubt as to the applicability of the Geneva Conventions, Article Five provides that

> should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong in any of the categories enumerated in category four, such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.

While Article Five of the Third Geneva Convention refers to persons "having committed a belligerent act," a category into which Mr. Hamad does not fall, the rule that

**MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING, STATEMENT OF MATERIAL FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES**

a prisoner be given the benefit of the doubt should be even more applicable to a person working in hospital administration and charity.

Article 20 of the Fourth Geneva convention provides:

Persons regularly and solely engaged in the operation and administration of civilian hospitals, including the personnel engaged in the search for, removal and transporting of and caring for wounded and sick civilians, the infirm and maternity cases shall be respected and protected.

The Return filed by Respondents states without contradiction that Mr. Hamad was a hospital administrator for WAMY in 2000 and 2001.  Ex. 5, pp. 15, 18-19, 27. The WAMY General Hospital in Chamkani, Afghanistan, was the primary civilian hospital in that region of the country.  Ex. 7.1-7.4, 8.1-8.2.  Mr. Hamad's exhibits confirm that WAMY was a general hospital for the civil population and that Mr. Hamad served diligently as administrator.  The hospital was in no manner political.  Ex. 7.1-7.3.  It received support from the United Nations and World Health Organizations.  Ex. 7.1-7.3. After September 11, 2001, Mr. Hamad continued to perform charitable relief work for the hospital's parent organization.

In light of the uncontrovertable evidence in the Return, the seizure and detention of Mr. Hamad violated international law at the outset.  His  imprisonment continues to violate Article 20 of the Fourth Geneva Convention.

In the Supreme Court briefing on *Hamdi*, among the amicus briefs filed was one on behalf of international humanitarian organizations and associations of international journalists.  Brief of International Humanitarian Organization and Associations of International Journalists as Amici Curiae, 2004 WL 575744 (Feb. 23, 2004).  Their brief discusses, with detail, the role played by international humanitarian organizations and

the dangers such relief workers face in unstable and ill-defined war zones.  The

importance of their work and the reality of the difficulties they face makes it all the more

important to ensure that those who are covered by Article 20 of the Fourth Geneva

Convention are able to enforce their rights through the writ of federal habeas corpus.

> ### 6.     Respondents' Action With Respect To Mr. Hamad At An Administrative Review Board Proceeding In 2005 Underscores The Unconscionable Nature Of His Continued Detention.

By memorandum dated September 14, 2004, the Department of Defense

established what it calls an Administrative Review Board process for detainees at

Guantánamo.  Ex. 28.  This process is intended to determine whether the government

should continue to detain individuals at Guantánamo who had previously been through

Combatant Status Review Tribunal proceedings.  A small percentage of the detainees

who have been through the Administrative Review Board process have not received the

results of the proceeding from the Department of Defense personnel at Guantánamo.

In a press statement released on February 9, 2006, the Department of Defense

stated that it had a list of approximately 134 detainees who it had determined should be

released from imprisonment at Guantánamo or transferred.  Ex. 24.  In the spring of

2006, a number of individuals, including 16 nationals of Saudi Arabia, were repatriated

to their home countries.  Ex. 3, ¶ 13.  A significant number, if not all of these individuals,

had attended ARB proceedings in 2005 and, like Mr. Hamad, had been given no

determination regarding their status.  Ex. 3, ¶ 13.

Mr. Hamad has been advised by interrogators at Guantánamo in the past six

months that he is among the individuals in the group of detainees who have been

cleared for release.  Ex. 3, ¶ 14.  His continued imprisonment under these circumstances has no justification.  As set out in the following section on remedy, the government should be ordered to either repatriate Mr. Hamad immediately or release him into the United States.

### 7.    Remedy.

Mr. Hamad seeks an order from this Court requiring the Department of Defense to release him from imprisonment forthwith.  Mr. Hamad wants to return to Sudan and believes that there will be no problems with his repatriation.  Ex. 3, ¶ 16.  During the time in which the United States Government is working with the Sudanese government for Mr. Hamad's repatriation, Mr. Hamad seeks an order directing the government to release Mr. Hamad under reasonable supervisory conditions.

The Court has broad authority under 28 U.S.C. § 2243 to formulate equitable relief as "law and justice require."  *See Sanders v. United States*, 373 U.S. 1, 17 (1968) (habeas corpus is governed by equitable principles).  In *Martinez v. Clark*, 543 U.S. 371 (2005), the petitioners were Mariel Cubans who were indefinitely detained because they could not be repatriated to Cuba in the reasonably foreseeable future.  The Court held that the government did not have the authority to indefinitely detain them even though they had never been "admitted" into the United States, rejecting the government's argument that it had the authority to detain because the Mariel Cubans were paroled into the United States, and thus, stood as if on the border requesting admission.  543 U.S. at 386.  *Martinez* held that they were to be treated as any other person who was subject to deportation but who could not be removed.  543 U.S. at 385. Under the

removal statute, 8 U.S.C. §1231(a)(6), as interpreted in *Zadvydas v. Davis,* 533 U.S. 678 (2001), detention while removal was being arranged was limited to six-months, after which the person was to be released on conditions of supervision until repatriation is effectuated. 543 U.S. at 385-86.

Mr. Hamad is in the same position as the petitioners in *Martinez*. As demonstrated above, the government does not have jurisdiction to detain Mr. Hamad as an enemy combatant. Accordingly, he stands as if at the border, and must be treated as any other person who is awaiting repatriation. Mr. Hamad, like Mr. Martinez, has been in custody much longer than the 6 months allowed, and should be released in the United States on conditions of supervision until he can be repatriated.

## CONCLUSION

For all the reasons set forth herein, and as demonstrated in the exhibits submitted herewith, this Court should conclude that there is "no genuine issue as to any material fact," that Mr. Hamad is "entitled to a judgment as a matter of law," and order his immediate release.

Respectfully submitted October 16, 2006.


/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender


/s/ Patrick J. Ehlers
Patrick J. Ehlers
Assistant Federal Public Defender


**Page 37**    **MOTION FOR SUMMARY JUDGMENT AND EXPEDITED HEARING, STATEMENT OF MATERIAL FACTS, AND MEMORANDUM OF POINTS AND AUTHORITIES**