Steven T. Wax, OSB #85012
Federal Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon 97204
Tel:   503-326-2123
Fax:  503-326-5524
steve_wax@fd.org
Attorney for Petitioner

Patrick J. Ehlers, OSB #04118
Assistant Federal Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon 97204
Tel:   503-326-2123
Fax:  503-326-5524
patrick_ehlers@fd.org
Attorney for Petitioner

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ADEL HASSAN HAMAD,<br><br>                              Petitioner,<br><br>        v.<br><br>GEORGE W. BUSH, DONALD RUMSFELD, JAY HOOD, and BRICE GYURISKO,<br><br>                              Respondents. | CV 05-1009 JDB<br><br>EXHIBITS TO MOTION FOR SUMMARY JUDGMENT AND MOTION TO LIFT OR MODIFY STAY |

1.    Summary Exhibit DVD

2.    Affidavit of Investigator William Teesdale

Page 1  EXHIBITS TO MOTION FOR SUMMARY JUDGMENT AND MOTION TO LIFT OR MODIFY
        STAY

3.      Affidavit of AFPD Patrick Ehlers

4.      Respondents' Factual Return

5.      Exhibit A to Respondents' Factual Return

6.      Oath Forms of:

     6.1      Dr. Najib - Mr. Hamad's coworker and Director of the WAMY Hospital in
          Chamkani

     6.2      Dr. Sailani -   Mr. Hamad's coworker at the WAMY Hospital in Chamkani

     6.3      Dr. Roghman - Mr. Hamad's coworker at the WAMY Hospital in Chamkani

     6.4      Hakim Nasiry - Deputy with Gardez Department of Education

     6.5      Engineer Naquibudin - WAMY Director in Afghanistan

     6.6      Engineer Ishmael - Mr. Hamad's landlord's representative in Peshawar

7.      DVD Video Statements

     7.1      Dr. Najib (Disc One Chap. 1.1)

     7.2      Dr. Sailani (Disc One Chap. 1.2)

     7.3      Dr. Roghman (Disc One Chap. 1.3)

     7.4      Hakim Nasiry (Disc One Chap. 1.4)

8.      DVD Video Statements

     8.1      Deputy Minister of Labor and Social Affairs Wasil Noor Murmand (Disc
          Two Chap. 2.1)

     8.2      Engineer Naquibudin (Disc Two Chap. 2.2)

     8.3      Engineer Ishmael (Disc Two Chap. 2.3)

9.      *Pro Se* Petition, handwritten petition of Adel Hassan Hamad

10.     Affidavit of Al Tayeb (English translation) (Mr. Hamad's brother-in-law)

10.1   Declaration of Translation

10.2   Affidavit of Al Tayeb (Arabic)

11.   Affidavit of Salwa Othman (English translation) (Mr. Hamad's wife)

11.1   Photograph of Hamad Apartment (Attachment 1 to affidavit)

11.2   Death Certificate of Mr. Hamad's daughter Fida (Attachment 2 to affidavit)

11.3   Receipt from WAMY for final payment (attachment 3 to affidavit)

11.4   Photograph of Mr. Hamad and two daughters (attachment 4 to affidavit)

11.5   Declaration of Translation

11.6   Affidavit of Salwa Othman (Arabic) with attachments

12.   Photograph of staff at WAMY hospital in Chamkani shown to witnesses

13.   Photograph of Mr. Hamad signed by Dr. Najib

14.   Hamad Family Photographs

14.1   Mr. Hamad and nieces shown to witnesses

14.2   Salwa Othman and daughters

14.3   Mr. Hamad and children and relatives

15.   Photographs from Abu Hadifa

15.1   United Nations High Commissioner for Refugees letter of commendation for WAMY for healthcare services

15.2   WAMY earthquake relief activities

15.3   WAMY earthquake relief activities

15.4   WAMY earthquake relief activities

15.5   Staff at WAMY hospital in Chamkani

15.6   Dr. Najib at ultrasound machine in WAMY hospital in Chamkani

Page 3  EXHIBITS TO MOTION FOR SUMMARY JUDGMENT AND MOTION TO LIFT OR MODIFY STAY

15.7    Dr. Najib in operating theater in WAMY hospital in Chamkani

15.8    Laboratory facilities in WAMY hospital in Chamkani

15.9    X-ray facilities at WAMY hospital in Chamkani

16.    Abu Hadifa's WAMY DVD of WAMY Hospital

17.    WAMY Documents

17.1    World Assembly of Muslim Youth orphan school in Afghanistan photograph

17.2    Photograph of signing of protocol between WAMY and Ministry of Labor and Social Affairs

17.3    Photograph of WAMY water project and school

17.4    Islamic Republic of Afghanistan Ministry of Economy to Ministry of Education document asking WAMY for books and supplies for schools

17.5    Islamic Republic of Afghanistan Ministry of Labor and Social Affairs document

17.6    Protocol between Afghan government and WAMY

17.7    Saudi Arabian certification of WAMY as an NGO

17.8    Letter of support to WAMY from United Nations High Commissioner for Refugees

17.9    World Food Program letter of agreement with WAMY for 1/1/2000 through 12/31/2000

17.10    Letter agreement between United Nations World Food Program in Afghanistan and WAMY dated February 20, 2000

17.11    Food and Agricultural Organization of the United Nations report on WAMY fruit tree project, December 9, 1998

17.12    Food and Agricultural Organization of the United Nations agreement of 1994 for agricultural work

17.13  September 10, 1998 progress report of the Food and Agricultural Organization of the United Nations on WAMY project

17.14  November 27, 1997 Food and Agricultural Organization of the United Nations contract with WAMY

17.15  January 13, 1997 Food and Agricultural Organization of the United Nations contract with WAMY

17.16  Food and Agricultural Organization of the United Nations 1994 contract with WAMY

17.17  Food and Agricultural Organization of the United Nations March 30, 1995 contract with WAMY

17.18  Transitional Islamic State of Afghanistan Ministry of Education receipts for school, dated November 16, 2004

17.19  Photograph of Afghan Director of Labor and Social Affairs visiting WAMY school in Jalalabad, Afghanistan

17.20  World Assembly of Muslim Youth, Pakistan Office, quarterly report of activities from January to September, 1999

18.  WAMY Brochures from Dr. Najib

18.1  WAMY report for 2000

18.2  WAMY report January to August, 1999

19.  World Health Organization Report on WAMY hospital in Chamkani, dated August 23, 1999

20.  Respondents' Brief in *Boumediene v. Bush, et al.,* p. 9

21.  AUMF dated September 18, 2001

22.  Executive Order dated November 13, 2001

23.  Deputy Secretary of Defense Wolfowitz July 7, 2004 memo defining "Enemy Combatant"

24.  Joint Doctrine of Detainee Operations, Publication 3-63, March 23, 2005 (excerpt)

25.  Deputy Secretary of Defense England Memorandum dated July 7, 2006

26.  DOD Guantánamo Website February 9, 2006, Press Statements regarding 134 Detainees

27.  Respondents' Brief in *Hamdan v. Rumsfeld*, pp. 15-16.

28.  Administrative Review Board memorandum of September 14, 2004 (cover sheet)

29.  Map of Afghanistan and Pakistan

30.  Map of Sudan

31.  Photograph of interview of Dr. Sailani

32.  Photograph of Indira Ghandi Institute, Dr. Sailani's current employer

33.  Photograph of Indira Ghandi Institute, Dr. Sailani's current employer

34.  Photograph of Afghan Ministry of Labour and Social Affairs

35.  Photograph of Pakistan, Afghan border

Respectfully submitted this 21st day of September, 2006.


/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Patrick J. Ehlers
Patrick J. Ehlers
Assistant Federal Public Defender

# EXHIBIT 1

# Summary Exhibit DVD

# (FILED SEPARATELY)

EXHIBIT 2


Affidavit of Investigator William Teesdale

Steven T. Wax, OSB #85012
Federal Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon  97204
Tel:   503-326-2123
Fax:  503-326-5524
steve_wax@fd.org
Attorney for Petitioner

Patrick J. Ehlers, OSB #04118
Assistant Federal Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon  97204
Tel:   503-326-2123
Fax:  503-326-5524
patrick_ehlers@fd.org
Attorney for Petitioner

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ADEL HASSAN HAMAD, | CV 05-1009 JDB |
| Petitioner, | |
| v. | AFFIDAVIT OF WILLIAM J. TEESDALE |
| GEORGE W. BUSH, DONALD RUMSFELD, JAY HOOD, and BRICE GYURISKO, | |
| Respondents. | |

STATE OF OREGON          :
                                          : ss
COUNTY OF MULTNOMAH  :

I, William J. Teesdale, depose and swear:

1.       I am an investigator employed by the Federal Public Defender for the

District of Oregon. I am an attorney and member of the bars of Oregon and England. This affidavit is filed as Exhibit 2 to Mr. Hamad's Motions for Summary Judgment and To Lift or Modify Stay. All references in this affidavit to exhibits use the exhibit numbers given to the full set of exhibits filed in support of the motions.

I am one of the investigators assigned to the case of *Hamad v. Bush*, CV 05-1009 JDB. Our office was appointed to Mr. Hamad's case on October 14, 2005. A factual return, including the Combatant Status Review Tribunal proceedings, in Mr. Hamad's case was filed by the government on May 1, 2006. My investigative work on Mr. Hamad's case has involved my efforts, and the efforts of several other Federal Defender Investigators, to investigate and corroborate the statements made by Mr. Hamad to the Combatant Status Review Tribunal ("Tribunal") and the Administrative Review Board ("ARB"). Mr. Hamad had, in essence, told the Tribunal and ARB that he was an innocent employee of a Saudi Arabian charity, called the World Assembly of Muslim Youth ("WAMY"), during the two years prior to his arrest. Before that, Mr. Hamad indicated that he had worked for another charity doing relief work in refugee camps and teaching. This affidavit is intended to summarize the information we have learned to date that corroborates Mr. Hamad's statements to the Tribunal and ARB. This affidavit does not contain any classified or protected information as designated by the relevant protective orders.

**Investigation in Afghanistan**

2.      On May 8, 2006, I received information from Zabi Noori, our Pashtu interpreter, that he made contact with Mr. Hakim Nasiry, a deputy with the Department of Education in Gardez (capital city of Paktiya province), Afghanistan. Mr. Noori, at my

direction, asked Mr. Nasiry some questions about the existence of the WAMY hospital

where Mr. Hamad had worked as administrator for 2 years.  Mr. Nasiry told Mr. Noori

that he was familiar with the hospital in Chamkani, but that it is now known as the Wana

Hospital, and is currently being sponsored by an Afghan organization called Ibn Sina.

3.    Mr. Nasiry provided information that the hospital in Chamkani used to be

sponsored by Arabs and was called the WAMY hospital.  Mr. Nasiry said that the

WAMY hospital was a modern facility with 60 beds, 2 ambulances, and state-of-the-art

equipment.  Mr. Nasiry stated that there was space in the hospital for staff to live in the

facility.  Mr. Nasiry stated that the hospital has not done as well under the sponsorship

of Ibn Sina, is now about 10 beds, and does not have any surgical capacity.  Mr. Nasiry

said that he knew of a former director of the WAMY hospital who was reported to be

living in Kabul, Afghanistan.  The former director of the WAMY Chamkani hospital was

identified as Dr. Najib.

4.    On June 20, 2006, Federal Public Defender Steven T. Wax and I had a

telephone conversation with Dr. Najibullah Zamai (hereinafter Dr. Najib) with the

assistance of Mr. Noori.  Dr. Najib told us that he was previously employed as a general

surgeon working at the WAMY hospital in Chamkani from March 1994 until January

2004.  Dr. Najib told us that eventually he became the director of the hospital.  Dr. Najib

stated that the hospital was a 60-bed facility, was set up to see surgical patients, and

had a full operations ward.  Dr. Najib said that the hospital also had obstetrics and

gynecology facilities.  Dr. Najib stated that Adel Hassan, whom he knew by his

nickname of Abu Doujana, came to work at the hospital in the middle of 2000.  Dr. Najib

said that Mr. Hamad was employed as a hospital administrator.  Dr. Najib said that Mr.

**Page 3    AFFIDAVIT OF WILLIAM J. TEESDALE**

Hamad would buy food for the hospital and write vouchers. Dr. Najib told us that the office for WAMY, at the time, was in Peshawar, Pakistan, and now the WAMY main office is in Islamabad, Pakistan, although the headquarters of the organization is in Riyadh, Saudi Arabia. Dr. Najib said that Abu Hadifa is the director general of WAMY in Pakistan and lives in Islamabad. Dr. Najib said that Abu Hadifa is from Iraq.

5.      Dr. Najib told us that Mr. Hamad lived at the hospital and worked approximately 22 days out of each month, then took approximately 8 days off -- the same schedule as all the other members of the hospital. Dr. Najib told us that Mr. Hamad had said that he was living in Peshawar. Dr. Najib recalled that Mr. Hamad said he either had 3 or 4 daughters. Dr. Najib said that his recollection of Mr. Hamad was that he was a very nice man with a good sense of humor. Dr. Najib fondly recalled playing ping pong (table tennis) with Mr. Hamad and that he was always in a good mood and joking. Dr. Najib said that Mr. Hamad never talked about anything political. Dr. Najib said that Mr. Hamad did not have any contacts outside the hospital in Chamkani.

6.      Dr. Najib told us that the WAMY hospital was a community hospital serving everyone in the geographic area, 24 hours a day. Dr. Najib said that the facility received assistance from the United Nations and they received a regular monthly visit from UNHCR people. Dr. Najib said they also had visitors from Canada and the United States on a regular basis. Dr. Najib said that the hospital received food from the United Nations in Kabul, including wheat, flour, sugar, and oil. Dr. Najib said that Mr. Hamad's position as administrator was under his as director of the hospital. Dr. Najib said that he (Najib) was generally the person who dealt with the UN people because

that was not part of Mr. Hamad's position.

7.      Dr. Najib stated that he has brochures and photographs of the hospital that he is willing to share with us.  The brochures, Exhibits 18.1 and 18.2 are copies of the brochures that I received by Federal Express from Dr. Najib in Afghanistan.

8.      Dr. Najib also sent a copy of a report compiled by a World Health Organization ("WHO") X Ray technician, Mr. Ali Shah Saidy, who visited the WAMY hospital in Chamkani between August 2-6, 1999.  This visit was requested by the WAMY office in Peshawar.  During that visit the technician reported that the hospital had 70 beds, x ray laboratory, dental, tuberculosis, Malaria, EPI, and surgical departments.  The report received from Dr. Najib is Exhibit 19.

9.      Dr. Najib told us that the hospital was taken over by an Afghan NGO, called Ibn Sina, several years ago.  Dr. Najib said that the hospital is now not anywhere near as good a facility as it was before.  Dr. Najib said that, under WAMY, the hospital was one of the best local hospitals, a very good facility.  Dr. Najib told us that there was never any political discussion in the hospital.  Dr. Najib also indicated that he did not think that there was any anti-U.S. activity at the WAMY hospital.  Dr. Najib mentioned that when the hospital ran short of food, WAMY was happy to take food and oil from the United Nations, which they would not have done if there was any anti-American feeling. Dr. Najib mentioned that now the hospital is down to about 15 or 20 beds from the 60 it had under WAMY, and it is just doing primary healthcare.  Dr. Najib said there is no longer any serious surgical care at the hospital because Ibn Sina does not have the same funding that WAMY was able to provide.  Dr. Najib said that Mr. Hamad did not say much about what he had done before he had worked for WAMY, but Dr. Najib

**Page 5    AFFIDAVIT OF WILLIAM J. TEESDALE**

believes he worked with another NGO.

10.    On June 20, 2006, I emailed a letter, which was translated through our interpreter, to Dr. Najib in Kabul. As an attachment to that email, I sent Dr. Najib a picture of Mr. Hamad that I received from his brother-in-law in Sudan (see Exhibit 12.1). Salwa Othman (Mr. Hamad's wife) told me that this picture had been taken sometime in June 2002 when Mr. Hamad was visiting the Sudan. I asked Dr. Najib in my email to look at the picture and see if he recognized the adult shown in it. On June 29, 2006, by email, I received a letter of response from Dr. Najib. Dr. Najib stated that he could confirm that the photograph I had sent him was that of Mr. Hamad, the person he worked with at the Chamkani hospital.

11.    On July 10, 2006, Dr. Najib told me that one of the pages of the brochures that he sent me contained a picture of Mr. Hamad standing in front of the hospital. Dr. Najib told me that he is also in the same picture. I asked Dr. Najib, through our interpreter, to look at a copy of the picture of the hospital staff and identify for me the picture of Mr. Hamad and his own picture. I asked Dr. Najib to sign and date the picture and return it to me by email. On July 16, I received Exhibit 13 from Dr. Najib, with the picture of Mr. Hamad and Dr. Najibullah identified. The picture is signed by Najib and dated July 15, 2006.

12.    Dr. Najib agreed to a meeting with me in Kabul, Afghanistan and also to provide me with a statement regarding his recollection of Mr. Hamad and the hospital. On August 1, 2006, I traveled to Afghanistan with colleagues from the Federal Public Defenders Office and Zabi Noori. Ex. 29. On August 2, 2006, I met with Dr. Najib and obtained a sworn, video taped statement from him. Dr. Najib reiterated the same

information he had provided before and also told me that Mr. Hamad is not an

extremist, but is a good man, a family man who did a good job at the hospital.  Dr. Najib

agreed that he would come to the United States to testify, if our office would pay for his

travel, should such testimony be necessary.  Dr. Najib provided this information under

oath.  A copy of the oath certification made by Dr. Najib is Exhibit 6.1.

13.    A copy of the complete video statement (in DVD format) is Exhibit 7.1.

14.    Dr. Najib provided me with contact information for two other doctors, both

pictured in the staff photo that Dr. Najib had provided from the WAMY brochure

discussed in paragraph 11 above.  Dr. Najib indicated that Dr. M. Sharif Sailani is a

doctor at the Indira Gandhi Institute of Child Health in Kabul Afghanistan.  Dr. Najib

indicated that Dr. Samiullah Roghman is a doctor working in Jalalabad, Afghanistan.

15.    On August 5, 2006, I met with Hakim Nasiry, the Deputy with the Gardez

Department of Education, in Kabul, Afghanistan.  Mr. Nasiry traveled at his own

expense from Gardez to Kabul to meet with me.  Mr. Nasiry agreed to provide a sworn

video taped statement, Exhibit 7.4.  Mr. Nasiry confirmed the same information that he

had provided before, that the present personnel at the hospital had told his delegation

that the hospital under WAMY was a good facility and Mr. Hamad was a former

administrator of the hospital and that he had done a good job in that capacity.  The oath

certification document executed by Mr. Nasiry is Exhibit 6.4.

16.    On August 5, 2006, in Kabul Afghanistan, I met with Engineer Naquibudin,

the current WAMY project manager in Kabul (highest level WAMY official in

Afghanistan).  After I introduced myself and explained our representation of Mr. Hamad,

Engineer Naquibudin provided me with a sworn video taped statement regarding his

**Page 7    AFFIDAVIT OF WILLIAM J. TEESDALE**

recollection of Mr. Hamad and the general activities of WAMY in Afghanistan.  Engineer
Naquibudin provided me with copies of substantial written material documenting
WAMY's charitable work, including:

1.   World Assembly of Muslim Youth orphan school in Afghanistan
     photograph.  Exhibit 17.1.

2.   Photograph of signing of protocol between WAMY and Ministry of Labor
     and Social Affairs.  Exhibit 17.2.

3.   Photograph of WAMY water project and school.  Exhibit 17.3.

4.   Islamic Republic of Afghanistan Ministry of Economy to Ministry of
     Education document asking WAMY for books and supplies for schools.
     Exhibit 17.4.

5.   Islamic Republic of Afghanistan Ministry of Labor and Social Affairs
     document.  Exhibit 17.5.

6.   Document between Afghan government and WAMY.  Exhibit 17.6.

7.   Saudi Arabian certification of WAMY as an NGO.  Exhibit 17.7.

8.   Letter of support to WAMY from United Nations High Commission for
     Refugees.  Exhibit 17.8.

9.   World Food Program letter of agreement with WAMY for 1/1/2000 through
     12/31/2000.  Exhibit 17.9.

10.  Letter agreement between United Nations World Food Program in
     Afghanistan and WAMY dated February 20, 2000.  Exhibit 17.10.

11.  Food and Agricultural Organization of the United Nations report on WAMY
     fruit tree project, December 9, 1998.  Exhibit 17.11.

12.  Food and Agricultural Organization of the United Nations agreement of 1994 for agricultural work.  Exhibit 17.12.

13.  September 10, 1998 progress report of the Food and Agricultural Organization of the United Nations on WAMY project.  Exhibit 17.13.

14.  November 27, 1997 Food and Agricultural Organization of the United Nations contract with WAMY.  Exhibit 17.14.

15.  January 13, 1997 Food and Agricultural Organization of the United Nations contract with WAMY.  Exhibit 17.15.

16.  Food and Agricultural Organization of the United Nations 1994 contract with WAMY.  Exhibit 17.16.

17.  Food and Agricultural Organization of the United Nations March 30, 1995 contract with WAMY.  Exhibit 17.17.

18.  Transitional Islamic State of Afghanistan Ministry of Education receipts for school, dated November 16, 2004.  Exhibit 17.18.

19.  Photograph of Afghan Director of Labor and Social Affairs visiting WAMY school in Jalalabad, Afghanistan.  Exhibit 17.19.

20.  World Assembly of Muslim Youth, Pakistan Office, quarterly report of activities from January to September, 1999.  Exhibit 17.20.

Engineer Naquibudin identified a picture of Mr. Hamad and told me that he remembered him from when Mr. Hamad worked as administrator of the WAMY hospital in Chamkani.  Engineer Naquibudin told me that he worked at the WAMY agricultural program, which was close to the hospital, at the same time that Mr. Hamad worked at the hospital.  Engineer Naquibudin told me that Mr. Hamad was a good man and that

**Page 9    AFFIDAVIT OF WILLIAM J. TEESDALE**

he did a good job for the hospital.  Engineer Naquibudin told me that he has personally worked for WAMY for more than 11 years and during that time WAMY has only tried to help the needy and done nothing political.  Engineer Naquibudin told me that WAMY works in cooperation with many international organizations, including the United Nations and World Food Program and the Afghanistan Government.

17.    A copy of Engineer Naquibudin's sworn video statement is Exhibit 8.2.  A copy of Engineer Naquibudin's oath certification is Exhibit 6.5.

18.    On August 7, 2006, I met with Dr. Sailani, an ENT specialist at the Indira Gandhi Institute of Child Health.  Ex. 31-33.  After introducing myself to Dr. Sailani and explaining our representation of Mr. Hamad, Dr. Sailani provided me with a sworn video taped statement.  A complete copy of that statement is Exhibit 7.2.  A copy of the oath certification is Exhibit 6.2.

19.    Dr. Sailani told me that before working for WAMY, he was a doctor working in Kabul Afghanistan, when the Taliban came into the hospital where he worked.  He was told that he had to cut his hair according to their rules.  When Dr. Sailani objected to the Taliban cutting his hair, he was forced to comply.  Dr. Sailani said that he then left Afghanistan to get away from the Taliban.  Later, he took a job at the WAMY hospital in Chamkani, Afghanistan, close to the Pakistan border, where the Taliban had much less control because the hospital was supported by powerful local tribal leaders.  Dr. Sailani identified a picture of Mr. Hamad, who was also known by the nickname Abu Doujana, and said he was the former administrator of the hospital.  Dr. Sailani said that Mr. Hamad was a good man, who was not an extremist or a member of the Taliban.

Page 10   AFFIDAVIT OF WILLIAM J. TEESDALE

20.     On August 8, 2006, I met with Deputy Minister of Labor and Social Affairs, Wasil Noor Murmand, in his office in Kabul, Afghanistan.  Ex. 34.  Deputy Minister Murmand provided me with a video taped statement regarding his Ministry's experience dealing with NGO's, and WAMY in particular.  The Deputy Minister told me that WAMY has signed a protocol agreement with the Ministry to operate 10 orphan schools in Afghanistan.  Deputy Minister Murmand told me that WAMY has been approved by the Foreign Affairs Ministry to operate in Afghanistan.  WAMY has agreed to obey all Afghan laws and refrain from getting involved in political activity.  The Deputy Minister said that their experience with WAMY has been that they have complied with all their obligations, including providing quarterly reports, and that the WAMY students are the best in recent educational testing.  A copy of Deputy Minister Murmand's video taped statement is Exhibit 8.1.

21.     On August 9, 2006, my colleagues and I travelled by road from Kabul, Afghanistan to Peshawar, Pakistan, through the Khyber Pass.  Ex. 30, 35.  During this journey, we stopped in Jalalabad, Afghanistan, and met with Doctor Samiullah Roghman in his office.  Dr. Roghman provided me with a sworn video taped statement, a complete copy of which is Exhibit 6.3.   A copy of the oath certification executed by Dr. Roghman is Exhibit 7.3.

22.     Dr. Roghman was also able to identify the picture of Mr. Hamad, and recalled him fondly as the former administrator of the WAMY hospital.  Dr. Roghman told me that Mr. Hamad was a very honest man, someone who would not even allow the cook to make him (Roghman) fried eggs in the morning because it would use the oil that was for the patients' meals at the hospital.  Dr. Roghman said that he lived in the

Page 11   AFFIDAVIT OF WILLIAM J. TEESDALE

same dormitory area of the hospital as Mr. Hamad and they were more like family members than fellow employees. Dr. Roghman also told me that Mr. Hamad was a good man, who was not a supporter of the Taliban or Al Qaeda. Dr. Roghman said that the Taliban had little control over the hospital because of support for the facility from local tribal leaders. Dr. Roghman said that the hospital was one of the best in Afghanistan. Dr Roghman said that Mr. Hamad was a real family man, who had great love for his daughters and family.

**Investigation in Pakistan**

23.    In order to assist me in conducting investigation in Pakistan, our office retained the services of Adeel Butt, an attorney practicing in Peshawar, Pakistan. At my direction, Mr. Butt was able to locate the house on Bilal Lane, off Arbab Road, in Peshawar where Mr. Hamad and his family were living when he was arrested, where he had lived for approximately 2 years prior to his arrest.

24.    Mr. Butt informed me on or about May 30, 2006, that he made contact with the representative of the owner of the house, Engineer Ishmael, a teacher at a polytechnic in Peshawar. Mr. Butt informed me on June 8, 2006, that he had met with Engineer Ishmael and obtained information from him about Mr. Hamad and Engineer Ishmael's recollection of events from 2000 to July 2002.

25.    Mr. Ishmael told Mr. Butt that he is the representative of the owner of the rental house on Bilal Lane in which Mr. Hamad and Mr. Mammar resided. Mr. Ishmael explained that the owner of the house, a female colleague of his at the polytechnic, does not have any male relatives, so he has assisted her in getting tenants for the home. Mr. Ishmael told Mr. Butt that the house was first rented by a man from Yemen,

**Page 12   AFFIDAVIT OF WILLIAM J. TEESDALE**

who then sublet a part of the home to Mr. Mammar.  Mr. Ishmael told Mr. Butt that Mr.

Mammar later sublet the upstairs part of the house to Mr. Hamad after the Yemeni man

had left.  Mr. Ishmael told Mr. Butt that Mr. Hamad and Mr. Mammar paid monthly rent

to live in the property.  Mr. Ishmael stated that he had never heard any negative

information about Mr. Hamad or Mr. Mammar.  Mr. Ishmael said that he does not

understand Arabic and, therefore, was not able to talk directly to Mr. Hamad.  Mr.

Ishmael said that he was not in Peshawar, but was in another town, Dirgham

(phonetic), when Mr. Hamad was arrested.

26.    Mr. Butt further stated that Mr. Ishmael said that he was contacted by a

Pakistani intelligence agent later.  Mr. Ishmael told that agent that Mr. Hamad and Mr.

Mammar paid their rent on time and no one in the area had complained about them.

Mr. Ishmael said that he heard that the arrests took place at about 1:30 or 2:00 a.m.

Mr. Ishmael said that the Bilal Lane area had about 90% foreigners living there.  Mr.

Ishmael also mentioned that people did not know why the arrests were made and that

there were many arrests at that time in Peshawar.

27.    On August 10, 2006, I met with Engineer Ishmael in the office of Adeel

Butt in Peshawar, Pakistan.  Engineer Ishmael agreed to provide me with a sworn video

taped statement, a copy of which is Exhibit 8.3.  A copy of the oath certification

executed by Engineer Ishmael is Exhibit 6.3.

28.    Mr. Ishmael remembered that Mr. Hamad lived upstairs at the rental

house with his family.  Mr. Hamad paid the rent on time and there were no complaints

about him, his family, or the other tenant in the house.

29.    I received information that Mr. Hamad's supervisor at WAMY during most

Page 13  AFFIDAVIT OF WILLIAM J. TEESDALE

of his employment was an Iraqi man. I asked Mr. Butt to locate information about

WAMY offices in Peshawar or other Pakistani cities, and contact information about Mr.

Hamad's supervisor from Iraq. Mr. Butt informed me on May 24, 2006, that he was

able to determine that the WAMY office in Peshawar had closed, but there was still an

office in Islamabad, Pakistan, and the head of the office was Abu Hadifa, who was from

Iraq.

      30.     On May 9, 2006, with the assistance of our Arabic interpreter, Dirgham H.

Sbait, Professor of Arabic / Aramaic Languages, Portland State University, and together

with Patrick Ehlers, Assistant Federal Public Defender, we had a telephone

conversation with Abu Hadifa at his office in Islamabad, Pakistan. Abu Hadifa

confirmed that Mr. Hamad worked in the WAMY hospital in Afghanistan. Abu Hadifa

said that the people who worked with Mr. Hamad in the hospital were local people

(Afghans). Abu Hadifa said that WAMY's involvement with the Chamkani hospital had

concluded three years ago and it is now difficult to get information. Abu Hadifa also

confirmed for us that he had been instrumental in making sure that Mr. Hamad received

his last wages from WAMY which were delivered to his family in the Sudan after his

arrest, and to make sure that Mr. Hamad's possessions from the home in Peshawar

were sold and the money also sent to the family in Sudan.

      31.     On August 12, 2006, I met with Abu Hadifa in Islamabad, Pakistan.

Conversation with Abu Hadifa was difficult because he does not speak Pashtu, or Dari.

My questions had to be translated from English into Dari, by Mr. Noori and from Dari

into Arabic, by Abu Hadifa's assistant. Abu Hadifa told me that he recalled speaking to

Mr. Hamad about going back to work and that he called from Sudan. Abu Hadifa said

Page 14  **AFFIDAVIT OF WILLIAM J. TEESDALE**

that he does not remember the exact conversation.  Abu Hadifa also said that he does

recall that Mr. Hamad came back a week late.  Abu Hadifa also told me that Mr. Hamad

left Afghanistan after September 11, 2001, because it was not safe there and then

worked for WAMY at the District Office in Peshawar, Pakistan.  During that time, Abu

Hadifa said that Mr. Hamad worked getting relief supplies such as food, clothing, and

blankets to Afghan refugees in Pakistan.  Abu Hadifa also said that when Mr. Hamad

was arrested, he (Abu Hadifa) made sure that his remaining wages, and proceeds from

the sale of his personal property in Peshawar, which Abu Hadifa arranged, were sent to

his family in Sudan.  Abu Hadifa said that he sent the money with another man who

was going back to Sudan.

32.    Abu Hadifa said that Mr. Hamad was a good man and that WAMY would

not have employed him, or have continued to employ him, if he was not a good person.

Abu Hadifa said that Mr. Hamad was not a supporter of the Taliban or Al Qaeda.  Abu

Hadifa explained that, during the time Mr. Hamad worked at the hospital, the Taliban

was the government in control of Afghanistan, and therefore everyone had to have

some contact with the Taliban.  Abu Hadifa said that an example would be if the

hospital had a female patient, the Taliban would not allow a male doctor to treat her.  If

there was no female doctor available, then the hospital would have to contact the

Taliban and ask for permission for the patient to be treated by a male doctor.  Abu

Hadifa told me that Mr. Hamad did not do anything against the United States.  Abu

Hadifa told me that Mr. Hamad was a humorous man, in fact, he was the funniest

person of all the staff, one who would always make everyone laugh at the office

meetings.

Page 15   AFFIDAVIT OF WILLIAM J. TEESDALE

33.    Abu Hadifa told me that he was not able to provide me with a statement on video tape without the permission of WAMY in Saudi Arabia. Abu Hadifa did provide me with a copy of video footage of the WAMY hospital in Chamkani on a CD. Abu Hadifa said that he believes the footage was taken sometime before Mr. Hamad worked at the hospital, probably in the late 1990's. A copy of the hospital footage is Exhibit 16. Abu Hadifa also showed me a number of photographs in his office, either relating to the WAMY hospital in Chamkani, or to other projects or charitable works undertaken by WAMY. Copies of those photographs are Exhibit 15.

34.    On August 9 and 10, 2006, I also tried to develop information about why Mr. Hamad was arrested by contacting various local law enforcement officials, including the Director of the FIA (Federal Investigation Agency), Mr. Abdul Quadeer Bhatti. These officials were not able to locate any information about Mr. Hamad's arrest. Mr. Butt, who lived in Peshawar during this time, told me that the Pakistani authorities were generally suspicious of many of the immigrants from Nigeria, Sudan, Yemen, or other parts of North Africa. Mr. Butt stated that many of them were put in jail. Mr. Butt said that the Pakistani government may have wanted to show the United States that it was a good ally to the United States in the war on terror by arresting Arab foreigners in the area.

**Investigation in Sudan**

35.    From approximately April 7, 2006, up until the present time, I have had regular  conversations with Mr. Hamad's family in Sudan. Many of these telephone conversations have been with Adil Al Tayab, Mr. Hamad's brother-in-law, and Mr. Hamad's wife, Salwa Othman. Mr. Al Tayab has sent me a number of photographs of

**Page 16  AFFIDAVIT OF WILLIAM J. TEESDALE**

Mr. Hamad and his family members and documents. These items are Exhibits 11.1-11.5 and 14.1-14.3. Mr. Altayab has been assisting his sister and trying to support Mr. Hamad's family during the period of his incarceration. Mr. Al Tayab has stated that he knows Mr. Hamad quite well. Mr. Al Tayab stated that he knows that Mr. Hamad had worked his whole life for charitable organizations, trying to help refugees and other needy people. Mr. Al Tayab told me that Mr. Hamad worked in refugee camps near Peshawar. Some of the time, this work involved teaching Arabic in a school for orphans. Mr. Al Tayeb said that later, Mr. Hamad's work included administrative duties at the boarding school. This charitable work was sponsored by the Islamic Daawa committee.

36.    Mr. Al Tayab said that Mr. Hamad told him about going to work for WAMY, approximately 2 ½ years before Mr. Hamad was arrested. At first, this job was in the WAMY office in Peshawar, purchasing and delivering relief goods to local refugees. Mr. Al Tayeb told me that, a short time later, a supervisory position opened up at the WAMY hospital in Afghanistan, so Mr. Hamad went to work there.

37.    Mr. Al Tayab told me that he personally visited Mr. Hamad in Pakistan, in about 1991, during the time when Mr. Hamad was working at the school for orphans. The school was located in Babi, Pakistan, and served grades 1 through 8.

38.    Mr. Al Tayab told me that many Sudanese people emigrate from the Sudan to look for work outside the country. Mr. Al Tayab explained that although there are jobs inside Sudan, most of these do not pay well, and there are better opportunities in other countries.

39.    Mr. Al Tayab told me that Mr. Hamad is a reasonable man, with no radical

Page 17  AFFIDAVIT OF WILLIAM J. TEESDALE

views.  Mr. Al Tayab told me that Mr. Hamad was never violent and that he liked to

resolve disagreements rather than perpetuate them.  Mr. Al Tayab said that Mr. Hamad

was also a fun man, with a good sense of humor.

40.    Mr. Altayab has provided a full notarized statement regarding his

knowledge of Mr. Hamad and events relevant to this matter.  Exhibit 10-10.1.

41.    I have had several telephone conversations with Salwa Othman (Adel

Hamad's wife) regarding events in her and Mr. Hamad's life.  Mrs. Hamad has provided

us with a sworn statement.  Exhibit 11-11.5.  Mrs. Hamad has told me that she married

Adel Hassan Hamad on June 8, 1987.  After they were married, Mrs. Hamad stated that

she and Mr. Hamad went to live in Pakistan, where Mr. Hamad had a job working as a

teacher for a charity called "Ghaar Harraa."  Mrs. Hamad said that this charity was

initially supported by a Quatari organization, but later was sponsored by the Kuwaiti

Da'wa Committee.  Salwa Hamad told me that Mr. Hamad had been working there for

about 6 months before they were married.  Mrs. Hamad told me that many Sudanese

people work outside Sudan because there are few good jobs.  Mrs. Hamad told me that

most Sudanese work in Saudi Arabia because they have money from oil and good job

opportunities.

42.    Mrs. Hamad said that Mr. Hamad's job involved teaching orphans Arabic

language, songs, and about the Koran.  Mrs. Hamad stated that Mr. Hamad worked

there from 1987 to 1993.  From 1993 until 1997, Mr. Hamad continued working at the

same school, but in the accounting department, because they had found he had an

ability with accounting.  Mrs. Hamad told me that this new position involved receiving

the employee's wages at the main office in Peshawar and delivering them to the

**Page 18  AFFIDAVIT OF WILLIAM J. TEESDALE**

employees at the school.  The school was located in a village called Babi, which was close to a town called Mujahra.

43.    Mrs. Hamad said that their first daughter, Zaynab, was born on April 15, 1988, in Peshawar hospital, Pakistan.  Their second daughter, Tasneem, was born in a private hospital, owned by Zakiyyah Minhaz, in Peshawar on January 30, 1990.  Mrs. Hamad told me that their third daughter, Maryam was born August 29, 1994, while the family were still living in Babi, Pakistan.

44.    Mrs. Hamad said that in 1997, the family moved to Peshawar because Mr. Hamad was asked to work in the main office in Peshawar, which he did until 1999.  Mrs. Hamad said that this work involved social affairs, such as greeting visitors to the office and accounting.  Mrs. Hamad said that the Peshawar office downsized in 1999 and Mr. Hamad was let go.  After being laid off by the Da'wa, Mr. Hamad did odd jobs such as buying and selling furniture.

45.    Mrs. Hamad said that the family lived on income from the odd jobs and Mr. Hamad's severance pay until he found work with WAMY in August 2000.  Mrs. Hamad said that about a week or ten days after taking the job with WAMY, Mr. Hamad traveled to Afghanistan to work in the hospital as an administrator.  Mrs. Hamad told me that Mr. Hamad worked and lived at the hospital except for breaks, when he was able to come and live at their rental house in Peshawar, which was on Bilal Lane, in the University area.  Mrs. Hamad said that Mr. Hamad used to be home from work for approximately five days a month.  Mrs. Hamad said that she lived in Peshawar so her daughters could attend school.  Mrs. Hamad said that Mr. Hamad used to go back and forth to the hospital in a car belonging to WAMY with an Afghan driver.  The trip took

two days.  Mr. Hamad continued to go back and forth to his job.  Then, on April 22,

2001, their daughter Rahmah was born at the al-Jawhar hospital in Twon.

46.    After September 11, 2001, Mrs. Hamad said that Mr. Hamad left

Afghanistan and returned to Peshawar.  Mrs. Hamad told me that there was fear in

Afghanistan that America was going to attack, so many people left the country,

particularly Arabs.  Mr. Hamad crossed the border into Pakistan in mid-September

2001.  Mr. Hamad then worked at the WAMY office in Peshawar, buying food and

supplies for the thousands of refugees leaving Afghanistan at that time.  Mrs. Hamad

recalled that Mr. Hamad visited Lahore, Pakistan, in order to buy clothes for refugees.

47.    Mrs. Hamad stated that on about June 11, 2002, the family took a

vacation to the Sudan.  Mrs. Hamad explained that she and Mr. Hamad also planned

that she would stay in Sudan with the children in order to enroll Zaynab in High School.

Mrs. Hamad said that the family was debating at that point whether they should stay in

Sudan or go back to Pakistan, because the school situation was better in Sudan, but

the standard of living lower.  Mrs. Hamad said that they decided that Mr. Hamad would

return to work in Pakistan and she would stay with the children in Sudan.  The family

planned that Mr. Hamad would work in Pakistan for another year and then he would

return to Sudan.

48.    Mrs. Hamad said that Mr. Hamad called on about July 10, 2001, and

spoke to Abu Hadifa at the WAMY office in Peshawar, who wanted Mr. Hamad to return

to work.  Mr. Hamad returned to Pakistan on about July 14, 2002.

49.    Mrs. Hamad told me that she did not hear from Mr. Hamad again until she

received a letter from him through the Red Cross.  Mrs. Hamad told me that her

**Page 20  AFFIDAVIT OF WILLIAM J. TEESDALE**

youngest child, Fida, was born January 29, 2003, but only lived about six months.  Fida

passed away on August 7, 2003.

50.     Mrs. Hamad stated that Adel Hamad has never done anything against the

United States.  Mrs. Hamad said that her husband was not involved in anything other

than helping Afghan orphans and doing other charitable work.  Mrs. Hamad said that

her husband is not a violent man.  Mrs. Hamad told me that Mr. Hamad does not have

any extremist views and is not associated with Al Quaeda.  Mrs. Hamad said that Mr.

Hamad has been a good husband, an ordinary man who has been good to her and

their girls.  Mrs. Hamad stated that Mr. Hamad was a very happy man, with a good

sense of humor and one who liked telling jokes.

**Other Investigation Activity**

51.     I have conducted research on using the internet to determine whether

WAMY is listed or designated as a terrorist organization by the United States

Government.  I have determined that WAMY is not listed by the Department of State as

a designated Foreign Terrorist Organization ("FTO").  I have also searched the

Department of Treasury Specially Designated Nationals List ("SDN") and did not find a

reference to WAMY, or any other organization with a similar name.

_____
William Teesdale
Federal Public Defender Investigator

Sworn to and subscribed before me this 20th day of September, 2006.

_____
Notary Public for Oregon

OFFICIAL SEAL
SANDRA L SHOWARD
NOTARY PUBLIC-OREGON
COMMISSION NO. 405689
MY COMMISSION EXPIRES JAN 14, 2010

Page 21   AFFIDAVIT OF WILLIAM TEESDALE

EXHIBIT 3


Affidavit of AFPD Patrick Ehlers

**Steven T. Wax, OSB #85012**
**Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, Oregon 97204**
**Tel:   503-326-2123**
**Fax:  503-326-5524**
**steve_wax@fd.org**
**Attorney for Petitioner**

**Patrick J. Ehlers, OSB #04118**
**Assistant Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, Oregon 97204**
**Tel:   503-326-2123**
**Fax:  503-326-5524**
**patrick_ehlers@fd.org**
**Attorney for Petitioner**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ADEL HASSAN HAMAD,** | **CV 05-1009 JDB** |
| **Petitioner,** | **AFFIDAVIT OF PATRICK EHLERS** |
| **v.** | |
| **GEORGE W. BUSH, DONALD RUMSFELD, JAY HOOD, and BRICE GYURISKO,** | |
| **Respondents.** | |

**STATE OF OREGON          :**
                                    **: ss**
**COUNTY OF MULTNOMAH   :**

I, Patrick Ehlers, being duly sworn, do hereby depose and state:

1.     I am an Assistant Federal Defender employed by the Federal Public

**Page 1    AFFIDAVIT OF PATRICK EHLERS**

Defender for the District of Oregon.  I am one of the attorneys assigned to represent

Adel Hassan Hamad in the case of *Hamad v. Bush*, CV 05-1009 JDB by order of the

United States District Court for the District of Columbia entered on October 14, 2005.

2.     In the course of my representation of Mr. Hamad, I had the opportunity to

visit with him twice at the United States Military Prison at Guantánamo Bay, Cuba, the

first visit occurring on March 5 and 6, 2006; the second visit occurring on May 27, 2006.

3.     During each visit with Mr. Hamad, I was accompanied by Federal Public

Defender Steven T. Wax and by Interpreter Felice Bezri.

4.     During each conversation with Mr. Hamad, I took notes of the statements

he made to me.  Those notes were submitted pursuant to the protective order entered

in this case to the Department of Justice Compliance Review and Litigation Security

Group Classification Review Team.  All the information from Mr. Hamad that is set forth

in the remainder of this affidavit is derived from the cleared portion of the interviews I

conducted with Mr. Hamad.

5.     During the course of my representation of Mr. Hamad, I was permitted to

visit at the United States Prison at Guantánamo Bay with Ameur Mammar, ISN No. 939,

who has a habeas corpus case pending in this Court under case no. 05-CV-00573 RJL.

6.     I met with Mr. Mammar on May 25, 2006, accompanied by Federal Public

Defender Steven T. Wax and Interpreter Felice Bezri.

7.     During the conversation with Mr. Mammar, I took notes of the statements

he made to me.  Those notes were submitted pursuant to the protective order entered

in this case to the Department of Justice Compliance Review and Litigation Security

Group Classification Review Team.  All the information from Mr. Mammar that is set

forth in the remainder of this affidavit is derived from the cleared portion of the interviews that I conducted with Mr. Mammar.

8.    Mr. Hamad advised me that he has not received a response from the Administrative Review Board that was conducted in 2005. Undersigned counsel has not received a response from the Administrative Review Board and when we have inquired of the government about whether one was given to Mr. Hamad, we have not received an answer.

9.    Mr. Hamad told me that he left Afghanistan based on a general warning from the Afghan government, not based on anything that was specifically said to him.

10.    Mr. Mammar advised me that he lived in the house at 5A Bilal Lane, Peshawar, Pakistan, in the downstairs apartment, had the lease, and that Mr. Hamad resided in the upstairs apartment. Mr. Hamad described the same arrangement.

11.    Mr. Mammar informed me that during the arrest, he was taken upstairs to Mr. Hamad's upstairs residence.

12.    Mr. Hamad advised me that when the authorities arrested him, they also arrested Ameur Mammar, his downstairs neighbor. Mr. Mammar further advised that the authorities brought he and Mr. Hamad into Mr. Hamad's upstairs residence. Mr. Mammar advised that the authorities put a number of documents that had been taken from him, and others that had been taken from Mr. Hamad, on a table in Mr. Hamad's upstairs residence during their arrest.

13.    Mr. Hamad advised me that he has personally spoken with a number of Saudi nationals who were repatriated in the Spring of 2006, and that they had told him that they had not received any response to their ARBs.

**Page 3    AFFIDAVIT OF PATRICK EHLERS**

14.     Mr. Hamad advised me that he was told by an interrogator, as recently as the Spring of 2006, that he should be going home soon.

15.     Mr. Hamad advised me that, prior to leaving Sudan for Pakistan in July 2002, he called his supervisor in Pakistan, Abu Hadifa, to determine whether it was safe to return to work.  Mr. Hadifa advised him that it was safe and that he was needed back at work.  He returned and went to work.

16.     Mr. Hamad advised me that he wants very much to go home to Sudan and that he does not anticipate any problems if he does.

17.     Mr. Hamad advised me that he was legally present in Peshawar, Pakistan, and possessed a legal passport and valid work visa and documents.

18.     Mr. Hamad advised me that he participated in the Administrative Review Board in August 2005, provided a sworn statement, and answered questions from Board members.  Mr. Hamad maintained his innocence throughout the proceeding and continues to do so.

19.     Mr. Hamad advised me that he informed the Administrative Review Board about his work teaching, delivery of food to refugee camps in the late 1980's and early 1990's for LDI.

20.     Mr. Hamad advised me that he informed the Administrative Review Board that he does not subscribe, and has never subscribed, to the views of either the Taliban or Al Qaeda.

21.     Mr. Hamad advised me that he informed the Administrative Review Board that he was unaware of ever having met persons who were members of Al Qaeda, that if he had contact with such people, he was unaware that he had done so, or unaware of any affiliation that they might have had with Al Qaeda.

22.    I have reviewed the public documents related to the Administrative Review Board proceedings and note that in their discussion of Al Qaeda and Osama Bin Laden, the documents, at most, say that WAMY "may be" affiliated with Osama Bin Laden and Al Qaeda.

23.    I have researched WAMY on the internet and found documentation that it is a charitable organization employing more than 2,000 people in more than 50 countries.

24.    Mr. Hamad advised me that he had informed the Administrative Review Board that on a number of occasions in the late 1980's or early 1990's, he delivered food to refugee camps that were located in Pakistan near the Afghan border and populated by refugees of the Afghan/Russian wars, but withdrew from the organization providing the aid when his own peaceful views became inconsistent with those of others in the organization.

25.    Mr. Mammar advised me that he was a lawful resident of Pakistan under the protection of the United Nations High Commission on Refugees (UNHCR) and has a UNHCR refugee card, which was taken from him when he and Mr. Hamad were arrested.

_____

Patrick Ehlers
Assistant Federal Public Defender

Sworn to and subscribed before me this 19th day of September, 2006.



_____

Notary Public for Oregon

OFFICIAL SEAL
SANDRA L SHOWARD
NOTARY PUBLIC-OREGON
COMMISSION NO. 405689
MY COMMISSION EXPIRES MAY 4, 2010

**Page 5    AFFIDAVIT OF PATRICK EHLERS**

EXHIBIT 4


Respondents' Factual Return

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ADEL HASSAN HAMAD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-CV-1009 (JDB) |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, | ) | |
| *et al.,* | ) | |
| | ) | |
| Respondents. | ) | |

## RESPONDENTS' FACTUAL RETURN TO PETITION FOR WRIT OF HABEAS CORPUS BY PETITIONER ADEL HASSAN HAMAD AND NOTICE OF SUBMISSION OF FACTUAL RETURN UNDER SEAL

Respondents hereby submit, as explained herein, the final record of proceedings before the Combatant Status Review Tribunal pertaining to petitioner Hassan Adel Hussein (listed in the petition as Adel Hassan Hamad) as a factual return to petitioner's petition for writ of habeas corpus. For the reasons explained in the record, petitioner Hassan Adel Hussein has been determined to be an enemy combatant. Accordingly, petitioner Hassan Adel Hussein is lawfully subject to detention pursuant to the President's power as Commander in Chief or otherwise, and is being detained.[1]

---

[1] On December 30, 2005, the Detainee Treatment Act of 2005, Pub. L. No. 109-148, tit. X, 119 Stat. 2680 ("the Act"), became law. The Act, among other things, amends 28 U.S.C. § 2241 to remove court jurisdiction to hear or consider applications for writs of habeas corpus and other actions brought in this Court by or on behalf of aliens detained at Guantanamo Bay, Cuba, and creates an exclusive review mechanism in the D.C. Circuit, applicable to pending cases, to address the validity of the detention of such aliens held as enemy combatants. Id. § 1005(e)(1), (h)(2). In light of this and given the new, statutory withdrawal of the Court's jurisdiction, a stay of all proceedings in this case is appropriate pending the resolution of the effect of the Act. Indeed, our understanding is that it is the sense of the Court that it wishes to await anticipated guidance from the D.C. Circuit regarding the effect of the Act before deciding

The portion of the record suitable for public release is attached hereto.  See Exhibit A.
The remaining portions of the record, including information that is classified or not suitable for
public release, are being submitted under seal through the Court Security Officers.  One copy of
the factual return is being submitted to the Court for *in camera* review.  Another copy of the
factual return, containing information suitable for disclosure to counsel under seal, is being made
available to petitioner's counsel who have been issued security clearances, consistent with the
Protective Order.  See June 27, 2005 Order (applying Amended Protective Order and Procedures
for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba in In
re Guantanamo Detainee Cases, No. 02-CV-0299, et al., 355 F. Supp. 2d 443 (D.D.C. Nov. 8,
2004), and related orders, to this case).  Any redactions made in the factual return are explained
in the declaration(s)/certification(s) submitted therewith.  Both copies of the factual return
contain highlighting, explained therein, consistent with the Court's Order for Specific
Disclosures Relating to Respondents' Motion to Designate as "Protected Information"
Unclassified Information and Petitioners' Motion for Access to Unredacted Factual Returns,
entered on December 8, 2004 by Judge Green in the coordinated cases.  Respondents have
designated certain highlighted, unclassified information in the factual return as "protected
information" under the Protective Order.  Pursuant to the Protective Order, once counsel for
petitioner has reviewed the factual return and counsel for the parties have conferred, respondents

---

any pending motions.  Notwithstanding these developments, however, respondents hereby submit
a factual return pertaining to petitioner Hassan Adel Hussein pursuant to the Court's December
28, 2005 Memorandum Opinion and Order.

will file a motion requesting that the Court designate the information in the factual return as "protected" pursuant to the Protective Order.[2]

For the reasons explained in the factual return, petitioner Hassan Adel Hussein has been determined to be an enemy combatant and is, therefore, lawfully subject to detention pursuant to the President's power as Commander in Chief or otherwise. Accordingly, the petition for writ of habeas corpus should be dismissed and the relief sought therein denied.

Dated: May 1, 2006                    Respectfully submitted,

                                      PETER D. KEISLER
                                      Assistant Attorney General

                                      DOUGLAS N. LETTER
                                      Terrorism Litigation Counsel

                                      ____/s/ Preeya M. Noronha_____
                                      JOSEPH H. HUNT (D.C. Bar No. 431134)
                                      VINCENT M. GARVEY (D.C. Bar No. 127191)
                                      TERRY M. HENRY
                                      JAMES J. SCHWARTZ
                                      PREEYA M. NORONHA
                                      ROBERT J. KATERBERG
                                      NICHOLAS J. PATTERSON
                                      ANDREW I. WARDEN
                                      EDWARD H. WHITE
                                      MARC A. PEREZ
                                      Attorneys
                                      United States Department of Justice
                                      Civil Division, Federal Programs Branch
                                      20 Massachusetts Ave., N.W.
                                      Washington, DC 20530
                                      Tel: (202) 514-4107
                                      Fax: (202) 616-8470

                                      Attorneys for Respondents

_____

[2] Pursuant to the Protective Order, respondents are disclosing this information to petitioner's counsel, who shall treat such information as "protected" unless and until the Court rules that the information should not be designated as "protected."