PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING

**Steven T. Wax, OSB #85012**
**Federal Public Defender**
**steve_wax@fd.org**
**Stephen R. Sady**
**Chief Deputy Federal Public Defender**
**steve_sady@fd.org**
**101 SW Main Street, Suite 1700**
**Portland, Oregon 97204**
**Tel: 503-326-2123**
**Fax: 503-326-5524**

**Attorneys for Petitioner**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ADEL HASSAN HAMAD,** | **CV 05-1009 JDB** |
| **Petitioner,** | **MOTION TO LIFT STAY** |
| **v.** | |
| **GEORGE W. BUSH, DONALD RUMSFELD, JAY HOOD, and MIKE BUMGARNER,** | |
| **Respondents.** | |

The Petitioner, through his attorneys, Steven T. Wax and Stephen R. Sady,

respectfully moves this Court for an order lifting the stay imposed in this case on June

PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING

27, 2005, based on the Supreme Court's ruling in *Boumediene v. Bush*, No. 06-1195 (U.S., June 12, 2008), and scheduling the case for briefing on the pending motion for summary judgment.

On September 22, 2006, Mr. Hamad filed a motion to lift stay and a motion for summary judgment, presenting this Court with affirmative evidence that he is not an enemy combatant.  Mr. Hamad sought to have this Court lift the stay on several subsequent occasions, the last one remaining under submission since the decision by the Circuit Court in *Boumediene v. Bush*, 476 F.2d 981 (D.C. Cir. 2007).  On April 19, 2007, Respondent sought to have Mr. Hamad's habeas corpus petition dismissed based on the Circuit's decision in *Boumediene*.  That motion also remains pending.

After the circuit court's decision in *Boumediene*, Mr. Hamad sought relief in the Circuit under the Detainee Treatment Act.  On August 23-24, 2007, the Court of Appeals granted his motion to expedite the DTA proceeding.  On December 13, 2007, without exonerating Mr. Hamad from the enemy combatant designation, the government released him under conditions that include not only the stigma of the enemy combatant designation but restrictions on his freedom in Sudan.

The government moved to dismiss Mr. Hamad's DTA case based on his repatriation in a motion filed on December 13, 2007, and provided this Court notice of the transfer in a pleading dated December 14, 2007.  Mr. Hamad opposed the motion to dismiss and explained to the circuit court why the continued collateral consequences he is suffering require resolution of the lawfulness of his detention under *Carafas v.*

**Page 2 MOTION TO LIFT STAY**

PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING

*LaVallee*, 391 U.S. 234 (1968).  The motion to dismiss the DTA petition has not been acted upon.

The law is clear that transfer or release of a prisoner does not render a habeas corpus case moot.  In *Carafas,* 391 U.S. at 237, the Supreme Court held that jurisdiction in a habeas case attached at the time of filing and was not defeated by the release of a petitioner where the petitioner continued to suffer collateral consequences.  The Court held that Carafas, who would suffer consequences as a result of his conviction, should be granted judicial review of the merits of his claim that his conviction was illegal.  *Id.* at 239.  Collateral consequences sufficient to allow a case to go forward include restrictions on liberty imposed by parole, including registration of address, periodic reporting to a parole officer, and restrictions on travel (*Jones v. Cunningham*, 371 U.S. 236, 241-43 (1963)); restrictions from serving as a labor union official, voting, and jury service (*Carafas*, 391 U.S. at 237); and commitment as a sex offender that included voting restrictions, jury service disqualification, special driver's license examinations, and limited access to a gun license (*White v. White*, 925 F.2d 287, 290 (9th Cir. 1991)).

In *Qassim v. Bush,* 466 F.3d 1073, 1076 (D.C. Cir. 2006), the Court noted that the collateral consequences doctrine could enable a released Guantánamo habeas petitioner to continue his litigation.  However, in *Qassim*, the Court found that there "is no such consequence."  *Id.* at 1077.  The Uigher prisoners, prior to release, had been specifically designated as "no longer enemy combatants."  *Qassim v. Bush,* 382 F. Supp. 2d 126, 127 (D.D.C. 2005).  In contrast, Mr. Hamad's designation as an "enemy

**PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING**

combatant" continues despite his claims of innocence before this Court and the District Court for twenty-one months

The discussion in *Qassim* of the collateral consequences doctrine outside of a challenge to a criminal conviction is consistent with the decision of the Court in *Justin v. Jacobs*, 449 F.2d 1017 (D.C. Cir. 1971). There, the court permitted a petitioner who had been committed to a mental health facility as a "sexual psychopath" to continue his challenge to that determination even after his release from the facility. Among other factors that were significant to the court was the fact that Justin's designation as a sexual psychopath connoted activity for which he could have been prosecuted and that he faced a "burden of a reputation for mental instability and dangerousness in a society in which personal responsibility is all important." 449 F.2d at 1020 n. 8. A similar result was reached in *In re Ballay*, 482 F.2d 648, 651-52 (D.C. Cir. 1973), a case involving the question of mootness on appeal after a civilly committed person was discharged from a mental hospital in which the Court observed that "a multitude of legal disabilities radiate[d] from the label 'mentally incompetent'" and that "such an adjudication, while not always crippling, is certainly always an ominous presence in any interaction between individual and the legal system."

The first key to Mr. Hamad's right to proceed to exoneration is the fact that Respondent did not relieve him of the finding that he is an enemy combatant. His release from Guantánamo was only a transfer from the custody of the United States government to the custody of the government of Sudan, leaving intact the "enemy

**Page 4 MOTION TO LIFT STAY**

PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING

combatant" designation, a designation that exposes him to the stigma of being a terrorist – "the worst of the worst" – which jeopardizes his freedom, his employability, his ability to travel, and potentially his life.[1]

The "enemy combatant" label, on its face, establishes collateral consequences sufficient to establish that this case is not moot. *See Carafas*, 391 U.S. at 239-40; *Sibron v. New York*, 392 U.S. 40, 55 (1968) (actual collateral consequences need not be proven where the mere possibility that such consequences may exist is sufficient to preserve a live controversy). The ignominy deriving from the "enemy combatant" label is similar to the ignominy discussed in *Fiswick v. United States*, 329 U.S. 211, 222 (1946), which permitted an appeal of a conviction for conspiracy to defraud the United States for concealing membership in the Nazi party, in part, because the conviction stood as "ominous proof" that Fiswick had committed the acts with which he had been

---

[1]The government's public statements have assured maximum stigmatization of Guantánamo detainees. *See, e.g.*, Department of Defense News Briefing – Gen. Richard B. Myers, Chairman, Joint Chiefs of Staff (Jan. 11, 2002), *available at* http://www.defenselink.mil/transcripts/2002/t01282002_t0128asd.html (prisoners are "the worst of the worst"); *Rumsfeld: Captives Will Not be POWs*, USA TODAY, Jan. 28, 2002, at A1 (quoting Secretary Rumsfeld: "[The prisoners are] among the most dangerous, best-trained vicious killers on the face of the Earth."); Department of Defense News Briefing – Secretary Rumsfeld and Gen. Myers (Jan. 28, 2002) ("These are people that would gnaw through hydraulic lines in the back of a C-17 to bring it down, so these are very, very dangerous people, and that's how they're being treated.") *available at* http://www.defenselink.mil/transcripts/2002/t01112002_ t0111sd.html; Department of Defense News Briefing – ASD PA Clarke and Rear Adm. Stufflebeem (Jan. 28, 2002) *available at* http://www.defenselink.mil/transcripts/ 2002/t01282002_t0128asd.html (Rear Admiral John D. Stufflebeem: "These are the worst of the worst, and if let out on the street, they will go back to the proclivity of trying to kill Americans and others. So that is well established.").

**Page 5 MOTION TO LIFT STAY**

**PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING**

charged.  Respondent's transfer of Mr. Hamad simply does not address or resolve the fact that he is "suffering, and will continue to suffer, serious disabilities because of the law's complexities and not because of his fault, if his claim that he has been illegally [detained and wrongfully designated as an enemy combatant] is meritorious."  *Carafas*, 391 U.S. at 239.  Mr. Hamad suffers the stigma of a label that creates substantial future risks to his employment, international travel, and – potentially – personal safety and freedom.

     Mr. Hamad suffers far more than the harmful effects of the "enemy combatant" designation.  His transfer was effectuated through an agreement between the United States and Sudanese governments.  While the full contours of that agreement are not currently available to Mr. Hamad, it includes such things as the Sudanese agreement to conduct its own investigation, to limit Mr. Hamad's travel, to make him accessible to United States' agents, and to provide assurances that they would limit Mr. Hamad's activities.

     While Respondent will not discuss with counsel the conditions it required from Sudan prior to Mr. Hamad's repatriation, the substance of the agreement has been disclosed to counsel for Mr. Hamad by the Sudanese government.  Submitted herewith as Exhibits 1 and 2, are declarations of Federal Defender investigator and attorney William J. Teesdale setting forth the information he personally obtained from the Sudanese Ambassador to the United States and from Hassan Mogummer, the Director of Civic Aid International Organization in Khartoum, Sudan.  As reflected in the exhibits,

PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING

the United States required the Sudanese to agree:

1. to retain Mr. Hamad's travel documentation;

2. to supervise Mr. Hamad at all times;

3. to prohibit Mr. Hamad from joining any organization or institution that had any possible animosity toward the United States or its allies;

4. to prevent Mr. Hamad from traveling outside of Sudan; and

5. to permit the United States government to reserve the right to rearrest Mr. Hamad if he joined any organization with animosity toward the United States or its allies and to continue its investigation of Mr. Hamad at any time.

These restrictions are, as reflected in the account of the negotiations between the United States and Sudan, set forth in Exhibit 4, the direct result of action by the United States government. Thus, as a result of the direct actions of the United States government in the repatriation process, Mr. Hamad is subject to conditions that are far more onerous than those that have been found sufficient to satisfy the collateral consequences doctrine in other cases. In the context of the Guantánamo habeas corpus cases, Mr. Hamad suffers from collateral consequences sufficient to require that his claims be adjudicated on their merits in order to exonerate him based on his claims of unlawful imprisonment and factual innocence.

**PREVIOUSLY FILED WITH CSO
AND CLEARED FOR PUBLIC FILING**

The petitioner respectfully requests that the Court immediately enter an order

lifting the stay and setting a status conference within a reasonable time.

Respectfully submitted this 30th day of June, 2008.

      /s/ Steven T. Wax and Stephen R. Sady
Steven T. Wax/Stephen R. Sady
Attorneys for Petitioner

# EXHIBIT 1

No. 07-1098

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

### ADEL HASSAN HAMAD,

Prisoner, Guantánamo Bay Naval Station, Guantánamo Bay, Cuba,

Petitioner,

v.

### ROBERT M. GATES,

Secretary of Defense of the United States of America,

Respondent.

## DECLARATION OF WILLIAM J. TEESDALE

Steven T. Wax
Federal Public Defender
Stephen R. Sady
Chief Deputy Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon 97204
Telephone: (503) 326-2123
Facsimile: (503) 326-5524

Attorneys for Petitioner

I, William J. Teesdale, declare:

1.    I am an investigator and attorney employed by the Federal Public Defender for the District of Oregon.  I am a member of the bars of Oregon and England.  Since October 2005, I have conducted a wide range of investigative and legal work on behalf of Mr. Hamad and several of our other Guantánamo detainee clients.  In Mr. Hamad's case, this has included collecting 15 sworn statements from witnesses in Afghanistan, Pakistan, and Sudan.

2.    On August 9, 2007, by prior arrangement, I met with Deputy Ambassador Elguneid at the Sudanese Embassy in Washington, DC.  Mr. Elguneid was aware of our office's representation of Adel Hamad.  I provided the Deputy Ambassador with a brief overview of the status of the various legal proceedings involving Mr. Hamad.

3.    The Deputy Ambassador informed me that he has spoken with the State Minister for Foreign Affairs in Khartoum about our visit to Sudan in April, 2007.  The Deputy Ambassador indicated that the Embassy had received a letter regarding our visit from the State Minister and provided me a copy of the letter addressed to Steven Wax.

4.    Deputy Ambassador Elguneid provided me with a briefing on the status of negotiations regarding two Sudanese detainees who have been cleared for

1

release, Adel Hamad (detainee 940) and Salim Mohammed Adam bin Amir (detainee 710). Deputy Ambassador Elguneid indicated that a meeting was held at the Sudanese Embassy in Washington, D.C. at the request of the State Department on February 21, 2006. Officials of the Sudanese Embassy, including Deputy Ambassador Elguneid, met with Samuel Whitton, the Director of the Office of War Crimes within the State Department. Mr. Elguneid said that Ambassador Whitton informed them that Adel Hamad and Mr. bin Amir had been cleared by the Department of Defense and were to be returned to Sudan. Deputy Ambassador Elguneid showed me a document dated November 14, 2005, indicating that Mr. Hamad and Mr. bin Amir were "approved for transfer." Mr. Elguneid told me that the State Department requested assurances from the government of Sudan about the detainees' treatment back in Sudan. Mr. Elguneid showed me a page and a half document containing questions posed to the government of Sudan about what would happen to the two detainees upon their return. I requested a copy of this document and the response that Mr. Elguneid later showed me. The Deputy Ambassador said that he would need to check on that and at this point just allowed me to read it and not make any notes.

The document contained a number of requests, such as the following: 1) would the detainees be investigated upon their return to Sudan? 2) Would the

Sudanese government respect the detainees' human rights?  3) Would the government of Sudan allow the United States government access to the detainees if needed?  4) Would the government of Sudan take responsibility for the detainees and present them from being a further threat to the United States?  5) The document indicated that United States wanted to clarify that they were handing over control of the detainees to the government of Sudan and wished to make clear that the United States government was not requesting the continued detention of either detainee.

     5.    Deputy Ambassador Elguneid said that a second meeting took place at the State Department on June 9, 2006, when the Sudanese Embassy gave an official reply to the questions.  Deputy Ambassador Elguneid showed me the half-page official response to the State Department which confirmed that the government of Sudan had an independent Ministry of Justice that was capable of conducting an investigation into the detainees' situation.  The memo indicated that the government of Sudan would respect the human rights of the detainees and treat them fairly upon their return to Sudan.  The memo noted that three detainees had previously been returned to Sudan and they were all living freely in Sudan.  Deputy Ambassador Elguneid mentioned to me that U.S. officials have met with some of the released Sudanese detainees in Sudan since their release.

6.    Deputy Ambassador Elguneid said that the State Department was pleased to receive the assurances from the government of Sudan and said that the result was encouraging and they would review that with the Department of Justice and the Department of Defense.  The State Department also indicated that it was a good start to try and resolve the issue of all of the Sudanese Guantánamo detainees.  The State Department indicated that the next step would be to draw up a memorandum of understanding between the two countries.  Deputy Ambassador Elguneid said that the State Department indicated that this was an important issue and that they are trying to do the same with other countries.

7.    Deputy Ambassador Elguneid said that the dealings with Ambassador Samuel Whitton went quite smoothly but he has since left that department. Deputy Ambassador Elguneid mentioned that the negotiations with the new Ambassador at Large for War Crimes, Clint Williamson, were more difficult.  The Deputy Ambassador indicated that he has sent Ambassador Williamson over ten emails about a further meeting to make progress on the issue without success. Deputy Ambassador Elguneid said that he has gone out of his way to try and arrange a meeting and sent him a summary of what has been accomplished to date; each time they say that they will meet, but then no meeting takes place.  The Deputy Ambassador said that he is personally very frustrated at the lack of

progress on the issue. Deputy Ambassador Elguneid said he is particularly upset because he reads that other detainees from other countries, such as Saudi Arabia and Afghanistan, have been returned home. The Deputy Ambassador said that the Embassy has provided everything that the State Department has requested, and they have cleared the two Sudanese detainees for release nearly two years ago, and yet they will not release them.

8.    The Deputy Ambassador said that the June 9, 2006, was the last meeting that was held with the State Department and his last ten requests for a meeting since that time have met with no progress. The Deputy Ambassador said that the last time he heard from the State Department, there was a response that there would be news in a month or two, but that is now more than two months ago. The Deputy Ambassador said he does not know what the problem is, but believes that the State Department is stuck in the middle between other government departments. The Deputy Ambassador showed me a cable (or possibly email) dated June 7, 2007, to the State Department indicating that the Sudanese Embassy was still waiting for an appointment with Ambassador Clint Williamson.

9.    On September 12, 2007, I spoke with the Sudanese Ambassador, Dr. Ukek, about the status of negotiations for the return of Mr. Hamad to Sudan. Ambassador Ukek told me that there had been a visit between Sudanese State

Minister for Foreign Affairs Elsamani and Deputy Secretary of State John
Negroponte. The Ambassador indicated that those talks had been productive and
that a promise was made that Mr. Hamad and Mr. Adem would be returned to
Sudan soon. There had been some hope that both detainees would be able to
return together with the State Minister on his return flight, but that was not
possible. The Ambassador indicated that his staff have been calling the State
Department regularly in order to get an update, but there has been no more
information forthcoming about that, or about a visit to Guantánamo that the
Ambassador has been promised.

10.     On September 26, 2007, Steve Wax and I spoke to Ambassador Ukek
about the status of negotiations for the return of Adel Hamad to Sudan and his
planned visit to Guantánamo. Ambassador Ukek said that he has heard nothing
new from the State Department on either subject, even though he has been trying
hard to get answers to these questions. The Ambassador mentioned that it is very
difficult for him to plan his official calendar without knowing when he will be
able to visit Guantánamo. The Ambassador mentioned that the situation is
demoralizing.

11.     On October 29, 2007, I had a further conversation with Deputy
Ambassador Salah Elguneid, in order to ask whether there were any developments

6

in negotiations for repatriation of Mr. Hamad, or the visit to Guantanamo. Mr. Elguneid told me that there had been no progress made on either issue.

12.    I later received some confirmation that the negotiation process had become delayed when, on November 2, 2007, I spoke with the head of Civic Aid International Organization, Mr. Mogummer, who informed me that there had been a new request for more assurances made by the United States, that had been forwarded to the Sudanese Ministry of Foreign Affairs.

13.    On November 9, 2007, I spoke to Ambassador Ukek again. The Ambassador said that there had been a new request for more assurances made by the United States Government, so the return of Mr. Hamad was again delayed. The Ambassador said that the United States Government had promised that Mr. Hamad and Mr. Adam would be returned to Sudan after the State Minister's visit but still nothing has happened.

Dated this _9_ day of November, 2007.

_____
William Teesdale
Federal Public Defender Attorney and
Investigator

7

# EXHIBIT  2

No. 07-1098

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

ADEL HASSAN HAMAD,

Prisoner, Guantánamo Bay Naval Station, Guantánamo Bay, Cuba,

Petitioner,

v.

ROBERT M. GATES,

Secretary of Defense of the United States of America,

Respondent.

_____

DECLARATION OF WILLIAM J. TEESDALE

_____

Steven T. Wax
Federal Public Defender
Stephen R. Sady
Chief Deputy Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon 97204
Telephone: (503) 326-2123
Facsimile: (503) 326-5524

Attorneys for Petitioner

I, William J. Teesdale, declare:

1.      I am an investigator and attorney employed by the Federal Public Defender for the District of Oregon.  I am a member of the bars of Oregon and England.  Since October 2005, I have conducted a wide range of investigative and legal work on behalf of Mr. Hamad and several of our other Guantánamo detainee clients.  On January 28, 2008, Federal Public Defender Steven T. Wax and I had a conversation with Hassan Mogummer, the Director of Civic Aid International Organization in Khartoum, Sudan.  Civic Aid International Organization is a privately funded non-governmental organization engaged in human rights activities.

2.      On our behalf, Mr. Mogummer had requested from the Sudanese Foreign Ministry a copy of the agreement between the United States government and the government of Sudan regarding the repatriation of Adel Hamad and Salim Adam, who were returned to Sudan on or around December 12, 2007.

3.      During our conversation of January 28, 2008, Mr. Mogummer informed Steve Wax and me that he had recently been shown a copy of the agreement by State Minister for Foreign Affairs Elsamani Elwasila Elsamani.  Mr. Mogummer was allowed to review the agreement at length.  Mr. Mogummer indicated that the major components of the agreement are as follows:

1

a.   The Sudanese government agreed to retain all of the detainees' travel documentation;

b.   The Sudanese government agreed with the United States to supervise Mr. Hamad and Mr. Adam at all times;

c.   The Sudanese government agreed that the detainees would not be allowed to join any organization or institution that had any possible animosity toward the United States or its allies;

d.   The United States government requested that the Sudanese not allow the detainees to travel outside of Sudan; and

e.   The United States government reserved the right to re-arrest the detainees if they joined any organization with animosity toward the United States or its allies. Similarly, the United States reserved the right to continue investigation of the detainees at any time.

Mr. Mogummer indicated that he read the agreement carefully and is confident that his recollection represents an accurate summary of the major components of the agreement.

Dated this _13th_ day of February, 2008.

_____
William Teesdale
Federal Public Defender Investigator and Attorney

2